UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY; ALLSTATE INDEMNITY COMPANY; and ALLSTATE PROPERTY & CASUALTY INSURANCE COMPANY, | |
| Plaintiffs, | Civil Action No. _____ |
| v. | |
| UNIVERSAL HEALTH GROUP, INC. d/b/a SAGINAW SPINE AND PAIN, MICHIGAN SPINE AND REHAB, ASSOCIATED MEDICAL, INC., ASSOCIATED CHIROPRACTIC & MEDICAL CENTER, and REHAB, INC.; PROFESSIONAL HEALTH SYSTEMS, LLC; HEALTH SYSTEMS, INC.; UNITED WELLNESS CENTERS, INC.; UNITED WELLNESS CENTER OF DETROIT, PLLC; UNITED WELLNESS CENTER OF FLINT, PLLC; UNITED WELLNESS CENTER OF LANSING, PLLC; CLEAR IMAGING LLC; HORIZON IMAGING LLC; ASSOCIATED SURGICAL CENTER, P.C.; AMERICAN SURGICAL CENTERS I, INC.; AMERICAN SURGICAL CENTERS II, LLC; WCIS MEDIA, LLC; UHG MANAGEMENT, LLC; UNITED WELLNESS CENTERS MANAGEMENT, LLC; GREATER MICHIGAN PROFESSIONAL SERVICES LLC d/b/a MI PRO CONSULTANTS; SCOTT P. ZACK, D.C.; DAVID M. KATZ, D.C.; CORY J. MANN; YISROEL SIGLER; EVAN P. SHAW; RON WALTZ; MAZIN K. YALDO, M.D.; SILVIO J. COZZETTO, D.C.; VINCENT L. CELENTANO; JOSEPH F. DESANTO; NICOLE F. MARTINEZ; ANTHONY F. SERENO; LOREN C. CHUDLER, D.O.; JEFF S. PIERCE, D.O.; CHINTAN DESAI, M.D.; and MICHAEL PALEY, M.D., | **Demand for Jury Trial** |
| Defendants. | |

<u>**COMPLAINT**</u>

Plaintiffs Allstate Insurance Company, Allstate Indemnity Company, and Allstate Property & Casualty Insurance Company (collectively, "Allstate" and/or "plaintiffs"), by their attorneys SMITH & BRINK, P.C., hereby allege as follows.

**I.**     <u>**INTRODUCTION**</u>

1.     This case is about medical facilities and individual providers, a lawyer referral entity, "marketing" entities, and the owners, agents, affiliates, and representatives of the same, who worked in concert with each other to devise and implement a scheme to solicit motor vehicle accident victims and defraud Allstate by submitting, or causing to be submitted, false and fraudulent medical records, bills, and invoices (collectively, "false medical documentation") through the U.S. Mail seeking reimbursement under the Michigan No-Fault Act, Mich. Comp. Laws § 500.3101, *et seq.*, for treatment and services that were medically unnecessary, not lawfully rendered, and the charges for which were not reasonable.

2.     Universal Health Group, Inc., including its assumed names Saginaw Spine and Pain, Michigan Spine and Rehab, Associated Medical, Inc., Associated Chiropractic & Medical Center, and Rehab, Inc. (collectively, "UHG"), which is owned by Scott P. Zack, D.C. ("Zack") and David M. Katz, D.C. ("Katz"); UHG Management, LLC ("UHG Management"), for which Zack is the managing member; Professional Health Systems, LLC ("PHS"), for which Zack and Katz serve as CEO and COO, respectively; Cory J. Mann ("Mann"), Yisroel Sigler ("Sigler"), Evan P. Shaw ("Shaw"), and Ron Waltz ("Waltz"), also members of PHS's executive management team; Health Systems, Inc. ("Health Systems"); United Wellness Centers, Inc. ("UWC"), which was incorporated by Katz and for which Silvio J. Cozzetto, D.C. ("Cozzetto") serves as President; United Wellness Centers Management, LLC ("UWC Management"), United

Wellness Center of Flint, PLLC ("UWC-Flint"), United Wellness Center of Detroit, PLLC ("UWC-Detroit"), and United Wellness Center of Lansing, PLLC ("UWC-Lansing"), in all of which Cozzetto holds an ownership interest; WCIS Media LLC ("WCIS") and its owner Vincent L. Celentano ("Celentano"); Greater Michigan Professional Services, LLC d/b/a MI Pro Consultants ("MI Pro Consultants"), which is owned by Celentano and for which Anthony F. Sereno ("Sereno") serves as the resident agent in Michigan; Horizon Imaging LLC ("Horizon Imaging"); Clear Imaging LLC ("Clear Imaging"); Associated Surgical Center, P.C. ("Associated Surgical"), which at all relevant times was owned in whole or in part by Mazin K. Yaldo, M.D. ("Yaldo");  American Surgical Centers I, Inc. d/b/a American Surgical Centers and American Surgical Centers II, LLC (collectively, "American Surgical"), which is owned in part by Jeff S. Pierce, D.O. ("Pierce"), who is also closely associated with UHG; Loren C. Chudler, D.O. ("Chudler"), a doctor of osteopathic medicine associated with UHG and serving as its Treasurer and medical director; Chintan Desai, M.D. ("Desai"), a radiologist for Horizon Imaging and Clear Imaging; Michael Paley, M.D. ("Paley"), also a radiologist for Horizon Imaging; Joseph F. DeSanto ("DeSanto"), a manager of UHG/PHS and an associate of Celentano, WCIS, and MI Pro Consultants; Nicole F. Martinez ("Martinez"), also an associate of Celentano, DeSanto, WCIS, and MI Pro Consultants; and Sereno, another associate of Celentano, DeSanto, WCIS, and MI Pro Consultants, conspired to, and did in fact, defraud Allstate by perpetrating an insurance billing fraud scheme in violation of state and federal law.

3.      The purpose of the fraudulent scheme perpetrated by the defendants was to generate claims to, and collect payment from, Allstate pursuant to Michigan's No-Fault Act for the purported treatment of patients who had been involved in motor vehicle accidents.

4.      To achieve their fraudulent objective, the defendants engaged in a comprehensive scheme spanning multiple states involving an attorney-referral service and various other "marketing" services, personal injury attorneys, and medical providers, all of whom conspired to refer Allstate insureds for medical treatment that was predetermined, excessive, and not medically necessary for the patients' care, recovery, or rehabilitation.

5.      This fraudulent scheme was fueled by patient referrals from WCIS, a Florida-based referral service that has both a phone- and web-based presence (whocanIsue.com); MI Pro Consultants, a "marketing" company; runners; and personal injury attorneys, to defendants UHG, Health Systems, UWC, UWC-Detroit, UWC-Flint, UWC-Lansing, Horizon Imaging, Clear Imaging, Associated Surgical, and American Surgical (collectively, the "medical facility defendants").

6.      The revenue generated by these patient referrals and the money supplied by Celentano and DeSanto, who were lured from Florida by the appeal of Michigan's unlimited No-Fault benefits, allowed UHG to acquire several medical and chiropractic practices under the UHG (and later PHS) umbrella, including many of the entities that are now assumed names of UHG.

7.      UHG and PHS also acquired ownership and/or management interests in the other medical facility defendants named herein.

8.      The network established by UHG/PHS allowed the defendants to keep all patients within network no matter the type of treatment allegedly received.

9.      Thus, the defendants were able to dictate all treatment that was rendered, including excessive treatment provided pursuant to a predetermined protocol established by the managers of UHG/PHS, and keep all billing and profits within the UHG/PHS network.

10.      The singular purpose of the defendants' scheme and network was to exploit Michigan's unlimited No-Fault benefits by generating as many bills as possible by doing as much treatment as possible.

11.      To this end, the medical facility defendants, Chudler, Pierce, Desai, and Paley (collectively, the "defendant medical providers"), together with other individual providers in the UHG/PHS network, performed medically unnecessary procedures and treatment on patients/Allstate insureds to submit inflated bills to Allstate seeking payment that they were not entitled to under the Michigan No-Fault Act because the services were not reasonably necessary for the injured person's care, recovery, or rehabilitation; were not lawfully rendered; and because the charges for such treatment were not reasonable.

12.      The defendants' scheme was comprehensive.

13.      First, the defendants used unlawful and improper means to solicit and obtain patients, including the WCIS/whocanIsue.com referral entity controlled by Celentano, DeSanto, and Martinez; symbiotic relationships with several Michigan personal injury attorneys; and the use of runners, police reports, and tow truck drivers.

14.      Second, the defendants set each patient on a course of excessive treatment that almost always involved several branches of the UHG/PHS network, including physical medicine and rehabilitation, chiropractic treatment, magnetic resonance imaging (MRI), electrodiagnostic testing, and injections.  This treatment was predetermined and often unnecessary.  The defendants relied on bogus diagnoses made by the healthcare professionals under their control to justify this treatment.

15.      Third, the defendants allowed attorneys to dictate the content of certain medical records (including drafting report narratives) and to mandate that certain diagnoses be made.

The defendants also wrote prescriptions for attendant care without justification or basis. All of the above – excessive treatment, adulterated medical records, bogus diagnoses, and orders for attendant care – were used by the defendants and by the personal injury attorneys with whom they closely worked to justify and inflate the value of the claims submitted to Allstate and the amount of damages sought from Allstate as part of litigation and settlement proceedings.

16.     The full extent of the defendants' misrepresentations only became known to Allstate after it commenced its investigation of the defendants shortly before filing the within Complaint.

17.     Indeed, it was at this time that the scope of the network established by the defendants and the interrelatedness of the various defendant medical providers became clear.

18.     Upon learning of the connections between seemingly independent medical providers, Allstate re-reviewed the defendants' submissions to it (including medical records and bills).

19.     Allstate's review revealed the strikingly similar course of treatment rendered to each patient of the ostensibly independent defendant medical providers, supporting that a predetermined treatment protocol (not tailored to the medical needs of each patient) was employed by the defendants.

20.     Moreover, the defendants' (mis)use of one spoke of the UHG/PHS hub to justify treatment at a different spoke became clear and vitiated any claim of treatment necessity by the defendants, who have an obvious financial incentive to refer for as much treatment as possible within their network.

21.     Allstate's review of the defendants' medical records and bills with the benefit of knowledge regarding the true nature of the defendant medical providers and their

interconnections, coupled with the information uncovered during Allstate's investigation that the defendants allowed non-healthcare professionals to draft medical chart narratives, to order prescriptions for attendant care benefits, and to demand certain diagnoses, evidence that the defendants submitted records and bills to Allstate that contained significant misrepresentations.

22.     Allstate reasonably relied on these documents to its detriment.

23.     Since 2007, the medical facility defendants (by and through their owners, managers, and individual healthcare providers) have billed Allstate in excess of $11,929,988 and Allstate has paid in excess of $3,697,049 to the medical facility defendants.

24.     Each of the defendants conspired with one another to accomplish and to further the objectives of their fraudulent scheme detailed herein.

25.     All of the acts and omissions of the defendants, described throughout this Complaint, were undertaken intentionally.

26.     The insurance fraud scheme perpetrated by the defendants was designed to, and did in fact, result in the payment of No-Fault benefits from Allstate to, or on behalf of, the defendants.

27.     In each claim at issue in this Complaint for which Allstate is seeking damages, an Allstate automobile insurance contract issued in the State of Michigan was the basis upon which the defendants perpetrated their fraudulent scheme.

28.     By this Complaint, and as detailed in each count set forth below, Allstate brings this action for: (1) violations of the federal Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1962(c) and (d); (2) common law fraud; (3) civil conspiracy; (4) payment under mistake of fact; and (5) unjust enrichment.

29.     Allstate's claim for compensatory damages includes: (1) payments made by Allstate to the medical facility defendants in reliance upon the defendants' false representations that they were eligible to receive reimbursement under the Michigan No-Fault Act, (2) payments made by Allstate to the medical facility defendants in reliance upon the false medical documentation submitted or caused to be submitted by the defendants, (3) treble damages, (4) statutory interest, (5) costs, including but not limited to, the costs of claims handling and the cost of investigation to uncover the fraudulent scheme perpetrated by the defendants, and (6) attorney's fees.

30.     Allstate also seeks a declaration pursuant to 28 U.S.C. § 2201 that the medical facility defendants, their owners, and individual medical providers Zack, Katz, Yaldo, Cozzetto, Chudler, Pierce, Desai, and Paley, have no right to receive payment for any denied, pending, and future bills submitted to Allstate whereas (1) these defendant medical providers billed Allstate for medical services and treatment that were not medically necessary; (2) the medical facility defendants did not bill Allstate reasonable charges for the medical services purportedly rendered to patients; and (3) the defendant medical providers engaged in a pervasive pattern and practice of submitting false medical documentation through the U.S. Mail demanding payment from Allstate.

## II.     THE PARTIES

### A.     PLAINTIFFS

31.     Allstate Insurance Company, Allstate Indemnity Company, and Allstate Property & Casualty Insurance Company are corporations duly organized and existing under the laws of the State of Illinois.

32.     Allstate Insurance Company, Allstate Indemnity Company, and Allstate Property & Casualty Insurance Company have their principal places of business in Northbrook, Illinois.

33.     At all times relevant to the allegations contained in this Complaint, the plaintiffs were authorized to conduct business in the State of Michigan.

**B.     DEFENDANTS**

**1.     Universal Health Group, Inc.**

34.     Universal Health Group, Inc., including its assumed names Saginaw Spine and Pain, Michigan Spine and Rehab, Associated Medical, Inc., Associated Chiropractic & Medical Center, and Rehab, Inc., is a Michigan corporation formed on or about May 11, 2007.

35.     UHG and its various assumed names operated out of headquarters located at the address 2000 Town Center, Southfield, MI 48075.

36.     At all relevant times, UHG's shareholders included Zack and Katz.

37.     Nearly all of the patients at issue in this Complaint were treated at UHG, including those patients identified in Exhibit 1.

**2.     Professional Health Systems, LLC**

38.     Professional Health Systems, LLC is a Michigan limited liability company formed on or about February 1, 2012.

39.     Zack is the resident agent of PHS, which is also located at the same 2000 Town Center, Southfield, MI 48075 address as UHG.

40.     PHS has an assumed name of Professional Medical Billing, LLC.

41.     PHS managed several healthcare facilities throughout Michigan, including every medical facility defendant named herein (except UWC-Detroit, though PHS managed the other United Wellness Center facilities).

9

42.     A significant number of PHS facilities fall under the auspices of UHG, including, but not limited to, UHG, Michigan Spine and Rehab, Associated Chiropractic Clinics & Medical Centers, and Saginaw Spine and Pain.

43.     The United Wellness Centers facilities are also associated with PHS, including locations in Lansing, Harper Woods, and Flint.

44.     PHS also partners with MRI facilities Clear Imaging and Horizon Imaging and the two defendant surgical centers Associated Surgical and American Surgical.

45.     The "executive management team" of PHS is comprised of Zack, Katz, Mann, Sigler, Shaw, and Waltz.

46.     Celentano and DeSanto were also heavily involved in the operation and management of PHS and its various medical facilities.

47.     As discussed in detail *infra*, PHS represents the management "nucleus" of the UHG conglomerate and allowed for the consolidation of power and the direction of medical treatment to be determined by persons who were motivated solely by profit and not patient care and rehabilitation.

### 3.     Health Systems, Inc.

48.     Health Systems, Inc. is a Michigan nonprofit corporation with an initial filing date of December 19, 2012.

49.     Katz is the resident agent of Health Systems, Inc.

50.     Several Allstate insureds at issue in this Complaint treated at Health Systems, including those insureds identified in Exhibit 2 annexed hereto.

### 4.   United Wellness Centers, Inc.

51.     United Wellness Centers, Inc. is a Michigan corporation incorporated by Katz on or about August 3, 2011.

52.     Katz was the resident agent of UWC until April 25, 2013 when he was replaced by Cozzetto, the President of UWC.

53.     UWC is associated with the address 2000 Town Center, Southfield, MI 48075, as is UHG and most of the other defendants named herein.

54.     Several Allstate insureds at issue in this Complaint treated at UWC, including those insureds identified in Exhibit 3 annexed hereto.

### 5.   United Wellness Center of Detroit, PLLC

55.     United Wellness Center of Detroit, PLLC is a Michigan professional limited liability company incorporated on or about March 22, 2011.

56.     Cozzetto is the owner of UWC-Detroit.

57.     Several Allstate insureds at issue in this Complaint treated at UWC-Detroit, including those insureds identified in Exhibit 4 annexed hereto.

### 6.   United Wellness Center of Flint, PLLC

58.     United Wellness Center of Flint, PLLC is a Michigan professional limited liability company incorporated on or about March 22, 2011.

59.     Cozzetto is an owner of UWC-Flint.

60.     UWC-Flint is managed by PHS.

61.     Several Allstate insureds at issue in this Complaint treated at UWC-Flint, including those insureds identified in Exhibit 5 annexed hereto.

### 7.       United Wellness Center of Lansing, PLLC

62.    United Wellness Center of Lansing, PLLC is a Michigan professional limited liability company incorporated on or about April 28, 2011.

63.    Cozzetto is the owner of UWC-Lansing.

64.    UWC-Lansing is managed by PHS.

65.    Several Allstate insureds at issue in this Complaint treated at UWC-Lansing, including those insureds identified in Exhibit 6 annexed hereto.

### 8.       Clear Imaging LLC

66.    Clear Imaging LLC is a Michigan limited liability company formed on or about September 2, 2009 with a principal place of business in Royal Oak, Michigan.

67.    Clear Imaging is part of the UHG/PHS conglomerate and is a frequent beneficiary of referrals from UHG and the other defendant medical providers.

68.    Several Allstate insureds at issue in this Complaint treated at Clear Imaging, including those insureds identified in Exhibit 7 annexed hereto.

### 9.       Horizon Imaging LLC

69.    Horizon Imaging LLC is a Michigan limited liability company formed on or about July 8, 2009 with a principal place of business in Berkley, Michigan.

70.    Horizon Imaging is part of the UHG conglomerate and is a frequent beneficiary of referrals from UHG and the other defendant medical providers.

71.    Several Allstate insureds at issue in this Complaint treated at Horizon Imaging, including those insureds identified in Exhibit 8 annexed hereto.

10.     **Associated Surgical Center, P.C.**

72.     Associated Surgical Center, P.C. is a Michigan professional corporation formed on or about February 19, 2003 with a principal place of business in Dearborn, Michigan.

73.     Yaldo has an ownership interest in Associated Surgical.

74.     Associated Surgical is associated with the address 2000 Town Center, Southfield, MI 48075, an address also linked to UHG and PHS.

75.     Several of the pain management procedures performed on the patients involved in this Complaint took place at Associated Surgical.

76.     Several Allstate insureds at issue in this Complaint treated at Associated Surgical, including those insureds identified in Exhibit 9 annexed hereto.

11.     **American Surgical Centers I, Inc. and American Surgical Centers II, LLC**

77.     American Surgical Centers I, Inc. is a Michigan corporation formed on or about February 8, 1993.

78.     American Surgical Centers II, LLC is a Michigan limited liability company formed on or about March 17, 1999.

79.     Both American Surgical Centers I, Inc. and American Surgical Centers II, LLC (collectively, "American Surgical") have operated under the assumed name "American Surgical Centers."

80.     American Surgical Centers I, Inc. provides the administrative and billing services for the surgical procedures that are performed at and by American Surgical Centers II, LLC.

81.     Pierce is an owner and director of American Surgical.

82.     Sigler was a director of American Surgical.

13

83.     Several of the pain management and surgical procedures performed on the patients involved in this Complaint took place at American Surgical, including those Allstate insureds identified in Exhibit 10 annexed hereto.

### 12.     WCIS Media, LLC

84.     WCIS Media, LLC is a limited liability company organized under the laws of the State of Florida.

85.     WCIS is managed by Digital Footprint Media LLC, a Florida limited liability company that is owned by Celentano.

86.     The mailing and principal address for both WCIS and Digital Footprint Media LLC is 7000 W. Palmetto Park Road, Suite 201, Boca Raton, FL 33433, an address connected to Celentano and other defendants named in this Complaint.

87.     WCIS operates a call center and the website whocanIsue.com, which were used by the defendants named herein to obtain patients and direct them to the UHG/PHS network.

### 13.     UHG Management, LLC

88.     UHG Management, LLC is a Michigan corporation that is also authorized to do business in Florida.

89.     UHG Management operates out of the 2000 Town Center, Southfield, MI address and is managed by Zack.

90.     Celentano serves as the registered agent of UHG Management in Florida.

91.     UHG Management's Florida office is located in Boca Raton at the 7000 W. Palmetto Park Road, Suite 201 address associated with several of the Florida-based defendants, especially Celentano.

92.     UHG Management holds itself out as managing the internal medicine, chiropractic, physical therapy, massage therapy, pain management, and radiology arms of the UHG conglomerate.

### 14.     United Wellness Centers Management, LLC

93.     United Wellness Centers Management, LLC is a Michigan limited liability company incorporated on or about June 3, 2011.

94.     Cozzetto is the owner of UWC Management.

### 15.     Greater Michigan Professional Services LLC

95.     Greater Michigan Professional Services LLC d/b/a MI Pro Consultants is a Michigan limited liability company established on April 28, 2010.

96.     Celentano is the owner of MI Pro Consultants.

97.     MI Pro Consultants purports to provide "marketing services."

98.     Sereno and Martinez formerly served as resident agents for MI Pro Consultants.

99.     MI Pro Consultants referred several motor vehicle accident victims to UHG and the other medical facility defendants.

### 16.     Scott P. Zack, D.C.

100.    Scott P. Zack, D.C. is a resident and citizen of the State of Michigan.

101.    Zack is a doctor of chiropractic licensed in Michigan.

102.    Zack is a shareholder of UHG.

103.    Zack is the resident agent for UHG.

104.    Zack is a founder and the CEO of PHS.

105.    Zack previously served as the Vice President and a director of UHG.

106.    Zack is also affiliated with several other entities that comprise the UHG conglomerate, as discussed in detail *infra*.

### 17.    **David M. Katz, D.C.**

107.    David M. Katz, D.C. is a resident and citizen of the State of Michigan.

108.    Katz is a doctor of chiropractic licensed in Michigan.

109.    Katz is a shareholder of UHG.

110.    Katz is the COO of PHS.

111.    Katz is the owner of A Medical, Inc., a Michigan corporation that formerly operated under the assumed names of Associated Chiropractic & Medical Center and Rehab, Inc., both of which are now assumed names of UHG.

112.    Katz is also affiliated with several other entities that comprise the UHG conglomerate, as discussed in detail *infra*.

### 18.    **Cory J. Mann**

113.    Cory J. Mann is a resident and citizen of the State of Michigan.

114.    Mann serves as an executive manager of UHG and PHS, including COO of MRI Administration.

115.    Upon information and belief, Mann has an ownership interest in Clear Imaging and Horizon Imaging, including through the entity Mann Global, LLC in which Mann is a member.

### 19.    **Yisroel Sigler**

116.    Yisroel Sigler is a resident and citizen of the State of Michigan.

117.    At relevant times, Sigler was a shareholder in UHG.

16

118.     Sigler serves as an executive manager of UHG and PHS, including Vice President of Strategic Planning and Development and COO of the Surgery Center Division.

119.     Sigler was previously employed by UHG Management.

120.     Sigler was also a director of American Surgical.

### 20.     Evan P. Shaw

121.     Evan P. Shaw is a resident and citizen of the State of Michigan.

122.     Shaw is an attorney licensed in the State of Michigan.

123.     He is associated with the law firm Shaw & Associates, located at the same 2000 Town Center, Southfield, MI address affiliated with most of the defendants named herein.

124.     Shaw serves as General Counsel for PHS.

### 21.     Ron Waltz

125.     Ron Waltz is a citizen and resident of the State of Michigan.

126.     Waltz is the CFO of PHS.

127.     Waltz is the CFO of UHG Management.

### 22.     Mazin K. Yaldo, M.D.

128.     Mazin K. Yaldo, M.D. is a resident and citizen of the State of Michigan.

129.     Yaldo is a medical doctor licensed in Michigan.

130.     Yaldo has an ownership interest in Associated Surgical.

131.     Yaldo affiliated himself and Associated Surgical with, and participated in the management of, the UHG/PHS conglomerate.

### 23.     Silvio J. Cozzetto, D.C.

132.     Silvio J. Cozzetto, D.C. is a resident and citizen of the State of Michigan.

133.     Cozzetto is a doctor of chiropractic licensed in Michigan.

134.    Cozzetto retains an ownership and/or management interest in all of the UWC entities (UWC, UWC-Lansing, UWC-Detroit, UWC-Flint, and UWC Management) and played an active role in the defendants' scheme to defraud by exerting control over the UWC entities and its chiropractors, which operated as part of the UHG/PHS network.

### 24.    **Vincent L. Celentano**

135.    Vincent L. Celentano is a resident and citizen of the State of Florida.

136.    Celentano is the CEO of WCIS and the registered agent for UHG Management in Florida.

137.    Celentano also owns MI Pro Consultants.

138.    Celentano participated in the operation and management of the UHG/PHS conglomerate, including the solicitation of patients via WCIS and MI Pro Consultants.

### 25.    **Joseph F. DeSanto**

139.    Joseph F. DeSanto is a resident and citizen of the State of Florida.

140.    DeSanto is a close associate of Celentano.

141.    Upon information and belief, DeSanto introduced Celentano to the founder of WCIS and was instrumental in the takeover of WCIS by himself and Celentano.

142.    DeSanto was heavily involved in the management of UHG and PHS, including working directly with its individual healthcare providers and other employees.

143.    Upon information and belief, Sereno and DeSanto worked together to generate leads for attorneys who in turn referred patients to UHG and affiliated facilities.

144.    Zack and Katz actively participated in DeSanto's business of soliciting and referring patients to attorneys and UHG and affiliated medical providers.

26.    **Nicole F. Martinez**

145.    Nicole F. Martinez is a resident and citizen of the State of Florida.

146.    Martinez is associated with WCIS and assisted in obtaining patients for the medical facility defendants.

147.    Martinez replaced Sereno as the resident agent of MI Pro Consultants on or about November 23, 2010.

148.    Martinez is the COO of Digital Footprint Media LLC, which owns WCIS.

27.    **Anthony F. Sereno**

149.    Anthony F. Sereno is a resident and citizen of the State of Michigan.

150.    Sereno holds himself out as providing "marketing" services for UHG and UWC, but in fact he is a runner who confronts persons injured in motor vehicle accidents and solicits them to treat at facilities within the UHG/PHS network.

151.    Sereno is the operating manager of Sereno Marketing and Management LLC, a New Jersey limited liability company that is authorized to do business in Michigan.

28.    **Loren C. Chudler, D.O.**

152.    Loren C. Chudler, D.O. is a resident and citizen of the State of Michigan.

153.    Chudler is an osteopathic physician licensed in Michigan.

154.    At all relevant times, Chudler was associated with UHG and several of the other medical facility defendants.

155.    Chudler is the Treasurer and a director of UHG and serves as its medical director.

156.    Chudler is also affiliated with UWC.

157.    Chudler referred patients from UHG and UWC to other UHG-affiliated facilities, including the other medical facility defendants named herein.

19

158.    Chudler purportedly provided medical treatment at UHG and UWC for which these facilities sought payment from Allstate.

159.    As discussed more fully below, including the discussion of a number of exemplar patients who were treated by Chudler, Chudler rendered medical treatment that was unnecessary and not performed in accordance with established medical standards and guidelines.

### 29.    Jeff S. Pierce, D.O.

160.    Jeff S. Pierce, D.O. is a resident and citizen of the State of Michigan.

161.    Pierce is an osteopathic physician licensed in Michigan.

162.    Pierce is an owner and director of American Surgical.

163.    Pierce is also associated with several of the other medical facility defendants.

164.    Pierce performed electrodiagnostic testing through Michigan Spine and Rehab (a UHG entity) and administered injections and performed other procedures at American Surgical to UHG and UWC patients that were medically unnecessary and not performed in accordance with established medical standards and guidelines, as detailed *infra*.

### 30.    Chintan Desai, M.D.

165.    Chintan Desai, M.D. is a resident and citizen of the State of Florida.

166.     Desai is a medical doctor licensed in Michigan.

167.    Desai read MRIs for Horizon Imaging and Clear Imaging on an independent contractor basis, including interpreting (and overreading) the MRIs of several of the patients at issue in this Complaint.

### 31.    Michael Paley, M.D.

168.    Michael Paley, M.D. is a resident and citizen of the State of Ohio.

169.    Paley is a medical doctor licensed in Michigan.

170.     Paley read MRIs for Horizon Imaging on an independent contractor basis, including interpreting (and overreading) the MRIs of several of the patients at issue in this Complaint.

## III.   JURISDICTION AND VENUE

171.     Jurisdiction over this action is conferred upon this Court by 28 U.S.C. §§ 1331 and 1332.

172.     Supplemental jurisdiction over the plaintiffs' state law claims is proper pursuant to 28 U.S.C. § 1367.

173.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) whereas the vast majority of wrongful acts known to Allstate and alleged herein with particularity were carried out within the Eastern District of Michigan.

## IV.   MICHIGAN'S NO-FAULT ACT

174.     Allstate underwrites automobile insurance in Michigan.

175.     Michigan's No-Fault Act provides for the payment of unlimited medical and rehabilitative benefits on a first-party payor basis for injured victims of motor vehicle accidents. Mich. Comp. Laws § 500.3107(1)(a).

176.     Personal protection insurance benefits are payable for "[a]llowable expenses consisting of all reasonable charges incurred for reasonably necessary products, services, and accommodations for an injured person's care, recovery, or rehabilitation" arising out of a motor vehicle accident.  Mich. Comp. Laws § 500.3107(1)(a).

177.     "Under [the No-Fault] statutory scheme, an insurer is not liable for any medical expense to the extent it is not a reasonable charge for the particular product or service, or if the

product or service itself is not reasonably necessary."  <u>Nasser v. Auto Club Ins. Ass'n</u>, 435 Mich. 33, 49 (1990).

178.    A claimant who seeks to hold an insurer liable for No-Fault benefits has the burden of proving that the service claimed is reasonably necessary and that the charge for the service is reasonable.  <u>Id</u>.

179.    Claims for personal injury benefits under the No-Fault Act are available only if the benefits are for "accidental bodily injury" and only if those injuries "arise[e] out of" or are caused by "the ownership, operation, maintenance or use of a motor vehicle . . . ."  Mich. Comp. Laws § 500.3105(1).

180.    Subject to limited exceptions, an insurer must pay each claim for personal protection insurance benefits arising out of a motor vehicle accident within thirty (30) days after receiving "reasonable proof of the fact and of the amount of the loss sustained."  Mich. Comp. Laws § 500.3142(2).

181.    The Michigan No-Fault Act provides that "[a] physician, hospital, clinic or other person or institution" may only charge a "reasonable amount" for personal injury protection (PIP) benefits for treatment/services which have been "lawfully render[ed]" to an injured person who has sustained bodily injury in an automobile accident.  Mich. Comp. Laws § 500.3157.

182.    "If the treatment was not lawfully rendered, it is not a no-fault benefit and payment for it is not reimbursable."  <u>Cherry v. State Farm Mutual Auto. Ins. Co.</u>, 195 Mich. App. 316, 310 (1992).

183.    The Michigan No-Fault Act provides that an insurer "may be allowed by a court an award of reasonable sum against a claimant as an attorney's fee for the insurer's attorney in

defense against a claim that was in some respect fraudulent or so excessive as to have no reasonable foundation." Mich. Comp. Laws § 500.3148(2).

184.    As alleged in this Complaint, the defendants violated Michigan's No-Fault Act by submitting, causing to be submitted, or knowing that bills would be submitted to Allstate seeking reimbursement for services and treatment that were not reasonably necessary for the care, recovery, or rehabilitation of the patients of the defendant medical providers, that was not lawfully rendered, and did not contain reasonable charges.

## V.    STRUCTURE AND CONTROL OF THE UHG/PHS CONGLOMERATE

### A.    ACQUISITION AND CONSOLIDATION OF MULTIPLE PRACTICES UNDER THE UHG UMBRELLA

185.    Zack and Katz incorporated UHG in 2007.

186.    Since the time of its incorporation, UHG expanded and took over several practices.

187.    UHG also does business as Associated Medical, Inc., Rehab Inc., Associated Chiropractic & Medical Center, Saginaw Spine and Pain, and Michigan Spine and Rehab.

188.    UHG, the umbrella entity, amassed these facilities as part of a design to mask the amount of treatment for which UHG billed insurers, including Allstate, by having the medical records show a variety of seemingly independent facilities providing treatment.

189.    Zack is the resident agent of UHG.

190.    Zack's colleague, Katz, is the registered agent of A Medical, Inc., which previously operated under the assumed names of Associated Chiropractic & Medical Center and Rehab, Inc. before UHG assumed those names.

191.    Michigan Spine and Rehabilitation Centers, P.C., which dissolved in 2005, was a professional service corporation for which Katz served as the resident agent.

23

192.    UHG serves, almost exclusively, patients who were involved in auto accidents.

193.    Therefore, UHG relies upon a complex and wide-ranging referral system to locate motor vehicle accident victims.

194.    Upon incorporating UHG, Zack and Katz quickly teamed with Celentano, DeSanto, Martinez, and WCIS in Florida to ensure a steady flow of patients.

195.    In addition to his direct connections to UHG, Zack, and Katz, Celentano is also the managing member for WCIS, the owner of a call center and the website whocanIsue.com, both of which were used to solicit patients.

196.    Under Celentano's management and at his direction, WCIS connected motor vehicle accident victims with personal injury attorneys in Michigan.

197.    Zack and Katz used Celentano's services to solicit patients by way of WCIS with the understanding that the attorneys to whom WCIS referred motor vehicle accident victims would, in turn, refer their clients predominantly, if not exclusively, to medical entities within the UHG (and later PHS) network for excessive treatment.

198.    As WCIS is located in and based out of Florida, Celentano and DeSanto also created a corporation to coordinate referral activities in Michigan under the guise of a "marketing" company: MI Pro Consultants.

199.    Sereno also assisted with the solicitation of patients, which he characterized as "case management" and "marketing" services.

200.    In addition to supplying Zack, Katz, and UHG with a source of motor vehicle accident victims, Celentano and DeSanto also provided capital to enable UHG to acquire other practices and expand the circumference of its operational umbrella.

201.    With this influx of capital, Katz and Zack acquired ownership interests in other practices such as its assumed name facilities; Horizon Imaging; Clear Imaging; UWC, UWC-Flint, UWC-Detroit, and UWC-Lansing, in which Cozzetto continues to have an interest; Associated Surgical and American Surgical, in which Yaldo and Pierce, respectively, continue to have ownership interests; and Health Systems, Inc., thus firmly establishing the conglomerate whereby UHG received a financial benefit for every type of treatment received by its patients, including physical medicine and rehabilitation, chiropractic, MRIs, electrodiagnostic testing, injections, and other pain management procedures.

202.    UHG's evolution is evidenced by the incorporation of UHG Management and especially PHS.

203.    UHG Management is a Michigan corporation also authorized to do business in Florida.

204.    UHG Management describes itself as managing the internal medicine, chiropractic, physical therapy, massage therapy, pain management, and radiology arms of the UHG conglomerate.

205.    Celentano serves as the resident agent of UHG Management in Florida while Zack is the managing member in Michigan.

206.    PHS was formed in early 2012 in response to UHG's acquisition of several medical facilities for the purpose of overseeing a multitude of facilities under the ownership, control, and/or management of the newly-formed PHS.

207.    PHS formally acknowledged the existence and extent of the UHG/PHS conglomerate, including the following entities: UHG, Michigan Spine and Rehab (an assumed name of UHG), American Surgical, Associated Surgical, Clear Imaging, Horizon Imaging,

Saginaw Spine and Pain (also an assumed name of UHG), UWC-Lansing, and UWC-Flint. *See Exhibit 11 annexed hereto.*

208.     To maximize financial benefit, the management team of UHG/PHS (the members of which are discussed in further detail below) established a predetermined protocol of treatment causing their patients to receive unnecessary, indiscriminate, and excessive treatment, as is also discussed more fully *infra*.

209.     The consolidation of multiple disciplines and providers under the auspices of UHG/PHS allowed the owners and managers of UHG/PHS to control the diagnoses of patients and the prescriptions that were written, notably for extensive attendant care, as discussed more fully *infra*.

### B.     INDIVIDUAL MANAGERS OF UHG/PHS

210.     A group of individuals controlled every aspect of UHG/PHS's operation, from soliciting patients to establishing treatment protocols to ordering that certain diagnoses be made and certain prescriptions be written. *See Exhibit 12 annexed hereto.*

211.     These individuals worked primarily out of UHG/PHS's "corporate headquarters" located at 2000 Town Center Drive, Southfield, MI 48075.

212.     Though patients were not seen or treated at this address, all patient referrals were directed to this office and employees at the corporate headquarters scheduled patient appointments, often deciding the type of care the patient was to receive well before the patient was examined by a healthcare professional.

213.     Moreover, patient-specific directives emanated from UHG/PHS's managers, even though these individuals almost never actually treated the patients to whom the treatment directives were applied.

214.   For example, Shaw, an attorney and not a licensed healthcare provider, ordered that prescriptions be written and diagnoses be made with respect to certain patients.

215.   Additionally, Zack, in conjunction with UHG/PHS's billing department, ordered that treatment commence or cease based on the status of a patient's pending litigation.

216.   Zack and the UHG/PHS billing department also ordered that treatment cease when they feared that the bills were getting too high and would attract the suspicion of the paying insurers.

217.   Thus, Zack made these treatment decisions based solely on litigation and payment concerns rather than the clinical needs of the patient.

218.   Likewise, the UHG/PHS billing department made medical decisions about treatment based solely on economic self-interest, not based on the needs and symptoms of each patient.

219.   Each of the individuals discussed below played a pivotal role in the operation of the UHG/PHS conglomerate and was fully aware of the actions taken by the other controllers of UHG/PHS, including those persons explicitly listed as members of PHS's "management team." *See Exhibit 12 annexed hereto.*

220.   Katz is an owner of UHG and COO of PHS.

221.   His role at UHG/PHS consisted of pressuring employees to generate bills and representing UHG in depositions.

222.   Zack is an owner of UHG and CEO of PHS.

223.   His role at UHG/PHS also consisted of pressuring employees to generate bills, as well as establishing predetermined treatment protocols that called for an extensive number of chiropractic sessions regardless of the clinical needs of each patient.

224.    Mann is the COO of MRI Administration at PHS.

225.    As part of his duties, Mann operated and managed Horizon Imaging and Clear Imaging.

226.    Sigler is the Vice President of Strategic Planning and Development and the COO of the Surgery Division Center of PHS.

227.    Sigler testified in 2011 that he worked for "UHG Management" at 2000 Town Center, Southfield, MI as the COO of the Surgery Center Division, thus confirming the consolidation of UHG and its entities under PHS.

228.    Sigler's job duties included overseeing staff, resources, financials, and the management and oversight of Associated Surgical and American Surgical.

229.    Shaw is PHS's General Counsel, who served as an advisor to the Executive Board of PHS on legal matters.

230.    Despite the fact that he is not and never was a healthcare professional, Shaw pressured the medical professionals in the UHG/PHS conglomerate to write certain prescriptions, including orders for attendant care benefits, for patients claiming No-Fault benefits from Allstate.

231.    Shaw also pressured the doctors to postdate medical records and make certain diagnoses to assist lawyers in litigation against insurance companies like Allstate.

232.    Shaw used his position as General Counsel to order that narratives and reports written by personal injury attorneys be included in patient medical charts.

233.    Waltz is the CFO of PHS and UHG Management.

234.    He worked closely with Celentano and DeSanto to merge the Michigan-based managers (Katz, Zack, Sigler, and Shaw) with the Florida-based managers (Celentano and DeSanto).

235.    Chudler, though not a member of the UHG/PHS "Executive Board," exerted a significant amount of power as UHG's medical director and Treasurer.

236.    His role predominantly involved performing rudimentary examinations on a revolving door of patients in order to "rubberstamp" them for continued referrals for unnecessary treatment and services, such as protracted chiropractic and physical therapy, MRIs, and pain management, including injections, all within the UHG/PHS network.

237.    Chudler also directly saw at least half of the patients at issue in this Complaint.

238.    Celentano participated in the running of the UHG/PHS conglomerate, including meeting with employees and ensuring that extensive medical treatment was recommended and rendered by the defendant medical providers.

239.    DeSanto likewise had a prominent role in the operation of UHG/PHS, including hiring employees and interacting with and directing the individual medical providers associated with the UHG/PHS network.

240.    Both Celentano and DeSanto provided capital for UHG, which allowed UHG to expand and eventually establish the UHG/PHS conglomerate.

241.    Celentano and DeSanto were also instrumental in soliciting patients who were then run through the UHG/PHS patient mill.

242.    Indeed, as discussed below, Celentano and DeSanto controlled WCIS, which was critical to the success of UHG because it provided immediate and multiple leads on patients (i.e., persons involved in motor vehicle accidents).

243.    Celentano also established MI Pro Consultants, a company that utilized runners in Michigan to steer patients to UHG/PHS.

C.    OTHER INDIVIDUALS WHO PARTICIPATED IN THE UHG/PHS SCHEME TO DEFRAUD

244.    The extent and breadth of the UHG/PHS conglomerate would not have been possible without additional individuals who, while not holding explicit management positions within UHG/PHS, nonetheless played an integral role in the scheme to defraud detailed herein.

245.    Martinez is a close associate of Celentano and DeSanto and was responsible for ensuring that Michigan motor vehicle accident victims were referred to UHG/PHS entities, including through the use of WCIS and its call center and website.

246.    Martinez is the COO of Digital Footprint Media, which owns WCIS.

247.    She is also associated with Celentano's MI Pro Consultants, a Michigan-based "marketing" service that solicited patients.

248.    Sereno is also an associate of Celentano and operated out of Michigan.

249.    Sereno holds himself out providing "marketing" and "case management" services.

250.    In reality, Sereno's responsibilities included scouting new locations for UHG/PHS to acquire and acting as a runner to solicit motor vehicle accident victims for UHG/PHS.

251.    Sereno is also associated with MI Pro Consultants, the "marketing" entity owned by Celentano and operated by Martinez.

252.    Cozzetto is one provider whose practices (the various United Wellness Centers entities) were partially acquired by UHG/PHS.

253.    Cozzetto used the resources of UHG/PHS, including WCIS and the patient solicitation done by Sereno, Martinez, and MI Pro Consultants, to garner more patients who were

30

then subjected to the predetermined chiropractic treatment protocol established by himself and Zack.

254.    Yaldo is another provider whose practice was enveloped by UHG/PHS.

255.    Specifically, Yaldo has an ownership interest in Associated Surgical, an ambulatory surgical center that was the site of numerous unnecessary injections administered to Allstate insureds at the referral of UHG and its doctors, as discussed more fully *infra*.

256.    Pierce has an ownership interest in American Surgical, an ambulatory surgical center that was the site of numerous unnecessary injections administered to Allstate insureds at the referral of UHG and its doctors, as discussed more fully *infra*.

257.    Pierce also performed many of the unjustified and unnecessary injections at American Surgical and performed bogus and excessive electrodiagnostic studies of Allstate insureds.

258.    Upon information and belief, Pierce's compensation arrangement with UHG/PHS was based upon his meeting a patient quota.

259.    Desai is a radiologist who read MRIs for Horizon Imaging and Clear Imaging, both of which depend on a substantial number of referrals from the other UHG/PHS entities.

260.    Desai's reports display a pattern of "overreading," if not outright falsification, which served as the basis upon which UHG/PHS entities justified additional excessive and unnecessary treatment, discussed in more detail *infra*.

261.    Paley is another radiologist who read MRIs for Horizon Imaging.

262.    Like Desai, Paley routinely read MRIs to indicate pathologies that were not actually present to provide justification for diagnoses that permitted the continuation of patient treatment under the defendants' fraudulent scheme, discussed in more detail *infra*.

## VI.    IMPROPER METHODS USED TO OBTAIN PATIENTS

263.    The sole goal of UHG/PHS was to obtain as many patients as possible in order to generate the maximum number of bills submitted to Allstate and other auto insurers.

264.    To this end, UHG/PHS employed several means of soliciting patients that are not permitted under Michigan law, including attorney-referral and "marketing" services such as WCIS and MI Pro Consultants, "runners," and tow truck drivers.

265.    The solicitation of patients who did not seek out treatment vitiates the necessity of the services and treatment provided by the defendant medical providers.

### A.    MICHIGAN LAW PROHIBITS THE SOLICITATION OF LEGAL CLIENTS AND MEDICAL PATIENTS

266.    Michigan law prohibits the solicitation of persons "for the purpose of representing that person in making a claim for damages or prosecuting an action or causes of action arising out of a personal injury claim . . . or to employ counsel for the purpose of that solicitation . . . ." Mich. Comp. Laws § 750.410(1).

267.    It is also unlawful in Michigan for "[a]ny physician or surgeon engaged in the practice of medicine in this state" to "employ any solicitor, capper, or drummer for the purpose of procuring patients."  Mich. Comp. Laws § 750.429.

268.    One who knowingly and intentionally "[e]mploys, uses, or acts as a runner, capper, or steerer with the intent to falsely or fraudulently obtain benefits under  a contract of insurance or to falsely or fraudulently assert a claim against an insured or an insurer for providing services to the client, patient or customer" has committed a "fraudulent insurance act." Mich. Comp. Laws § 500.4503(h).

269.    As these above-cited statutes illustrate, Michigan law prohibits the solicitation of clients/patients by attorneys, physicians, and surgeons.

B.     **WCIS AND MI PRO CONSULTANTS**

270.    UHG/PHS used WCIS's call center and website to solicit patients and steer them to the medical facility defendants.

271.    The website whocanIsue.com, created in 2007, is ostensibly a web-based "platform for people to find the right attorney, for any legal claim." *See Exhibit 13 annexed hereto.*

272.    According to its webpage, whocanIsue.com provides services to the public to "demystify" the legal process by providing information to users about their potential legal claims and acting as a directory for attorneys who may handle a particular claim in the website user's geographic area. *See* Id.

273.    WCIS also maintains a call center in Florida that operates similarly to its website: victims of motor vehicle accidents call in and are steered to certain Michigan personal injury attorneys and medical providers, including all of the medical facility defendants named herein.

274.    Originally, attorneys paid WCIS to participate in its directory and to advertise their legal services with a premium placed upon more prominent advertisements on the whocanIsue.com webpage.

275.    Upon information and belief, rather than serving as an information portal for the general public regarding legal rights and creating revenue through selling advertising to attorneys, WCIS is now in the business of generating leads for attorneys and, indirectly, healthcare providers.

276.    Once the individual victims are identified through the WCIS service, WCIS actively directs these potential clients to Michigan attorneys who agree, in turn, to refer their clients to the medical facility defendants.

277.    In several instances, WCIS representatives directly referred callers to UHG/PHS with instructions to commence treatment immediately.

278.    These representatives telephoned the UHG/PHS corporate headquarters in Michigan, located at 2000 Town Center, Southfield, MI, and provided the patient's information.

279.    Employees at UHG/PHS headquarters then directed the patient to the various UHG/PHS entities in Michigan, including scheduling treatment before the patient had been seen by a healthcare provider.

280.    WCIS exclusively served UHG/PHS entities in Michigan.

281.    The owners and operators of WCIS, namely, Celentano, DeSanto, and Martinez, also have interests in UHG/PHS, which, in turn, have an interest in nearly every facility at which a WCIS-referred patient received treatment.

282.    Thus, WCIS is not in any sense an independent referral service providing a public benefit.

283.    Instead, WCIS existed and operated to serve directly the pecuniary interests of its owners/operators, including Celentano, DeSanto, and Martinez.

284.    Given that Celentano is based in Florida, he associated with and employed a number of individuals to orchestrate and effectuate the fraudulent referral scheme in Michigan under the guise of performing "marketing" services.

285.    These individuals include defendants DeSanto, Sereno, and Martinez.

286.    Upon information and belief, DeSanto and Celentano share a long-term friendship that has evolved into a business relationship.

287.    Upon information and belief, DeSanto is responsible for introducing Celentano to the then-owner of WCIS.

34

288.     Upon information and belief, DeSanto and Martinez had a personal relationship and also have a business relationship.

289.     Upon information and belief, DeSanto worked closely with Sereno to solicit potential clients for certain attorneys in Michigan.

290.     Under the moniker Greater Michigan Professional Services, LLC, operating with the assumed name of "MI Pro Consultants," Celentano, DeSanto, Sereno, and Martinez "marketed" to various attorneys who agreed to refer their clients obtained through MI Pro Consultants to UHG/PHS-affiliated facilities.

C.     **U**HG **W**ORKED WITH **S**EVERAL **A**TTORNEYS TO **S**OLICIT **C**LIENTS/**P**ATIENTS

291.     UHG/PHS and WCIS cultivated mutually beneficial relationships with local Michigan attorneys to acquire patients.

292.     Specifically, UHG formed such referral relationships with five prominent Michigan personal injury attorneys.

293.     These attorneys' names appear on UHG patient intake sheets and other documentation as the referral source at a very high frequency.

294.     The medical facility defendants kept business cards for each of these five attorneys prominently displayed in their offices.

295.     If a patient was not yet represented by counsel, employees of the medical facility defendants were directed to encourage the patient to select one of the five business cards and to call the law firm immediately to arrange a meeting and representation.

296.     This arrangement was beneficial to both UHG/PHS and the attorneys because UHG/PHS directed potential clients to the attorneys and the attorneys, in turn, ensured that their

clients treated with UHG/PHS, which permitted UHG/PHS to generate more (and more substantial) bills to Allstate.

297.    Consequently, UHG/PHS and the attorneys worked in concert to demand payment from Allstate on the medical facility defendants' bills, which permitted the attorneys to use the extent and fact of treatment to inflate and bolster the claims submitted to Allstate when negotiating payment and during litigation of claims brought on behalf of the medical facility defendants and Allstate insureds.

### D.    USE OF POLICE REPORTS, RUNNERS, AND TOW TRUCK DRIVERS TO SOLICIT PATIENTS

298.    As noted *supra*, it is unlawful in Michigan for "[a]ny physician or surgeon engaged in the practice of medicine in this state" to "employ any solicitor, capper, or drummer for the purpose of procuring patients."  Mich. Comp. Laws § 750.429.

299.    However, this is exactly what the defendants did through the euphemisms "case management" and "marketing."

300.    Indeed, one of Sereno's primary duties as an associate of UHG/PHS was so-called "case management," which, in actuality, was the solicitation of patients in derogation of § 750.429.

301.    WCIS, MI Pro Consultants, and Sereno purchased police reports of recent motor vehicle accidents to identify persons involved.

302.    MI Pro Consultants and WCIS dispatched "runners" to solicit persons involved in motor vehicle accidents both to refer these persons to certain attorneys and to funnel them to predetermined medical providers in the UHG/PHS network.

303.    MI Pro Consultants and WCIS paid runners to identify potential clients and patients by purchasing police reports in bulk and scouring them for motor vehicle accident victims.

304.    Potential patients were contacted by runners either in person or over the telephone and were told to seek treatment at the medical facility defendants, sometimes on the very same day as their motor vehicle accident.

305.    The runners pursued these leads by contacting alleged accident victims by way of the addresses and telephone numbers contained in the police reports.

306.    The runners cold called the victims and often personally visited them at their homes and "educated" the victims about their rights under Michigan's No-Fault Act.

307.    The runners also pressured victims, who oftentimes had very mild to no symptoms, to seek treatment immediately, including by using scare tactics such as stating that symptoms often do not manifest for a period of time following one's involvement in a motor vehicle accident and it could be too late then to collect insurance benefits.

308.    The runners then arranged appointments for the victim and offered complimentary transportation to and from the designated medical facility defendant within the UHG/PHS network.

309.    These runners acted as agents for UHG/PHS to refer the victims that they located to UHG/PHS-affiliated facilities and arranged for the appointments without providing the victims with a choice of medical provider.

310.    Brandon Abell, an associate of MI Pro Consultants and Celentano, is one such individual who purchased police reports to identify potential patients to refer to UHG and the

other defendant medical providers.  See MI Pro Consultants Referral Form, annexed hereto as Exhibit 14.

311.     Sereno also developed relationships with several Michigan tow truck drivers who distributed UHG business cards at accident scenes to the occupants of the vehicles that were being towed and stated that the accident victims must immediately report to UHG.

312.     Several patients presented at UHG bewildered as to why they were told they must report for medical treatment at the UHG facility even though they had no symptoms or complaints.

### E.     SPECIFIC EXAMPLES OF PATIENT SOLICITATION

313.     UHG's standard forms contain an area where the referral source is to be documented.

314.     The same few referral sources are found on most of these forms: WCIS, MI Pro Consultants, and the five attorneys discussed above.

315.     Thus, UHG's own documentation proves the symbiotic relationship between Celentano, WCIS, MI Pro Consultants, certain Michigan attorneys, and UHG/PHS.

316.     Several patients of the medical facility defendants have confirmed that they were solicited to treat at UHG/PHS facilities.

317.     The following patients/Allstate insureds exemplify the fact and extent of the defendants' unlawful solicitation practices.

### 1.     H.C. (Claim No. 0182068106) [1]

318.     H.C. testified that he was "bombarded" with a "barrage of calls" after he was involved in a motor vehicle accident on November 7, 2010.

---

[1] To protect the identity of its insureds, Allstate refers to them in this Complaint by initials and Allstate claim number.

319.    H.C. compared this attention to having "won the lottery and all [his] cousins that [he] never knew were trying to contact" him.

320.    According to H.C., the callers informed him of the benefits that he was entitled to under Michigan's No-Fault Act.

321.    H.C. testified that a representative of a Michigan personal injury law firm came to his home and provided him with a business card.

322.    H.C. testified that this law firm arranged for him to be treated at Associated Chiropractic Clinic, which is one of the UHG facilities.

323.    H.C. began treating at Associated Chiropractic Clinic on November 12, 2010, mere days after his accident.

324.    Associated Chiropractic billed Allstate relative to the services purportedly rendered to H.C., including submitting medical records and claims for payment to Allstate through the U.S. Mail.

325.    In reasonable reliance upon the medical documentation and bills submitted by Associated Chiropractic through the U.S. Mail, Allstate paid money to Associated Chiropractic relative to H.C.

326.    Allstate would not have tendered payment had it known the truth of H.C.'s solicitation and subsequent unnecessary treatment.

2.    **T.A. (Claim No. 0232642165)**

327.    T.A. testified that she learned of UHG during a telephone call with an individual named William (Bill) Sanders following her motor vehicle accident on January 14, 2012.

328.    T.A. testified that Sanders told her that he had viewed the police report of her motor vehicle accident on the internet.

39

329.   According to T.A., Sanders sent someone to her home to arrange for an examination.

330.   T.A. testified that a man by the name of "Marcus" came to her home to gather information from her.

331.   T.A. testified that while "Marcus" was at her home, he called UHG and put her on the phone.

332.   According to T.A., "Marcus" did not give her a choice of which provider to call, but rather chose UHG himself.

333.   T.A. proceeded to receive treatment at UHG.

334.   UHG billed Allstate for treatment purportedly rendered to T.A.

335.   UHG submitted claims for payment and medical records relative to T.A. to Allstate through the U.S. Mail, upon which Allstate relied in adjusting the claims and tendering payment.

336.   Allstate tendered payment to UHG for billed-for treatment and services relative to T.A. that it would not have paid had it known that UHG solicited T.A. to receive unnecessary treatment.

### 3.      N.H. (Claim No. 0235242401)

337.   According to N.H., a man visited her home after her motor vehicle accident on February 7, 2012 and referred her to UWC.

338.   N.H. testified that the man, whom she did not know, knocked on her door and was in possession of the police report from her motor vehicle accident.

339.   N.H. testified that the man explained the law to her and encouraged her to have her injuries "checked out" because it was "not [her] fault or something like that."

340.    N.H. testified that the man told her specifically that she should seek treatment at UWC and used his cell phone to arrange an appointment for her.

341.    N.H. did in fact treat at UWC-Flint and UWC.

342.    UWC and UWC-Flint billed Allstate relative to the treatment purportedly rendered to N.H.

343.    Allstate remitted payment to UWC-Flint relative to N.H.

344.    UWC and UWC-Flint submitted claims for payment and accompanying medical records to Allstate by way of the U.S. Mail.

345.    Allstate relied upon UWC and UWC-Flint's submissions when adjusting the claims and tendering payment.

**4.    T.M. (Claim No. 0236952404)**

346.    According to T.M., following her motor vehicle accident on March 3, 2012, she received "a lot of phone calls."

347.    T.M. testified that one of the individuals who called her ultimately visited her at her home.

348.    T.M. testified that the visit consisted of the individual explaining to her the medical treatment she could receive and arranging an appointment for her at Associated Chiropractic, which is a UHG entity.

349.    T.M. proceeded to treat at Associated Chiropractic for several months.

350.    T.M. also treated at Michigan Spine and Rehab (also a UHG entity) for almost one year.

351.    Both Associated Chiropractic and Michigan Spine and Rehab billed Allstate relative to the treatment purportedly rendered to T.M.

352.     Allstate made payments to Associated Chiropractic and Michigan Spine and Rehab relative to T.M.

353.     Associated Chiropractic and Michigan Spine and Rehab submitted claims for payment and medical records to Allstate through the U.S. Mail and Allstate relied upon the same in adjusting the claims and tendering payment.

### 5.     A.W. (Claim No. 0251098827)

354.     A.W. testified that an individual contacted her and referred her to UWC following her motor vehicle accident on July 3, 2012.

355.     A.W. testified that a man visited her home and discussed her injuries with her.

356.     A.W. testified that the man then arranged an appointment for her at UWC as well as transportation to and from her appointment.

357.     According to A.W., UWC obtained a copy of the police report regarding her accident and used it to contact her.

358.     Approximately a week after her accident, A.W. treated with Chudler at UWC.

359.     A.W. proceeded to treat at UWC and also at Michigan Spine and Rehab.

360.     UWC and Michigan Spine and Rehab each billed Allstate for the treatment and services purportedly rendered to A.W.

361.     Allstate tendered payment to UWC for the billed-for treatment and services.

362.     UWC and Michigan Spine and Rehab submitted claims for payment and pertinent medical records to Allstate via the U.S. Mail and Allstate relied upon the same in adjusting the claims and tendering payment.

6.      **L.C. (Claim No. 0262230030)**

363.    L.C. testified that the first facility at which she received treatment following her motor vehicle accident on October 13, 2012 was UWC.

364.    According to L.C., she received a telephone call on her cell phone, the number for which was contained on the police report for her accident.

365.    L.C. testified that the individual who called her requested to have someone visit her at home to explain her treatment options to her.

366.    L.C. testified that a man came to her home and asked her questions regarding her injuries.

367.    According to L.C., the man encouraged her to seek treatment even though she was not in pain because sometimes symptoms do not manifest for a few days following an accident.

368.    L.C. testified that the man arranged an appointment for her at UWC and provided her with a document preprinted with "United Wellness Centers" along with his contact information.

369.    L.C. then treated concurrently at UWC and Michigan Spine and Rehab.

370.    UWC and Michigan Spine and Rehab submitted claims for payment and accompanying medical records to Allstate by way of the U.S. Mail upon which Allstate relied in adjusting the claims.

7.      **T.L. (Claim No. 0263532624)**

371.    T.L. stated that he received a call from Bill Sanders the day after he was involved in a motor vehicle accident, which occurred on October 26, 2012.

372.    T.L. stated that he did not know how Sanders obtained his phone number.

373.    According to T.L., Sanders offered to send someone to T.L.'s home to take his statement and arrange a doctor's appointment.

374.    T.L. stated that Sanders informed him that he represented doctors, but also could connect him with an attorney.

375.    T.L. stated that he met the man sent by Sanders at the repair shop where T.L.'s vehicle had been towed.

376.    T.L. stated that this man arranged a doctor's appointment for T.L. at UHG.

377.    T.L. thereafter treated at UHG and Michigan Spine and Rehab, a UHG entity.

378.    UHG and Michigan Spine and Rehab submitted bills to Allstate seeking payment for the treatment purportedly rendered to T.L.

379.    Allstate remitted payment for these bills.

380.    UHG and Michigan Spine and Rehab submitted the claims for payment and pertinent medical records to Allstate through the U.S. Mail and Allstate relied upon these submissions in adjusting the claims and tendering payment.

**8.    G.K. (Claim No. 0197858632)**

381.    Patient G.K. treated at UHG following his involvement in a motor vehicle accident on March 4, 2011.

382.    G.K. came to be a UHG patient by way of MI Pro Consultants and a local personal injury attorney referral.

*383.*    UHG documentation indicates that on March 11, 2011, G.K. was referred to UHG and scheduled for an appointment on March 15, 2011.  *See G.K. Referral Form, annexed hereto at Exhibit 15.*

384.    The pre-printed form used to document this referral and appointment provides a line for "Attorney/Referral" for which "MI Pro" (i.e., MI Pro Consultants) is listed.  Id.

385.    G.K. treated with UHG and Michigan Spine and Rehab undergoing extensive treatment with Chudler and receiving MRIs at both Horizon Imaging and Clear Imaging.

386.    UHG, Michigan Spine and Rehab, Horizon Imaging, and Clear Imaging billed Allstate for the services purportedly rendered to G.K.

387.    Allstate paid UHG and Michigan Spine and Rehab relative to the billed-for treatment and services for G.K.

388.    UHG, Michigan Spine and Rehab, Horizon Imaging, and Clear Imaging submitted claims for payment and pertinent medical records through the U.S. Mail to Allstate and Allstate relied upon these submissions in adjusting the claims and tendering payment.

### 9.    A.H. (Claim No. 0176043925)

389.    A.H. treated at UHG following his involvement in a motor vehicle accident on August 25, 2010.

390.    UHG documentation shows that on September 9, 2010, MI Pro Consultants, through "Branden [sic] Abell" as the "Lead Source," located A.H. and arranged an appointment at UHG for him on September 13, 2010, along with transportation.  *See Exhibit 14 annexed hereto.*

391.    The pre-printed form used to document the MI Pro Consultants referral lists one of the five personal injury attorneys closely connected to UHG/PHS as A.H.'s attorney.

392.    UHG chiropractic notes for A.H. also reflect this attorney as the referral source.

393.    A.H. proceeded to treat at UHG and Michigan Spine and Rehab for almost one year.

394.    UHG and Michigan Spine and Rehab billed Allstate for the treatment and services purportedly rendered to A.H.

395.    Allstate remitted payment to UHG and Michigan Spine and Rehab for these treatment and services.

396.    UHG and Michigan Spine and Rehab submitted claims for payment and accompanying medical records to Allstate via the U.S. Mail and Allstate relied upon the same in adjusting the claims and tendering payment.

**10.    M.L. (Claim No. 0210020961)**

397.    M.L. treated at UHG following her involvement in a motor vehicle accident on July 11, 2011.

398.    According to UHG's documentation, on July 15, 2011, MI Pro Consultants and one of the five Michigan attorneys closely associated with UHG/PHS referred M.L. to UHG and arranged for her initial visit to UHG on July 18, 2011.  *See M.L. Referral Form, annexed hereto at Exhibit 16.*

399.    M.L. went on to treat at UHG and Michigan Spine and Rehab, including treatment with Chudler.

400.    UHG and Michigan Spine and Rehab billed Allstate relative to the treatment and services purportedly rendered to M.L.

401.    UHG and Michigan Spine and Rehab submitted claims for payment and relevant medical records to Allstate by way of the U.S. Mail.

402.    Allstate relied upon these submissions when adjusting the claims.

## VII.  PURPOSE OF THE DEFENDANTS' SCHEME TO DEFRAUD

403.    The purpose of the actions taken by the UHG/PHS conglomerate and the individual participants in the same is obvious and undeniable: to generate claims for payment from auto insurers like Allstate.

404.    To achieve this purpose, the defendants actively worked to establish a mill through which patients were run, receiving in the process a number of treatments that were not necessary and bogus diagnoses that were designed to justify additional treatment, including expensive MRIs, electromyography (EMG) and other electrodiagnostic tests, injections, months of chiropractic treatment, and months of physical therapy (all of which are discussed more fully *infra*, including specific patient examples of the unnecessary and improper treatment).

405.    The defendants also utilized numerous methods to solicit patients, including symbiotic relationships with several Michigan attorneys, the use of the referral entity WCIS and its call center and website whocanIsue.com, MI Pro Consultants, and the use of police reports, runners, and tow truck drivers.

406.    As part of their agreement with the attorneys, the individuals who controlled the medical facility defendants agreed to ensure that patients received certain diagnoses and certain prescriptions, particularly for attendant care benefits, to inflate and bolster claims and litigation against Allstate.

407.    Attendant care benefits allow a third party, including the spouse, child, or neighbor of the person injured in a motor vehicle accident, to charge the auto insurer an hourly rate for assisting the injured person.

408.    Attendant care is a coveted component of a damages claim because charges for such care are not capped under Michigan law (as opposed to charges for replacement services), attendant care may last a lifetime, and it may be provided by a family member or friend.

409.    At the behest of UHG/PHS management and the local Michigan personal injury attorneys who were closely associated with UHG/PHS, the individuals providing care at the medical facility defendants often wrote prescriptions for attendant care benefits, including for several of the patients at issue herein.

410.    Jarrod Bailey, D.C., a chiropractor at UHG and UWC, testified under oath that he spoke with "attorney firms on the phone . . . [I]f an attorney requested disability or something like that . . . . [T]hat's at the request of the attorney."

411.    At least one of the Michigan personal injury attorneys closely connected with UHG/PHS set up a video link to demand that a UHG physician write an order for attendant care.

412.    Thus, the decision that a particular patient required attendant care was frequently made not by a licensed healthcare professional, but rather by a layperson member of UHG/PHS's management team, including Shaw, and the attorneys with whom UHG/PHS management developed symbiotic relationships, which is a clear violation of Michigan law.

413.    Further, many of the individual healthcare providers at UHG/PHS frequently signed backdated disability and other forms at the request of attorneys and UHG/PHS management without question.

414.    UHG/PHS management also coerced the individual healthcare providers under their control to utilize narratives and reports in their medical charts that were written by attorneys and that were designed to justify extensive treatment and significant diagnoses.

415.    The course of treatment for the patients wrongfully obtained by the medical facility defendants was established before the patient began treatment and had a singular goal: to treat to the fullest extent possible for the purpose of generating as many claims for payment as possible.

416.    The predetermined protocol treatment rendered by the defendant medical providers bore little relation to the actual clinical needs of the patients.

417.    Instead, the patients were merely pawns used to allow the defendants to set in motion their fraudulent scheme to bring in as many patients as possible and to subject the patients to a pre-designed protocol of treatment through a network of varied affiliated providers to reap the maximum amount of pecuniary benefit from Allstate and other Michigan auto insurers.

418.    The excessive treatment rendered by and the interrelationships between the various entities in the UHG/PHS network are demonstrated by the overlap of the patients at issue in this Complaint.

419.    Every single patient at issue in this Complaint treated with at least one of the medical facility defendants and most treated at several.

420.    More than three-quarters of the patients at issue treated at UHG (inclusive of its various assumed name facilities), as befits UHG's role as the hub of the defendants' scheme.

421.    Indeed, as the chart annexed hereto at Exhibit 17 demonstrates, nearly all of the patients at issue in this Complaint treated at UHG.

422.    Approximately half of all patients treated directly with Chudler, UHG's medical director, who referred patients to the other medical facility defendants and wrote prescriptions for physical therapy and recommended chiropractic care.  Id.

49

423.     Despite the fact that Chudler almost never found a neurological deficit in the patients he "examined," his patients routinely underwent EMGs and nerve conduction studies (NCS).  Id.

424.     Indeed, of the 128 patients on the chart at Exhibit 17 for whom Chudler found "no neurological deficit," nearly half (62) nonetheless underwent an EMG and/or NCS.  Id.

425.     Approximately two-thirds of the patients at issue in this Complaint received MRIs at Horizon Imaging and/or Clear Imaging, the referral for the MRI almost always coming from another defendant medical provider within the UHG/PHS network.  Id.

426.     Of these patients, at least 80% had at least two MRIs at Horizon Imaging and/or Clear Imaging and 42% had at least three MRIs at the defendant imaging facilities.  Id. and Exhibit 21.

427.     Desai and Paley read nearly every single MRI at issue herein.  Id.

428.     Nearly half of all patients at issue herein underwent electrodiagnostic testing, usually EMG and NCS, including several that were done by Pierce.  Id.

429.     Approximately three-quarters of the patients involved in this Complaint who received treatment at Associated Surgical or American Surgical also treated with at least one other medical facility defendant.

430.     The specific reasons why all of this treatment (physical medicine and rehabilitation, MRIs, EMGs, and injections) was both unnecessary and excessive are detailed below in section IX, including a multitude of specific patient examples, but the raw numbers are telling.

431.     The defendants aspired to create an all-encompassing network whereby every patient they solicited would receive direct referrals to medical providers and facilities within the

50

UHG/PHS network, resulting in an excessive amount of treatment across various specialties and the billing for all of this treatment staying within the UHG/PHS network and flowing directly and indirectly to each defendant named herein.

432.    The defendants achieved their purpose.

433.    Indeed, since 2007, the medical facility defendants (by and through the facilitation and support of each defendant named herein) have billed Allstate in excess of $11,929,988 and Allstate has paid them in excess of $3,697,049.

434.    These amounts would not have been possible without the comprehensive scheme devised and enacted by the defendants, including (1) the solicitation of patients in conjunction with five prominent Michigan personal injury attorneys, WCIS, MI Pro Consultants, runners, tow truck drivers, and the use of police reports, (2) guaranteed referrals to each medical facility defendant from other providers in the UHG/PHS network, and (3) bogus testing results and diagnoses that were used to justify excessive amounts of treatment.

## VIII.  IMPROPER SELF–REFERRALS

435.    As the above illustrates, the medical facility defendants and the individual healthcare provider defendants enjoyed a mutually beneficial relationship given overlaps in ownership and management that guaranteed referrals to the various spokes of the UHG/PHS hub, including physical medicine and rehabilitation, physical therapy, chiropractic, MRIs, electrodiagnostic testing, and invasive procedures, including injections.

436.    Once the solicited motor vehicle accident victims became patients, the defendant medical providers endeavored to refer them for extensive treatment within the UHG/PHS network of intertwined, yet ostensibly independent, facilities and providers.

437.    There is a palpable financial incentive for providers with an ownership interest in an additional medical facility to engage in self-referral.

438.    UHG/PHS and its individual constituents had financial interests in the entities falling under the UHG/PHS umbrella.

439.    In order to realize maximum financial gain from the full spectrum of treatment, UHG/PHS acquired treatment facilities so that all aspects of treatment, including MRIs, injections, physical therapy, chiropractic, and EMG and other electrodiagnostic testing, would contribute to the UHG/PHS coffers.

440.    The defendants used one spoke of the UHG/PHS hub to justify treatment at a different spoke.

441.    Chudler, UHG's medical director, stood at the center of this hub and was personally responsible for directing several of the patients at issue in this Complaint for treatment and testing at the other facilities under the UHG/PHS banner, including chiropractic treatment (at UHG, its assumed name entities, UWC, UWC-Detroit, UWC-Flint, UWC-Lansing, and Health Systems); physical therapy (at UHG, its assumed name entities, UWC, and Health Systems); MRIs (at Horizon Imaging and Clear Imaging and read by Desai and Paley); electrodiagnostic testing (at UHG, its assumed name entities, and performed by Pierce); and injections (at Associated Surgical, American Surgical, and performed by Pierce).

442.    The rampant self-referrals employed by the defendant medical providers undermine any claim that the treatment performed by them was necessary.

443.    Indeed, there was an undeniable financial interest for each and every defendant medical provider (including the owners and managers of the same) to perpetuate treatment and send patients for additional (unnecessary) testing.

444.     That the defendant medical providers' pecuniary interests outweighed their

obligations to provide and refer only for medically necessary treatment is demonstrated by the

excessive and unjustified treatment rendered by the members of the UHG/PHS conglomerate, as

discussed in detail in section IX *infra*.

445.     Allowing financial considerations to supersede objective medical decision making

not only has a deleterious impact on the quality of patient care and impermissibly places

financial interests above patient welfare, but also constitutes unlawfully rendered treatment.

## IX.    <u>FRAUDULENT MEDICAL TREATMENT</u>

446.     The medical facility defendants billed Allstate for medical services and medical

procedures that were not warranted by the patients' actual clinical symptoms and/or that were not

performed in accordance with established medical standards.

447.     As an initial matter, almost every patient at issue in this Complaint was involved

in a motor vehicle accident of minor impact, usually of the "fender-bender" variety, and

presented to the defendant medical providers with soft-tissue injuries.

448.     By their nature, soft-tissue injuries are self-limiting and usually require minimal

intervention to resolve the patient to pre-accident status.

449.     Despite the limited scope of injury experienced by most of their patients, the

defendant medical providers routinely treated for months on end across a variety of disciplines,

many of which overlapped and treated the exact same symptoms.

450.     The defendant medical providers' goal in treating patients was to perform as

much treatment as possible, regardless of whether such treatment was reasonably necessary to

the patients' care, recovery, or rehabilitation and/or arose out of a motor vehicle accident, in

order to generate bills to be submitted to auto insurers like Allstate, as well as to inflate and bolster litigation brought by the attorneys with whom the defendants worked to obtain patients.

451.    Another major objective of the defendants' unnecessary treatment (and bogus diagnoses) was to justify prescriptions for attendant care.

452.    As such, the services and treatment rendered by the provider and medical facility defendants, if at all, were not medically necessary.

453.    These unnecessary services include chiropractic treatment, physical therapy, magnetic resonance imaging (MRI), electromyography (EMG), nerve conduction studies (NCS), and invasive procedures such as epidural steroid injections, trigger point injections, facet joint injections, and all other treatment and services identified in Exhibits 1 to 10 annexed hereto.

454.    These treatment and services were administered in a manner remarkably devoid of variance as part of the defendants' scheme to take advantage of Michigan's unlimited No-Fault benefits, rather than a commitment to quality and individualized patient care.

455.    As discussed throughout this pleading, the full extent of misrepresentations contained in the medical records and bills submitted to Allstate by the defendants only became known to Allstate upon its investigation of the defendants, including discovery of (1) the consolidation of the medical facility defendants under the UHG/PHS banner (as opposed to independent medical providers who treated and referred while not motivated by pecuniary self-interest), (2) the aggressive solicitation of motor vehicle accident victims that vitiates the claim that treatment in any amount was warranted where patients only presented for treatment under the misdirection of the defendants themselves, and (3) the defendants' practice of allowing attorneys and other non-healthcare professionals (including the layperson managers of

54

UHG/PHS) to dictate the content of medical reports, the necessity of attendant care benefits, and the diagnoses made.

456.    None of these facts is evident within the four corners of the documents submitted to Allstate by the medical facility defendants and upon which Allstate relied in adjusting the claims and tendering payment.

457.    Indeed, it was only upon obtaining statements from several of its insureds (as part of its investigation) that Allstate realized the tactics used by the defendants to obtain patients.

458.    As discussed above, including a multitude of specific patient examples, several patients were told that they must present at a facility within the UHG/PHS network.

459.    Several patients walked into the defendant facilities bewildered as to why they were ordered to do so and disputing that they required medical attention.

460.    Treatment of a patient who does not desire or need treatment is not "for an injured person's care, recovery, or rehabilitation," Mich. Comp. Laws § 500.3107(1)(a), and, thus, is not compensable under Michigan's No-Fault Act.

461.    Yet, the defendants submitted bills to Allstate under the guise of No-Fault benefits for such treatment.

462.    The true interconnectedness of the defendants, and their shared pecuniary interests, also is not evident on the face of the documents submitted to Allstate.

463.    Finally, there was no way for Allstate to know before it undertook its investigation that many of the defendant medical providers' "findings," "reports," and "diagnoses" were, in fact, made by non-healthcare providers, including attorneys with their own vested interest in generating significant claims against Allstate for use in litigation.

464.    All of these factors – patient solicitation, rampant self-referrals within the UHG/PHS network, and medical reports/prescriptions/diagnoses generated by non-medical professionals – demonstrate that valid and necessary treatment of motor vehicle accident victims was not the goal of the defendant medical providers.

465.    These factors, coupled with the defendants' disregard for established standards of medical and chiropractic care, reveal the unnecessary, excessive, unsubstantiated, and unjustified treatment that the defendant medical providers rendered, to the extent such treatment was rendered at all.

A.    FRAUDULENT CHIROPRACTIC TREATMENT

466.    Chiropractic treatment is a hallmark of the defendant medical providers' services.

467.    Patients presenting at a clinic within the UHG/PHS conglomerate, including UHG, UWC, UWC-Detroit, UWC-Flint, UWC-Lansing, and Health Systems, were ushered to a doctor of chiropractic as a matter of course.

468.    The chiropractic care persisted without discharge for months, though there is little documentation substantiating the need for such extensive chiropractic treatment rendered and the standard of care for the duration of chiropractic treatment is far less.

469.    The inevitable result is that the formulaic chiropractic treatment rendered by the defendant medical providers and facilities was unnecessary and excessive.

470.    The chiropractic treatment billed for by the medical facility defendants was unnecessary for at least one or more of the following reasons: (1) chiropractic treatment was rendered pursuant to a predetermined protocol that necessarily failed to take into account each patient's unique symptoms and clinical needs; (2) billed-for chiropractic treatment was

undocumented; (3) chiropractic treatment was excessive; and (4) chiropractic treatment was duplicative of concurrent physical therapy being done.

**1.** **Patients Received Chiropractic Treatment Pursuant to a Predetermined Protocol**

471.     Chiropractors in the UHG/PHS conglomerate, including at UHG, UWC, UWC-Detroit, UWC-Flint, UWC-Lansing, and Health Systems, were instructed to perform chiropractic treatment on patients pursuant to a predetermined protocol.

472.     Specifically, chiropractors were directed to treat for at least several times per week for the first month of treatment, then slightly reducing the number of weekly visits in the second month, and so on.

473.     Indeed, most of the patients at issue in this Complaint who received chiropractic treatment were referred for multiple (up to six) visits per week.

474.     To the extent the frequency diminished to once per week, it was usually months after chiropractic treatment had commenced.

475.     This schedule of treatment was established at the directive of the UHG/PHS management team, especially Zack and Cozzetto, and not by the individual healthcare providers who were actually treating patients.

476.     Rather than reflecting thoughtful and customized treatment, the chiropractic records indicate a troubling pattern of formulaic chiropractic treatment.

477.     For example, the defendant medical providers relied upon a series of preprinted forms that precluded the cultivation of meaningful and individualized clinical records and treatment.

478.     Rather, these forms indicate that a preset protocol for treatment was in place before patients came under the defendant medical providers' care.

479.     Moreover, the preprinted forms list the same treatment goals for all patients, further supporting that chiropractic treatment was not individualized to each patient, but rather done in a *pro forma* manner.

480.     As a result of the use of a predetermined protocol for the administration of chiropractic treatment, each patient's course of treatment remained constant regardless of his or her actual clinical needs.

481.     The lack of variation in care from patient to patient confirms that a predetermined protocol was used to direct the course of chiropractic treatment and that treatment plans were established prior to a patient's arrival at the medical facility defendants, resulting in excessive and unnecessary chiropractic treatment being performed.

### 2.     Chiropractic Treatment Was Undocumented

482.     The records submitted to Allstate by UHG, UWC, UWC-Detroit, UWC-Flint, UWC-Lansing, and Health Systems were of poor quality and failed to record even the most basic data and information to support the continuation of chiropractic care, let alone the months of chiropractic treatment that usually occurred.

483.     Instead, the chiropractors at UHG, UWC, UWC-Detroit, UWC-Flint, UWC-Lansing, and Health Systems almost always merely circled entries on the preprinted forms, without any additional (patient-specific) detail.

484.      Generally, when chiropractic manipulation is considered, a detailed history and physical examination is done.

485.     The defendant medical providers did not document either.

486.     Nor were the daily notes generated by the defendant medical providers adequate to justify continued treatment for each patient.

487.   Indeed, the daily notes failed to document subjective complaints of the patient, the objective findings that the chiropractor detected, an assessment of the patient's response to treatment, and the indication or plan to follow from the examination.

488.   Put another way, the defendant medical providers' charts merely record what treatment was done, but do not explain why such treatment was done.

489.   Instead, the defendant medical providers resorted to the same types of chiropractic treatment for all patients, including manipulation, mechanical traction, and hot/cold packs, regardless of each patient's individualized needs for the entire course of care with only minimal deviations.

490.   As discussed below, UHG, UWC, UWC-Detroit, UWC-Flint, UWC-Lansing, and Health Systems failed to document adequately or otherwise substantiate the manipulation that they purportedly performed.

491.   As also discussed below, the hot/cold packs employed by UHG, UWC, UWC-Detroit, UWC-Flint, UWC-Lansing, and Health Systems were also improper and excessive.

### a.   Manipulation Inadequately Documented and Substantiated

492.   When chiropractic manipulation is considered, the provider must perform a detailed history, physical examination, and evaluation of the mechanism of injury.

493.   If manipulation is indicated, a short-term trial of treatment should be undertaken, after which the patient should be reevaluated to determine if the intervention decreased the patient's issues.

494.   Following the trial of chiropractic treatment, the patient should be reevaluated to determine if the treatment was effective and whether adjustments to the chiropractic treatment plan should be made.

495.   Chiropractors at UHG, UWC, UWC-Detroit, UWC-Flint, UWC-Lansing, and Health Systems rarely performed such a reevaluation and patient treatment plans rarely changed throughout the chiropractic treatment period, which frequently endured for months.

496.   The defendant medical facilities included very limited information in the chiropractic notes for their patients.

497.   Indeed, the chart notes reveal little information other than the levels of spinal manipulation done.

498.   Even where evaluations were recorded, there is little change in the findings from one evaluation to another.

499.   The UHG, UWC, UWC-Detroit, UWC-Flint, UWC-Lansing, and Health Systems chiropractic records fail to support the effectiveness of manipulation, yet the chiropractic treatment plans remained unchanged.

500.   Overall, the information contained in the records is entirely insufficient to substantiate the chiropractic manipulation done.

501.   Based upon these woefully inadequate clinical records, the chiropractic manipulation rendered by the defendant medical providers was entirely unjustified and, thus, unnecessary.

### b.   Improper Use of Hot/Cold Packs

502.   UHG, UWC, UWC-Detroit, UWC-Flint, UWC-Lansing, and Health Systems frequently billed Allstate for the use of hot/cold packs as part of chiropractic treatment.

503.   As an initial matter, the use of heat and cold is not included within the scope of chiropractic practice under Michigan law.  *See* Hoffman v. Auto Club Ins. Ass'n, 211 Mich. App. 55, 81 (1995).

504.     Thus, Allstate is not obligated to reimburse UHG, UWC, UWC-Detroit, UWC-Flint, UWC-Lansing, and Health Systems for any hot/cold packs used as part of chiropractic treatment.

505.     Even if the use of heat and cold by chiropractors is reimbursable under Michigan's No-Fault Act as a general matter, the hot/cold packs used by the chiropractors in the UHG/PHS network were excessive and the justification for the same was undocumented.

506.     The use of heat and cold generally is to help a patient's muscles relax and allow for easier adjustment, but is not required for this purpose.

507.     The use of this passive therapy has limited therapeutic value and generally is not therapeutic beyond the first few visits.

508.     However, the defendant medical providers excessively billed Allstate for hot/cold packs on each chiropractic office visit despite its limited therapeutic value after the first few uses.

509.     The defendant medical providers also failed to document how the use of hot/cold packs had any effect on the care, recovery, or rehabilitation of patients beyond the initial visits, thus rendering the hot/cold pack-related services not compensable under Michigan's No-Fault Act.

### 3.     Patients Received Excessive Chiropractic Treatment

510.     The defendant medical providers rendered astronomically excessive chiropractic treatment to their patients in terms of both frequency and temporal duration.

511.     Chiropractic manipulation may relieve pain and improve movement on a short-term basis, generally up to eight weeks at a rate of one or two times per week, while long-term chiropractic manipulation is not accepted as beneficial.

512.    A lack of patient progress after the first six to eight weeks of chiropractic care suggests that such treatment is not beneficial and other treatment options should be considered if they would be beneficial.

513.    Some patients' chiropractic treatment endured for up to one year despite languishing without improvement of their conditions.

514.    The patients presented to the defendant medical providers with primarily soft-tissue injuries without fractures or lacerations.

515.    Indeed, the vast majority of the patients at issue in this Complaint treated with the defendant medical providers after involvement in minor motor vehicle accidents of the "fender-bender" variety.

516.    As the police reports for these accidents indicate, most patients did not treat at a hospital for any injuries prior to treating with the defendant medical providers.

517.    Despite the fact that soft-tissue injuries typically heal within six to eight weeks without any intervention, the patients who treated with the defendant medical providers often did so for upwards of months and even a year.

518.    The defendant medical providers also often continued with in-office chiropractic treatment without instituting independent exercise programs for the patients to perform on a regular basis at home once patients were able to perform the exercises themselves safely, independently, and effectively.

519.    Passive chiropractic treatment without implementation of an at-home exercise program eliminates any reasonable expectation of the patient reaching maximal medical improvement.

520.    As a result, the passive chiropractic treatment rendered by the defendant medical providers did not offer the patients effective relief, thus creating an excuse to continue the treatment indefinitely yet rendering the treatment essentially worthless because any benefit was lost by the time of the subsequent office visit.

521.    In addition to persistent yet ineffective chiropractic treatment, many patients also concurrently treated with physical therapists who employed similar modalities as the chiropractors, thus compounding the excessive treatment being rendered, as discussed more fully *infra*.

522.    For example, patients sometimes received chiropractic therapy of traction, hot/cold pack, and other physical therapy modalities on the same day that the patient also attended a physical therapy appointment (also with a provider in the UHG/PHS network).

523.    When properly conducted, physical therapy and chiropractic treatment need not be provided concurrently.

524.    The patients therefore received duplicative therapies on the same bodily area more than once per day, which does not result in any increased benefit to the patient.

### 4.    Chudler's Role as the Patient Gatekeeper in Promoting Unnecessary and Excessive Chiropractic Treatment

525.    Chudler acted as the liaison between the chiropractic arm of UHG and its physical therapy arm, especially Michigan Spine and Rehab (an assumed name of UHG).

526.    To feign a finding in favor of justifiable chiropractic treatment on a long-term basis, Chudler performed rudimentary physical examinations of patients and rubberstamped continued chiropractic treatment and physical therapy.

527.    For example, Chudler's medical records indicate that he saw little, if any, change in patient progression (despite the provision of chiropractic treatment) in addition to a lack of variance in each patient supposedly examined by Chudler.

528.    Comporting with the lack of individualized treatment explained above, Chudler referred patients for a course of predictable treatment, including simultaneous chiropractic and physical therapy.

529.    As such, Chudler was a lax gatekeeper who permitted an unfettered flow of patients between the chiropractic and physical medicine arms of UHG/PHS.

530.    The patients continued to receive chiropractic treatment as long as Chudler indicated regardless of the outcome of the patients' physical exams.

531.    The result is duplicative therapeutic services rendered and an excessive amount of treatment after the treatment's benefits had reached their maximal effectiveness.

532.    The only conclusion that may be drawn from the services and treatment recommended, rendered, and ordered by Chudler is that they were not necessary and did not accord with established standards of care.

### 5.    **Exemplar Claims**

533.    The defendant medical providers' above-described disregard for determining the true extent and cause of a patient's injury/symptoms in order to devise a necessary and individualized plan of treatment in favor of treating patients according to a predetermined protocol regardless of particular findings is exemplified by several Allstate insureds who received chiropractic treatment at UHG (including its assumed names), UWC, UWC-Detroit, UWC-Flint, UWC-Lansing, and Health Systems.

534.    For each of the following patients, the course of treatment utilized the same chiropractic services with minimal patient response/progression, resulting in excessive treatment over an unjustified period of time.

### a.    T.C. (Claim No. 0152170122)

535.    Patient T.C. presented at UHG with complaints of low back pain on or about November 2, 2009 following her involvement in a motor vehicle accident on October 25, 2009.

536.    She received x-rays on November 2, 2009 and began receiving chiropractic adjustments by November 4, 2009.

537.    T.C. was then treated at UHG with manipulation of her cervical, thoracic, and lumbar spinal regions, despite the fact that her neck and mid-back were not presenting complaints.

538.    T.C. also received hot/cold packs and mechanical traction as part of her chiropractic treatment at UHG.

539.    T.C.'s treatment was documented in a *pro forma* manner by way of preprinted checklists further reinforcing the predetermined nature of her treatment.

540.    On January 7, 2010, T.C. was evaluated by Chudler and rated her pain to be a 3-5 out of 10.

541.    Chudler ordered that she continue with chiropractic therapy and recommended that she undergo an EMG to "rule out nerve injury," despite his finding that she had "[n]o focal neuro deficits."

542.    T.C. continued to receive chiropractic treatment at UHG until March of 2010, nearly five (5) months after her chiropractic treatment commenced.

543.    Thus, T.C.'s treatment was both objectively excessive and also unnecessary based on T.C.'s subjective symptoms and Chudler's own findings.

544.    UHG submitted claims for payment and medical records relative to the treatment purportedly rendered to T.C. through the U.S. Mail.

545.    Allstate relied upon UHG's submissions in adjusting the claims and tendering payment for the billed-for chiropractic treatment.

### b.    L.G. (Claim No. 0159354117)

546.    Patient L.G. first treated at UHG on February 12, 2010 for injuries that she purportedly sustained in a motor vehicle accident on January 26, 2010.

547.    On February 12, 2010, she received x-rays and began receiving chiropractic manipulation on February 18, 2010.

548.    As a patient with UHG, L.G. received manipulation of the cervical, thoracic, and lumbar spines, hot/cold packs, and mechanical traction on a regular basis of at least three times per week.

549.    On March 2, 2010, Chudler examined L.G. and found "tenderness to palpation" in her left shoulder and paravertebral muscles.

550.    Chudler recommended that she continue with chiropractic treatment.

551.    L.G. continued receiving chiropractic treatment at a rate of three times per week until September 2010, at which point she began receiving chiropractic treatment twice per week.

552.    On December 6, 2010, nearly a year after her January 26, 2010 accident, a "re-evaluation" was conducted revealing "no significant change" as to L.G.'s condition and recommending that she "start PT" [physical therapy].

553.    Therefore, L.G. was subjected to a predetermined protocol of chiropractic treatment that remained constant over the course of almost a year without affording her any meaningful relief and, thus, not comporting with the clinical indications for continued chiropractic modalities and supporting that her chiropractic treatment was unnecessary and excessive.

554.    UHG submitted claims for payment and medical records relative to the chiropractic treatment rendered to L.G. to Allstate through the U.S. Mail.

555.    Allstate relied upon these submissions when adjusting the claims and tendering payment to UHG.

### c.    R.M. (Claim No. 0167978997)

556.    R.M., who was nine years old at the time, presented at UHG for treatment on May 18, 2010 for injuries she purportedly sustained in a motor vehicle accident that occurred less than two weeks prior on May 6, 2010.

557.    R.M. received x-rays on May 18, 2010 and first underwent chiropractic adjustment on May 20, 2010.

558.    R.M. initially was diagnosed at UHG on May 18 with "cervical radiculitis."

559.    A diagnosis of cervical radiculitis in a nine-year-old female is a very serious condition requiring an in-depth evaluation for its true cause and severity.

560.    There is no evidence that such an evaluation was conducted at UHG.

561.    Moreover, the period of twelve days since the onset of any injury is a very short time in which to see such a severe condition as cervical radiculitis in a nine-year-old individual develop.

562.    Following this serious diagnosis, R.M. nonetheless received the same pattern of chiropractic treatment as received by other UHG patients with lesser diagnoses: manipulation of the spine, hot/cold packs, and mechanical traction.

563.    R.M. continued to treat at UHG until June of 2011, despite a "reevaluation" in August of 2010 indicating that she was improving and had no pain.

564.    As a result, R.M. underwent unnecessary and excessive chiropractic treatment pursuant to a protocol of treatment for more than one year without clinical justification to support the care rendered, characteristic of treatment rendered as a matter of course and not tailored to each patient.

565.    UHG submitted claims for payment and medical records relative to the chiropractic treatment rendered to R.M. to Allstate through the U.S. Mail.

566.    Allstate relied upon UHG's submissions when adjusting the claims.

### d.    A.G. (Claim No. 0176043925)

567.    Patient A.G. was initially evaluated at UHG on September 7, 2010 after involvement in a collision in which the vehicle in which he was a passenger was rear-ended on August 25, 2010.

568.    A.G. was initially diagnosed on September 7, 2010 with cervical and lumbar sprains and headaches.

569.    At the time of the initial examination, A.G. was 5'8" tall and weighed approximately 300 pounds.

570.    Following A.G.'s initial evaluation, he began receiving chiropractic treatment at UHG on September 14, 2010.

571.    A.G. was put on a course of chiropractic treatment for more than a year.

572.   On each visit, A.G. received manipulation, hot packs, and intersegmental mechanical traction.

573.   During the course of his treatment, which extended almost into 2012, A.G. underwent MR imaging of his spine.

574.   The MRI showed disc herniations at several levels that were wholly unrelated to his August 2010 motor vehicle accident.

575.   Nonetheless, even after the MRI findings, A.G. continued on the same track of care that was instituted at the commencement of his treatment at UHG.

576.   In other words, the MRI findings were not used in any way to affect A.G.'s chiropractic treatment and, thus, were of no clinical utility.

577.   Moreover, none of the examinations revealed any indication that continued treatment delivered to A.G. was warranted.

578.   For example, A.G. often reported that he was experiencing mild or "little to no" lower back pain.

579.   Specifically, on December 28, 2010, A.G. stated that he had no pain in his neck and back, but he nonetheless continued treatment throughout all of 2011.

580.   In addition, A.G.'s health history was not deemed contributory to his back pain, despite his 5'8," 300 lb. frame, even though obesity is a significant component for back pain and disc degeneration and calls into question the relation of his symptoms to the motor vehicle accident.

581.   Despite the questionable causal link between A.G.'s symptoms and the motor vehicle accident, and despite the fact that A.G. frequently reported to UHG that he had little to no symptoms, A.G. received chiropractic treatment for more than a year.

69

582.    This is excessive both as an objective and subjective matter.

583.    UHG and Michigan Spine and Rehab submitted claims for payment and medical records relative to A.G.'s chiropractic treatment to Allstate through the U.S. Mail.

584.    Allstate relied upon these submissions when adjusting the claims and tendering payment to UHG for the chiropractic treatment purportedly rendered to A.G.

**e.    C.S. (Claim No. 0151055860)**

585.    Patient C.S. was initially evaluated at UHG on September 15, 2009 following an August 23, 2009 motor vehicle accident.

586.    The "Initial Report" generated by UHG relative to C.S. contains inadequate documentation of the orthopedic tests purportedly performed and the resultant diagnosis lacks supportive clinical findings.

587.    C.S. treated from the date of initial evaluation until approximately March 12, 2010, or a period of six (6) months.

588.    On each visit, C.S. received chiropractic manipulation, hot packs, and either intersegmental mechanical traction or massage despite the absence of clinical findings to justify these services.

589.    For example, the notes do not support the necessity of the rendered services given that the "objective" portion of the notes report only pain and spasm, which were not part of the specific diagnoses.

590.    A reevaluation of C.S. performed at UHG on March 16, 2010 did not demonstrate significant improvement despite the services rendered; indeed, the last visit report of March 22, 2010 reports the same findings (spasms and back pain) as at the start of treatment.

591.     Thus, despite six (6) months of chiropractic treatment, C.S. demonstrated no progression, negating that the chiropractic treatment had any beneficial effect or was necessary to C.S.'s care, recovery, or rehabilitation.

592.     UHG submitted claims for payment and medical records relative to the chiropractic treatment rendered to C.S. to Allstate through the U.S. Mail.

593.     Allstate relied upon these submissions when adjusting the claims.

### f.     L.D. (Claim No. 0167978997)

594.     Patient L.D. was initially evaluated at UHG on May 18, 2010 after involvement in a motor vehicle accident on May 6, 2010.

595.     L.D.'s treatment persisted from May 18, 2010 until approximately March 31, 2011, almost one year.

596.     Over this time, L.D. received the same services, including chiropractic adjustments and hot packs, and either intersegmental traction or massage, although specific clinical findings were not made to substantiate these services.

597.     On July 29, 2010, L.D. was examined by Chudler.

598.     Chudler found tenderness to palpation of L.D.'s paravertebral muscles, shoulders, and clavicle and recommended that she continue receiving chiropractic care.

599.     Chudler's examination of L.D. the following month was virtually identically to the previous examination, and he again recommended that she continue receiving chiropractic treatment.

600.     L.D. received manipulations, hot packs, and either intersegmental traction or massage regardless of the efficacy of the services to bring about any positive changes in her condition.

601.    L.D. underwent excessive chiropractic treatment over an extended period of time with minimal response or progress.

602.    Therefore, despite the lack of clinical indications for chiropractic treatment, L.D. continued with the treatment protocol implemented by the defendants throughout the remainder of her time as a UHG patient from approximately May 18, 2010 until at least March 31, 2011, with little change in the frequency or content of the treatment used and without adequate reexaminations.

603.    UHG submitted claims for payment and medical records relative to the chiropractic treatment rendered to L.D. to Allstate through the U.S. Mail.

604.    Allstate relied upon these submissions when adjusting the claims.

g.      M.S. (Claim No. 0167978997)

605.    Patient M.S. was initially examined at UHG on May 18, 2010 following her involvement in a motor vehicle accident on May 6, 2010.

606.    Patients M.S. and L.D. (discussed in the preceding subsection) were involved in the same accident and both treated at UHG.

607.    M.S. and L.D. received substantially the same treatment at UHG.

608.    M.S. treated at UHG from May 18, 2010 until approximately November 22, 2011.

609.    Throughout this time, M.S. received chiropractic adjustments, hot packs and either intersegmental mechanical traction or massage.

610.    Chudler examined M.S. on July 29, 2010 and found tenderness to palpation of her paravertebral muscles.

611.    Chudler recommended that she continue to receive chiropractic treatment.

612.    After an August 26, 2010 examination, Pierce recommended that M.S. begin physical therapy in addition to her chiropractic care.

613.    Therefore, M.S. also began receiving physical therapy at least two days per week.

614.    The treatment notes for M.S., which only report objective findings of pain and spasm, are inadequate because they do not address any specific diagnoses, including M.S.'s response to treatment relative to her diagnoses.

615.    UHG treated M.S. pursuant to a predetermined protocol of chiropractic treatment consisting of manipulation of the spine, hot/cold packs, and mechanical traction, without regard for the full clinical picture, such as M.S.'s degenerative joint/disc disease, an important contributing factor to her condition, which is indicative that her treatment was performed pursuant to a predetermined protocol rather than her individualized symptoms.

616.    Likewise, the similarities between the chiropractic treatment provided to M.S. and L.D. supports that a protocol approach was being used for all UHG, UWC, UWC-Detroit, UWC-Flint, UWC-Lansing, and Health Systems chiropractic patients.

617.    The chiropractic treatment rendered to M.S. for a year and a half was excessive and unnecessary.

618.    Nonetheless, UHG submitted claims for payment and medical records relative to the chiropractic treatment provided to M.S. to Allstate through the U.S. Mail.

619.    Allstate relied upon the submissions when adjusting the claims and tendering payment to UHG.

**h.    N.H. (Claim No. 0235242401)**

620.    Patient N.H. testified that she first received treatment at UWC following her involvement in a motor vehicle accident after being solicited by the defendants, as discussed above.

621.    N.H. treated at UWC-Flint and UWC.

622.    N.H. testified that chiropractic treatment focused on her back even though her back was not one of her complaints.

623.    According to N.H., her treatment began with an approximately fifteen-minute long conversation about her symptoms with the UWC chiropractor.

624.    N.H. testified that the chiropractor's treatment included the application of heat to her back, mechanical traction that massaged her back with rollers, and chiropractic adjustment.

625.    This predetermined, non-specific treatment, rendered to a solicited patient, is not compensable under Michigan's No-Fault Act.

626.    UWC and UWC-Flint submitted claims for payment and medical records relative to the chiropractic treatment purportedly rendered to N.H. to Allstate through the U.S. Mail, upon which Allstate relied when adjusting the claims and tendering payment.

**B.    FRAUDULENT PHYSICAL THERAPY**

627.    Like the chiropractic treatment rendered by the defendant medical providers, the physical therapy services provided were also excessive, unnecessary, and not properly documented.

628.    This is particularly true as almost every patient at issue in this Complaint received both physical therapy and chiropractic treatment, the chiropractic treatment almost always including physical therapy modalities, such as hot/cold packs.

629.   The danger of excessive and unnecessary physical therapy arises when, as here, providers simultaneously render both physical therapy and chiropractic (including physical therapy modalities) treatment across disciplines.

630.   As all of the defendant medical providers were part of the UHG/PHS network, there is no question that they knew that patients were receiving largely duplicative physical therapy and chiropractic services.

631.   In addition to the issue of duplicative treatment, the physical therapy rendered by the defendant medical providers, including UHG, UWC, and Health Systems, was also independently unnecessary and excessive.

### 1.   Medically Unnecessary Physical Therapy

632.   Physical therapy must be objectively indicated.

633.   That is, a patient's subjective complaints of pain are not sufficient to justify more than a few weeks of physical therapy.

634.   The defendant medical providers often prescribed extensive physical therapy based upon a patient's subjective symptoms alone.

635.   Indeed, Chudler routinely reported essentially normal findings in his patient examinations yet entered diagnoses unsupported by his physical exam that purported to justify extensive physical therapy.

636.   Chudler's physical exams and findings for each patient were strikingly similar, indicating that the exams were *pro forma* and merely attempts to justify unnecessary treatment, instead of an attempt to identify each patient's unique symptomology and clinical needs.

637.   Like Chudler's exams, the physical therapy treatment notes consist of mere checklists that fail to substantiate the treatment rendered in any meaningful way.

638.    Moreover, the majority of patients at issue in this Complaint presented at UHG with minor injuries purportedly sustained in "fender-bender" type motor vehicle accidents.

639.    In approximately 90% of all motor vehicle accident cases, mild injuries will resolve by themselves within a few weeks without any treatment whatsoever.

640.    This fact supports that immediate resort to physical therapy, as often happened with UHG, UWC, and Health Systems, is not related to the care, recovery, or rehabilitation of the patient, thus rendering such physical therapy medically unnecessary and not compensable under Michigan's No-Fault Act.

### 2.    Excessive Physical Therapy

641.    Motivated by financial self-interest and accomplished by self-referrals, UHG, UWC, and Health Systems treated patients with physical therapy for far longer than the standard of care.

642.    Under accepted practices, a patient rarely should receive physical therapy for more than four to six weeks.

643.    For example, the average number of physical therapy sessions done at Michigan's William Beaumont Hospital, which operates one of the largest outpatient physical therapy clinics in the country, is just under nine (9) over the course of a few weeks.

644.    After four to six weeks, the physical therapy will have reached its maximum benefit and the patient should either cease in-office physical therapy or be recommended for a different type of treatment.

645.    When a patient is no longer making objective progress in physical therapy, the treatment plan must be changed or the patient discharged.

646.    Indeed, continuing to treat patients who are not significantly improving with physical therapy can actually be detrimental to their recovery.

647.    In fact, if a patient is going to respond to physical therapy, a patient will almost always respond early in the treatment or not at all.

648.    Therefore, continued physical therapy pursuant to an unchanged treatment plan for a patient who does not respond within the first four to six weeks of treatment is excessive and not medically necessary and may actually harm the patient.

### 3.    Duplicative Chiropractic Treatment and Physical Therapy

649.    As discussed above, a major characteristic of the treatment rendered by the defendant medical providers was the duplication of physical therapy and chiropractic treatment.

650.    Despite a false sense of independence, the UHG/PHS entities were in actuality one in the same, thus revealing the duplicative physical therapy and chiropractic services as an intentional act to generate additional bills to Allstate.

651.    Nearly every chiropractic treatment session at UHG, UWC, UWC-Detroit, UWC-Flint, UWC-Lansing, and Health Systems involved the use of modalities such as mechanical traction, heat/cold packs, and massage.

652.    Meanwhile, these very same chiropractic patients were then seen at UHG, UWC, and/or Health Systems, often on the same day, for the application of yet more physical therapy modalities, including electrical stimulation, heat packs, therapeutic exercises, and mechanical traction.  *See chart annexed hereto at Exhibit 18 setting out a representative example of patients who received both chiropractic and physical therapy treatment at one of more of the medical facility defendants.*

653.    The same CPT codes were used by the UHG/PHS-affiliated chiropractor and physical therapist relative to their shared patients.

654.    The end result is duplicative, excessive, and unnecessary treatment, as well as twice as many bills for the same treatment being rendered at the same time.

655.    In derogation of accepted standards of care, the defendant medical providers, particularly those under Chudler's direct influence, continued to treat patients with extensive courses of physical therapy even when not clinically indicated and/or when already being addressed by chiropractic treatment.

### 4.    Exemplar Claims

#### a.    M.M. (Claim No. 0246903066)

656.    Patient M.M. treated with UHG and Michigan Spine and Rehab following a motor vehicle accident on June 1, 2012.

657.    M.M. was put on a course of physical therapy that endured from approximately July 25, 2012 until November 14, 2012.

658.    On July 25, 2012, Chudler examined M.M. and found "[n]o focal neuro deficits."

659.     Chudler proceeded to diagnose M.M. with disc displacements, back pain, and muscle spasms and recommended that she begin receiving physical therapy two to three days per week for four to six weeks.

660.    This initial physical therapy prescription was not altered based upon her progress over nearly five months of treatment.

661.    For these five months, M.M. received massage, ice, manipulations, and traction during nearly every office visit.

662.    The notes for these visits remark that her condition is unchanged.

663.     Despite the lack of progress or change over several months, M.M. continued to be referred for manipulations and physical therapy far beyond the standard four to six weeks that should be administered.

664.     Moreover, M.M.'s extensive physical therapy was not supported by objective evidence of a problem, but rather merely M.M.'s subjective complaints of pain.

665.     The resultant excessive and unjustified treatment thus was likely detrimental to M.M.

666.     UHG and Michigan Spine and Rehab submitted claims for payment and medical records relative to the physical therapy and chiropractic treatment purportedly provided to M.M. to Allstate through the U.S. Mail.

667.     Allstate relied upon the submissions when adjusting the claims and tendering payment to UHG.

### b.     L.B. (Claim No. 02173236882)

668.     Patient L.B. first was evaluated at UHG on August 18, 2008 following her involvement in a motor vehicle accident on July 24, 2008 in which her vehicle was rear-ended by another vehicle.

669.     L.B. was not treated at a hospital for any injuries following the accident and did not seek any documented treatment for approximately one week subsequent to her accident.

670.     Chudler examined L.B. on September 8, 2008, and noted "[n]o focal neuro deficits."

671.     Chudler's exam consisted of palpation of the paravertebral muscles and anterior right shoulder, which is inadequate.

672.     Chudler diagnosed L.B. with a shoulder sprain.

673.    Chudler ordered L.B. to continue receiving chiropractic care at UHG.

674.    L.B. proceeded to undergo chiropractic treatment three times per week for approximately five months, until early 2009.

675.    On February 10, 2009, Chudler again examined L.B.

676.    The notes of his evaluation reflect that L.B. reported subjective symptoms of right shoulder pain and pain and stiffness in her back purportedly arising out of the motor vehicle accident on July 24, 2008.

677.    Despite the extensive course of chiropractic therapy previously administered with only minimal improvement, Chudler recommended that L.B. begin receiving physical therapy three times per week for four weeks.

678.    On April 17, 2009, Chudler recommended that L.B. "continue with physical therapy as previously prescribed" based upon L.B.'s subjective report of continued pain and stiffness in her back and right shoulder pain.

679.    Subsequent exams on June 26, 2009 and July 31, 2009 revealed similar continued subjective complaints of pain from L.B. and recommendations from Chudler that she continue physical therapy at UHG.

680.    On September 16, 2009, Chudler continued to recommend physical therapy for L.B. for one day per week.

681.    However, in an evaluation note dated February 3, 2010, Chudler reported that L.B. had been receiving physical therapy twice per week.

682.    Physical therapy can only be rendered pursuant to a prescription and must adhere to that prescription.

683.    Thus, physical therapy that occurred more frequently than prescribed is improper.

684. Despite L.B.'s subjective statement that the physical therapy was alleviating her pain somewhat, she claimed to continue to have pain and stiffness in her back and pain in her right shoulder and arm.

685. Chudler again recommended that she continue with physical therapy "as it does seem to be helping patient's pain."

686. On March 12, 2010, Chudler again evaluated L.B. and recommended that she continue with physical therapy one day per week.

687. At that time, L.B. discontinued treatment with UHG, more than a year and a half following her motor vehicle accident of July 24, 2008 and without any significant improvement in her condition.

688. L.B. received physical therapy at UHG for more than one year when four to six weeks is the standard.

689. L.B.'s subjective complaints of continued pain were not sufficient to justify such extensive physical therapy as objective indications are also required, which Chudler's exams did not identify.

690. Moreover, the extensive physical therapy that L.B. endured had no beneficial effect.

691. Indeed, more than a year of physical therapy had little impact on L.B.'s symptoms.

692. Thus, as both a subjective and objective matter, L.B.'s physical therapy of more than one year was unnecessary and excessive.

693. The problematic physical therapy L.B. received is compounded by the fact that L.B. was also receiving chiropractic treatment from the defendant medical providers.

694.    In sum, the significant amount of treatment rendered to L.B. is not justifiable.

695.    Nonetheless, UHG submitted claims for payment and medical records relative to L.B.'s physical therapy and chiropractic treatment to Allstate through the U.S. Mail.

696.    Allstate relied upon these submissions when adjusting the claims.

### c.    F.M. (Claim No. 0189039191)

697.    Patient F.M. was initially evaluated at UHG on December 2, 2010, following her involvement in a motor vehicle accident on November 24, 2010.

698.    F.M. was the driver of a vehicle that was rear-ended by another vehicle.

699.    F.M. did not receive treatment for any injuries at the scene of the accident or at a hospital prior to presenting at UHG approximately a week following the accident.

700.    Chudler evaluated F.M. on February 21, 2011, and found that she presented with "[n]o focal neuro deficits."

701.    Despite what was an essentially normal exam, Chudler "diagnosed" F.M. with muscles spasms and cervical and dorsal sprain, which are not diagnoses in and of themselves, and, in any event, are not diagnoses that can justify long-term care, and recommended that she continue to receive chiropractic treatment.

702.    On April 19, 2011, after nearly five months of chiropractic therapy, Chudler reevaluated F.M.

703.    Despite notes again reflecting a basically normal exam, Chudler diagnosed F.M. with disc protrusions and displacements at several levels in the thoracic and cervical spine.

704.    Chudler then recommended that F.M. begin a course of physical therapy three times per week for four weeks at Michigan Spine and Rehab.

705.    At the same time, F.M. continued to undergo chiropractic treatment at UHG.

706.    On May 17, 2011, Chudler reexamined F.M. at which time she reported subjective complaints of pain in her neck.

707.    Chudler consequently recommended that F.M. continue receiving physical therapy twice per week for four weeks.

708.    Chudler again evaluated F.M. on June 14, 2011 and noted F.M.'s continued subjective complaints of pain in her spine and neck.

709.    Based upon her subjective assessment of her persistent yet improved pain levels, Chudler again recommended that F.M. continue with physical therapy twice per week for four weeks.

710.    In his August 9, 2011 evaluation of F.M., Chudler again made the same findings and recommended that F.M. receive physical therapy once per week for four weeks.

711.    On September 13, 2011, approximately ten months following F.M.'s motor vehicle accident on November 24, 2010, Chudler finally recommended that F.M. discontinue physical therapy.

712.    However, F.M. clearly received much more than the standard four to six weeks of physical therapy indicated for minor injuries such as those sustained by F.M.

713.    Moreover, F.M. continued to receive chiropractic adjustments, massage, and hot/cold pack at UHG while receiving physical therapy at Michigan Spine and Rehab (which is, in fact, UHG).

714.    Thus, the physical treatment that was rendered to F.M. was both excessive and duplicative.

715.    UHG and Michigan Spine and Rehab submitted claims for payment and medical records relative to the chiropractic treatment and physical therapy provided to F.M. to Allstate through the U.S. Mail.

716.    Allstate relied upon these submissions when adjusting the claims and tendering payment.

### d.    S.L. (Claim Nos. 0250434222 and 0236132312)

717.    Patient S.L. treated at Michigan Spine and Rehab, Associated Chiropractic, and UWC following a motor vehicle accident on February 20, 2012 in which S.L. was the restrained driver of a vehicle that was rear-ended by another vehicle.

718.    S.L. began his treatment with the defendant medical facilities on March 14, 2012, three weeks following his motor vehicle accident.

719.    Prior to being examined by Chudler at Associated Chiropractic on June 14, 2012, S.L. received chiropractic treatment at UWC.

720.    Chudler found that S.L. had tenderness to palpation in his spine with decreased range of motion.

721.    Chudler also found that S.L. possessed "[n]o focal neuro deficits."

722.    However, Chudler proceeded to diagnose S.L. with disc herniation and cervical and lumbar pain.

723.    Chudler consequently recommended that S.L. begin physical therapy two days per week for four weeks.

724.    On June 28, 2012, Chudler made the same findings, and noted that S.L.'s subjective complaints of pain had decreased following physical therapy.

2:13-cv-15108-VAR-MKM   Doc # 1   Filed 12/17/13   Pg 85 of 230   Pg ID 85

725.    However, Chudler again recommended that S.L. continue with physical therapy twice per week for four additional weeks.

726.    S.L. received therapy at Rehab, Inc., an assumed name of UHG.

727.    In a reevaluation by Chudler on July 13, 2012, S.L. reported that he had been in a second motor vehicle accident on July 1 in which he was again a restrained driver of a vehicle rear-ended by another vehicle.

728.    After making identical findings and diagnoses as in his previous examinations of S.L., Chudler again recommended that S.L. continue with physical therapy two days per week for four weeks.

729.    During this time, S.L. also continued to receive chiropractic therapy including hot/cold packs, mechanical traction, chiropractic adjustments, neuromuscular reeducation, and massage.

730.    On September 13, 2012, Chudler recommended that S.L. discontinue physical therapy.

731.    However, prior to discontinuation, S.L. had received approximately twelve weeks of physical therapy, which is two to three times the standard length of treatment.

732.    Moreover, S.L. was receiving chiropractic treatment at the same time he was undergoing nearly identical physical therapy.

733.    Thus, the physical therapy for which Allstate was billed was not necessary and was duplicative.

734.    Nonetheless, UWC and Associated Chiropractic submitted claims for payment and medical records related to S.L.'s chiropractic treatment and physical therapy to Allstate through the U.S. Mail.

735.    Allstate relied upon these submissions when adjusting the claims and tendering payment.

### e.    L.P. (Claim No. 0184811834)

736.    Patient L.P. first sought treatment at UHG on September 16, 2011 for injuries purportedly sustained in motor vehicle accidents that occurred on November 5, 2010, and February 5, 2011.

737.    Prior to presenting at UHG, L.P. had received extensive chiropractic therapy with another provider.

738.    Chudler's initial examination of L.P. on September 16, 2011 found that she had tenderness to palpation paravertebral muscles with decreased range of motion in the lumbar region, but "[n]o focal neuro deficits."

739.    Based upon L.P.'s subjective complaints and a MRI, Chudler diagnosed her with foraminal disc protrusion, severe lumbar pain, left knee pain, and lumbar radiculitis.

740.    Chudler then recommended that L.P. begin a course of physical therapy two days per week for four weeks at Michigan Spine and Rehab.

741.    On November 11, 2011, Chudler again examined L.P. at UHG during which time she expressed continued subjective complaints of back pain.

742.    Chudler recommended that she continue to receive physical therapy twice per week for four weeks.

743.    The documentation for L.P.'s treatment at Michigan Spine and Rehab consists of checklists with nearly every available problem marked for L.P.

744.    The daily treatment notes for L.P.'s lumbar spine treatment at Michigan Spine and Rehab do not provide documentation of exactly what was being treated.

745.    The documentation that does exist for L.P. indicates that she was not progressing as a result of the extensive chiropractic and physical therapy she was simultaneously prescribed.

746.    As such, there was no basis to continue physical therapy treatment.

747.    Nonetheless, L.P. received months of physical therapy (and largely duplicative chiropractic treatment), which did not have any documented beneficial effect on her symptoms.

748.    As such, the months of physical therapy provided to L.P. were not medically necessary and, therefore, not compensable under Michigan's No-Fault Act.

749.    Michigan Spine and Rehab submitted claims for payment and medical records relative to the treatment provided to L.P. to Allstate through the U.S. Mail.

750.    Allstate relied upon Michigan Spine and Rehab's submissions when adjusting the claims.

### f.    T.F. (Claim No. 0157885773)

751.    Patient T.F. began treating at UHG on January 13, 2010 for injuries purportedly sustained in a motor vehicle accident on January 8, 2010 in which T.F. was a restrained passenger of a vehicle that was rear-ended by another vehicle.

752.    T.F. did not treat at a hospital following the accident, but rather followed up at UHG approximately one week later.

753.    Chudler initially evaluated T.F. on January 19, 2010.

754.    Chudler found during his initial evaluation of T.F. that she possessed "[n]o focal neuro deficits."

755.    Chudler diagnosed T.F. with cervical, dorsal, and lumbar sprain and muscle spasms.

756.     Chudler recommended that T.F. begin a course of chiropractic treatment at UHG, including adjustments to her spine, hot/cold packs, and intersegmental mechanical traction.

757.     On or about April 19, 2010, T.F. also began physical therapy at UHG.

758.     On May 12, 2010, Chudler again evaluated T.F. at which time she stated subjective complaints of lumbar pain.

759.     Chudler recommended that T.F. continue receiving physical therapy three days per week.

760.     On June 18, 2010, Chudler again recommended that T.F. continue with the course of physical therapy three times per week for an additional four weeks.

761.     Approximately one month later, on July 16, 2010, T.F. again presented to Chudler for an evaluation.

762.     After recording a physical exam that remained virtually unchanged from previous exams, Chudler recommended that T.F. continue to receive physical therapy three times per week for four weeks in addition to continued chiropractic treatment.

763.     At T.F.'s next evaluation by Chudler on August 19, 2010, Chudler again recommended that T.F. continue with physical therapy twice per week for four weeks.

764.     Chudler made the same recommendation on a largely unchanged exam in October 2010: T.F. should continue to receive physical therapy at Michigan Spine and Rehab two days per week.

765.     Incredibly, Chudler again recommended the same course of therapy based upon T.F.'s subjective complaints on November 12, 2010 and December 20, 2010.

766.     Meanwhile, T.F. continued to receive chiropractic care as well throughout this time period.

767.    Foot surgery forced T.F. to discontinue physical therapy.

768.    However, T.F. already had undergone approximately eight months of physical therapy with sessions occurring at least two or three times per week, which is well above the standard length of physical therapy of four to six weeks.

769.    Physical therapy that persists longer than six weeks can actually be detrimental to a patient's recovery, as demonstrated in the case of T.F.

770.    Indeed, T.F.'s pain did not subside and even became worse over time.

771.    As such, continued physical therapy, especially at the rate of two to three sessions per week, was excessive and not medically necessary.

772.    This fact is compounded by the largely duplicative chiropractic treatment T.F. was also receiving within the UHG/PHS network.

773.    Despite the lack of justification for such extensive physical therapy in addition to chiropractic treatment, UHG and Michigan Spine and Rehab submitted claims for payment and medical records relative to T.F.'s physical therapy and chiropractic treatment to Allstate through the U.S. Mail.

774.    Allstate relied upon these submissions when adjusting the claims and tendering payment.

### g.    E.R. (Claim No. 0225920123)

775.    Patient E.R. first treated at Associated Chiropractic on November 17, 2011 following her involvement in a motor vehicle accident on November 14, 2011.

776.    E.R. did not exhibit any evidence of a significant injury emanating from her accident, which only caused a small amount of damage to the front bumper of her vehicle.

777.    E.R. sought treatment at Associated Chiropractic following the accident on November 17, 2011, where she received chiropractic treatment.

778.    On March 8, 2012, Chudler evaluated E.R.

779.    As in his exams of other patients at issue in this complaint, Chudler found "[n]o focal neuro deficits."

780.    Based upon E.R.'s subjective complaints and a MRI, Chudler diagnosed E.R. with cervical radiculopathy, disc herniation, and cervical and lumbar pain.

781.    Chudler recommended that E.R. begin physical therapy two days per week for four weeks and continue chiropractic therapy as well.

782.    E.R. underwent physical therapy at Rehab, Inc., which is an assumed name of UHG.

783.    On April 12, 2012, E.R.'s cervical and lumbar pain levels had remained constant.

784.    Nonetheless, Chudler recommended that E.R. continue physical therapy two days per week for four weeks.

785.    On June 28, 2012, E.R. reported to Chudler during another evaluation that she was still experiencing pain in her cervical and lumbar regions.

786.    Again, Chudler recommended that she continue physical therapy two days per week for four weeks.

787.    The same recommendation followed an August 1, 2012 reevaluation with E.R. reporting that her pain was only slightly better.

788.    It was not until October 11, 2012 that Chudler recommended that E.R. discontinue physical therapy.

789.     By this time, however, E.R. already had undergone approximately eight months of physical therapy at a rate of at least two days per week, which grossly exceeds the standard four to six weeks of physical therapy.

790.     Any more than four to six weeks of physical therapy can be detrimental to a patient's recovery, which is reflected in E.R.'s slow-paced recovery despite the intensive course of physical therapy.

791.     The lack of progression in E.R.'s recovery also supports that the physical therapy she was prescribed was not contributing to her care, recovery, or rehabilitation, rendering such treatment not compensable under Michigan's No-Fault Act.

792.     Nonetheless, Associated Chiropractic submitted claims for payment and medical records relative to E.R.'s treatment to Allstate through the U.S. Mail.

793.     Allstate relied upon these submissions when adjusting the claims and tendering payment.

**h.     L.F. (Claim No. 0194061453)**

794.     Patient L.F. began treating at UHG on or about March 3, 2011, following her involvement in a motor vehicle accident on February 20, 2011.

795.     L.F. was the driver of a vehicle that was rear ended by another vehicle.  She refused transport to the hospital from the scene.

796.     Approximately two weeks later, L.F. began treating at Associated Chiropractic & Medical Center, a UHG entity.

797.     On September 2, 2011, Chudler examined L.F. and noted that since the date of the accident approximately seven months prior, she had complained of back pain despite receiving chiropractic treatment in the interim.

798.    Chudler's assessment of L.F. resulted in findings of "[n]o focal neuro deficits."

799.    Chudler recommended that L.F. begin physical therapy three times per week for four weeks at Michigan Spine and Rehab.

800.    In reevaluations on November 3, 2011 and December 8, 2011, L.F. reported continued pain.

801.    Based upon L.F.'s subjective complaints, Chudler recommended at both reevaluations that she continue to receive physical therapy two days per week for four weeks at Michigan Spine and Rehab.

802.    L.F. ceased treating at Associated Chiropractic and Michigan Spine and Rehab on December 14, 2011 after completing approximately fourteen weeks of physical therapy, more than twice the six week standard maximum length of physical therapy to be provided to patients, and after completing approximately nine months of chiropractic treatment, which involved several physical therapy modalities.

803.    Indeed, the physical therapy modalities provided to L.F. at Michigan Spine and Rehab, such as therapeutic exercise, ultrasound, soft-tissue trigger points, electrical muscle stimulation, and cold pack, are excessive when provided for even a few weeks; here, however, such treatment persisted for months without any appreciable benefit to L.F.

804.    For all of these reasons, the treatment provided to L.F. by the defendant medical providers was excessive, duplicative, and unnecessary.

805.    Nonetheless, Associated Chiropractic and Michigan Spine and Rehab submitted claims for payment and medical records relative to L.F.'s care to Allstate through the U.S. Mail.

806.    Allstate relied upon these submissions when adjusting the claims and tendering payment.

**i.     A.P. (Claim No. 0182157586)**

807.    Patient A.P. began receiving chiropractic care at UHG on November 15, 2010, following her involvement in a motor vehicle accident on November 8, 2010.

808.    Chudler initially evaluated A.P. on December 6, 2010.

809.    Chudler found that A.P. presented with "[n]o focal neuro deficits."

810.    Chudler recommended that A.P. continue receiving chiropractic treatment.

811.    Approximately six months later, on June 6, 2011, Chudler reexamined A.P.

812.    Chudler's physical exam findings were virtually unchanged from his initial exam.

813.    Chudler recommended that A.P. begin physical therapy two days per week for four weeks.

814.    A.P. continued to receive chiropractic adjustments and other modalities concurrently with her physical therapy at Michigan Spine and Rehab.

815.    On September 12, 2011, Chudler again prescribed A.P. with four weeks of physical therapy at a rate of twice per week based upon her continued subjective complaints of pain.

816.    On October 3, 2011, Chudler discontinued A.P.'s physical therapy, but by that time, she had undergone approximately sixteen weeks of physical therapy with sessions occurring at least twice per week, which is over and above the standard of four to six weeks of physical therapy treatment.

817.    The documentation for A.P.'s physical therapy also conforms to the "checklists" observed in other patients at issue in this Complaint along with minimal documentation of individual visits lacking specific objective data supporting the rendered treatment.

818.    Moreover, A.P. received chiropractic treatment, including multiple physical therapy modalities, for a period of time approximating ten months, including the time period A.P. was prescribed physical therapy.

819.    Thus, A.P.'s physical therapy was excessive in its own right, but also duplicative of the same treatment modalities being rendered by the same network of providers.

820.    Despite the lack of justification supporting her physical therapy treatment, Allstate was billed for the same by Michigan Spine and Rehab via claims for payment and medical records submitted through the U.S. Mail.

821.    Allstate relied upon these submissions when adjusting the claims and tendering payment.

### j.    L.C. (Claim No. 0262230030)

822.    Patient L.C. was solicited to treat with the defendant medical providers, as detailed above.

823.    The first facility that L.C. treated at following her motor vehicle accident was UWC.

824.    L.C. testified that she was surprised to learn upon her arrival at UWC from the office manager that it was prearranged for her to be examined by four doctors (Chudler, Stanford Rapp, D.O., Jarrod Bailey, D.C., and Ed Atty, M.D.), rather than just one.

825.    According to L.C., she "was really confused" as to why she was to present to that many providers at the same facility on the same day.

826.    Stanford Rapp, D.O is a doctor of osteopathic medicine providing treatment at Michigan Spine and Rehab, an assumed name of UHG.

827.    Jarrod Bailey, D.C. is a doctor of chiropractic providing treatment at UHG, UWC, and UWC-Flint.

828.    Ed Atty, M.D. is a medical doctor who is affiliated with the UHG/PHS network, especially its Flint locations.

829.    According to L.C., she saw each of the four doctors in the same office.

830.    Indeed, UWC's Flint location and Michigan Spine and Rehab in Flint are located at the same address: 2329 Stonebridge Drive, Building E, Flint, MI.

831.    L.C. testified that Bailey talked to her for approximately ten minutes on her first visit.

832.    L.C.'s medical records indicated that Bailey, of UWC, referred L.C. for an evaluation with Rapp at Michigan Spine and Rehab.

833.    L.C. testified that Rapp examined her for approximately ten minutes and prescribed her Topomax for her headaches and later Vicodin to facilitate Bailey's chiropractic treatment.

834.    After treating with Rapp and Bailey, L.C. testified that she treated with Chudler who contributed very little to her treatment and essentially repeated the questions that had previously been asked by Rapp and Bailey.

835.    According to L.C.'s medical records, Chudler reexamined her at Michigan Spine and Rehab.

836.    L.C. received chiropractic treatment from UWC while undergoing office visits at Michigan Spine and Rehab.

837.    On December 7, 2012, Chudler recommended that L.C. begin to receive physical therapy two to three days per week for four to six weeks.

838.    UWC submitted claims for payment and medical records relative to the chiropractic treatment purportedly rendered to L.C. to Allstate through the U.S. Mail.  Allstate relied on these submissions when adjusting the claims.

### k.      A.W. (Claim No. 0251098827)

839.    Patient A.W. testified that she first treated at UWC after her involvement in a motor vehicle accident after being solicited, as discussed above.

840.    A.W. testified that "when we got sent [to UWC] they had us signed up to see Bailey and Chudler."

841.    According to A.W., Chudler "examined" her by only moving her shoulder and measuring her range of motion and then prescribed physical therapy, which she received in the same building as UWC.

842.    A.W.'s medical record indicates that Chudler evaluated her at both UWC's Flint location and Michigan Spine and Rehab, which are located at the same address in Flint.

843.    A.W. testified that Chudler did not give her a choice of where to receive physical therapy.

844.    A.W. testified that she also treated with chiropractor Bailey on her first day of treatment at UWC although her back was not included within her complaints, which were focused on her shoulder.

845.    According to A.W., she initially saw Bailey five times per week for chiropractic treatment that included mechanical traction with a rolling massage mechanism for her back, application of heat to her back, and chiropractic adjustment.

846.    A predetermined schedule of chiropractic treatment was critical to the defendants' scheme to perform as much treatment as possible without regard for patient need, but rather for the sole purpose of generating claims for payment to auto insurers like Allstate.

847.    At Chudler's direction, A.W. received both chiropractic therapy and physical therapy at UWC, which represent duplicative treatment.

848.    UWC submitted claims for payment and medical records relative to the chiropractic and physical therapy purportedly rendered to A.W. to Allstate through the U.S. Mail, upon which Allstate relied in adjusting the claims and tendering payment.

### l.    M.C. (Claim No. 0216858992)

849.    Patient M.C. testified that he first treated at UWC-Lansing following his involvement in a motor vehicle accident.

850.    According to M.C., he received chiropractic treatment at UWC-Lansing from Jamie B. Berk, D.C.

851.    Berk is a doctor of chiropractic associated with UWC-Lansing.

852.    M.C. testified that he also received physical therapy at UWC including heat therapy and exercises.

853.    M.C.'s medical record also reveals that he treated with Rapp at Michigan Spine and Rehab.

854.    Thus, M.C. received both physical therapy and chiropractic treatment aimed at the same symptoms from the same interconnected web of providers who ignored the concurrent treatment that was being done in order to bill for excessive treatment.

855.     UWC and UWC-Lansing submitted bills and accompanying medical records to Allstate through the U.S. Mail for the chiropractic and physical therapy purportedly rendered to M.C., upon which Allstate relied in adjusting the claims and tendering payment.

C.     FRAUDULENT MRIs

856.     Like chiropractic treatment and physical therapy, magnetic resonance imaging was also a routine mainstay of the defendant medical providers' repertoire.

857.     The defendant medical providers routinely referred patients to Horizon Imaging and Clear Imaging, where defendants Desai and Paley read the MRIs and produced the accompanying reports.

858.     As a result, nearly all of the patients at issue in this Complaint who underwent MRIs at a defendant imaging center also treated with a defendant medical provider in the UHG/PHS network.

1.     The Defendant Medical Providers Ordered Medically Unnecessary MRIs Precipitated by Rudimentary Physical Exams

859.     Oftentimes, the defendant medical providers ordered MRIs at the onset of the patient's treatment, thus indicating that MRI was resorted to as a matter of course regardless of how a patient responded to initial treatment.

860.     Such a practice is belied by medical literature proving "that unnecessary imaging may do more harm than good.  Multiple randomized controlled trials have shown that the early use of imaging for [lower back pain] is not associated with improved outcomes and may even be harmful to the patient."  Brendan J. McCullough et al., Lumbar MR Imaging and Reporting Epidemiology: Do Epidemiologic Data in Reports Affect Clinical Management?, 262 Radiology 941, 942 (2012) (finding that the inclusion of a qualifying statement in MRI reports that many abnormalities on spine radiographs are common among even those who are asymptomatic

reduces subsequent narcotic referrals and may stem an increasing tide of unnecessary MR imaging).

861.    Indeed, early resort to MRI has been denounced by The American College of Physicians for its "inefficiencies" and "potential harms."  McCullough, *supra* at 945.

862.    Rather, immediate MR imaging should be ordered only where a patient presents a "red flag" indicating an underlying cause of the pain such as cancer, infection, cauda equina syndrome, or severe neurological deficits.  Bahman Roudsari et al., Lumbar Spine MRI for Low Back Pain: Indications and Yield, 195 Am. J. of Roentgenology 550, 553 (2010); *see also* Roger Chou et al., Diagnostic Imaging for Low Back Pain: Advice for High-Value Health Care From the American College of Physicians, 154 Annals of Internal Med. 181, 187 (2011) (recommending that for patients without "red flags" imaging should be deferred for a least a month while the patient undergoes trial therapy at which time the patient should be reevaluated).

863.    As such, MRI should be reserved for situations where the objective clinical exam strongly suggests a structural condition that must be clarified and alternative attempts have already been made to treat the condition without success because a "key principle" of the general approach to MR imaging "is that a thorough history and physical examination are necessary to guide imaging decisions."  Chou et al., *supra* at 185.

864.    The medical records of the patients referred for MRI by the defendant medical providers reveal that inadequate and substandard examinations were conducted before the imaging took place.

865.    Chudler's physical examinations were uniformly rudimentary and appear calculated simply to refer his patients for MRI studies and other unnecessary treatment.

866.     Therefore, the defendant medical providers did not make the necessary objective findings of prerequisite symptomology before ordering MRIs for their patients.

867.     Indeed, none of the patients presented with objective symptoms suggestive of cancer, infection, cauda equina syndrome, severe neurological deficits or any other "red flag" that may justify immediate use of MRI.

868.     Consequently, the physical exams performed by the defendant medical providers, particularly by Chudler, were insufficient to support use of MRI.

869.     This shortcoming in the treatment rendered by the defendant medical providers is brought into sharper relief when considered in conjunction with the established evidence counseling against early MR imaging in the first place and the detrimental effect unnecessary imaging can have on patients and their future treatment.

870.     Since 1994, when the first set of guidelines regarding the use of imaging for lower back pain was published by the Agency for Health Care Policy and Research, additional evidence-based guidelines have consistently "agree[d] that for patients with acute [low back pain] and without any risk factor for serious spine abnormalities, imaging within the initial 4-8 weeks should not be performed."  Roudsari, *supra* at 555.

871.     MR imaging is disfavored as a routine diagnostic tool absent attempts at conservative treatment because it not only inflates medical costs, but also can indicate "abnormalities that are not necessarily clinically relevant" and which can then lead to the provision of further unnecessary testing and referrals.  Chou et al., *supra* at 181-182.

872.     Moreover, patients reporting back pain often recover within the first few weeks of the onset.  Id. at 182.

873.    Consequently, evidence-based guidelines from entities including the American Academy of Neurology, the Institute for Clinical Systems Improvement, the American Academy of Family Physicians, the American College of Physicians, and the American Pain Society uniformly "call for imaging only for patients who have severe or progressive neurologic deficits or signs and symptoms that suggest a serious or specific underlying condition" or who do not respond to conservative treatment after at least 4-8 weeks.  Chou et al., *supra* at 181; Roudsari et al., *supra* at 555; Donald C. Pompan, M.D., <u>Appropriate Use of MRI for Evaluating Common Musculoskeletal Conditions</u>, 83 Am. Family Physician 883, 883-84 (2011) (explaining that even patients with significant pain are not candidates for immediate MRI because "the patient may improve with four to six weeks of conservative care"); Quality Standards Subcommittee of the American Academy of Neurology, <u>Practice Parameters: Magnetic Resonance Imaging in the Evaluation of Low Back Syndrome</u>, 44 Neurology 767, 769 (1994, aff'd August 2, 2008) (recommending against MRI for the majority of patients in the first seven weeks of low back pain symptoms because "employment of this modality before 7 weeks may not be cost effective or medically necessary"); M. Goertz, et al., Institute for Clinical Systems Improvement, <u>Adult Acute and Subacute Low Back Pain</u> (15th ed. 2012) (stating that "[c]lincians should not recommend imaging (including…[MRI]) for patients in the first six weeks of radicular pain").

874.    The defendant medical providers repeatedly deviated from this widely-accepted standard that MR imaging should not be resorted to in the first weeks of the patient's symptoms (absent "red flags," which were almost never present with respect to the patients at issue in this Complaint).

875.    Indeed, on at least 240 occasions, the defendant medical providers ordered and performed MRIs within six (6) weeks of a patient's motor vehicle accident.  *See chart annexed hereto at Exhibit 19.*

876.    Of these 240 discrete instances, almost half were MRIs that were ordered less than four (4) weeks after the date of the motor vehicle accident.  Id.

877.    Indeed, many MRIs were ordered and performed mere days after the subject motor vehicle accident, in clear violation of the established standard of care.  Id.

### 2.    Desai and Paley Routinely Misrepresented Image Findings

878.    The MRIs for the defendant medical providers' patients were almost exclusively read by defendants Desai and Paley, both of whom are radiologists.

879.    Desai and Paley habitually overread the images to support findings that were exaggerated and/or not present at all.

880.    Desai's and Paley's findings for many patients indicated significant pathology.

881.    However, the films do not contain evidence of trauma, but rather to the extent any abnormality was present, they were overwhelmingly degenerative changes of a chronic nature not discussed or considered in Desai's and Paley's reports.

882.    Thus, Desai and Paley misrepresented information in their reports.

883.    For example, Desai often found "impingement of the thecal sac," a "finding" that has no clinical significance, and disc bulges or herniation where none were present.

884.    Desai's repeated findings of "impingement" do not comport with radiological standards of practice and were nearly always incorrect.

885.    Rather, despite findings of "impingement," the images were entirely normal.

886.    Paley also misrepresented instances of disease in the MRIs he interpreted.

887.     Even where disc protrusions or disc bulges are present, this does not automatically lead to a conclusion that the pathology is the cause of the low back pain.

888.     To the contrary, a study published in The New England Journal of Medicine postulates that "[g]iven the high prevalence of back pain in the population, the discovery of a bulge or protrusion on an MRI scan in a patient with low back pain may frequently be coincidental."  Maureen C. Jensen et al., Magnetic Resonance Imaging of the Lumbar Spine in People Without Back Pain, 331 New Eng. J. Med. 69, 72 (1994); see also McCullough et al., supra at 942 ("MR imaging examinations of the lumbar spine frequently reveal numerous findings, including disc desiccation, height loss, or bulging, with questionable relevance to patient symptoms").

889.     As a practical consequence, "the clinical picture should be correlated with the MRI results.  Abnormalities of the lumbar spine by MRI examination can be meaningless if considered in isolation."  Jensen et al., supra at 72 (emphasis added).

890.     Here, in the complete absence of objective clinical findings by the defendant medical providers, the defendant radiologists' reports and the decisions to continue further treatment predicated on the same were reached in isolation from the patients' "clinical picture" as a whole.

891.     Such exaggerated MRI findings that disregard a baseline of expected degenerative changes accompanying advancing age and health history can lead to harmful outcomes for patients who undergo unnecessary treatment and surgery justified on the basis of the misrepresentation-filled MRI reports.

892.     Given their consistently exaggerated and misrepresented findings, Desai's and Paley's MRI reports were largely meaningless and without credibility.

893.    Yet, the defendants relied heavily on the MRI findings to justify additional treatment, including expensive pain management procedures such as injections.

894.    As the MRI findings were misrepresented, and in some instances outright fabricated, any subsequent treatment by the defendant medical providers that relied on the MRI findings was unsupported and unjustified.

895.    As a result, Desai and Paley actively participated in the scheme to place maximum amount of treatment over accuracy, thoroughness, and the patients' best interests by facilitating the enduring treatment.

896.    Allstate relied on the misrepresentations contained in these reports, which Horizon Imaging and Clear Imaging submitted to Allstate to substantiate their charges for the MRIs and and which the other defendant medical providers cited to justify additional treatment, including expensive injections and other surgical procedures.

### 3.    Improper Referrals to Horizon Imaging and Clear Imaging

897.    It is well established that a provider's financial incentive to engage in self-referral to imaging centers in which the provider has an ownership interest leads to an increased likelihood of overutilization of imaging studies.

898.    The defendant medical providers were directly connected to two imaging centers: Horizon Imaging and Clear Imaging.

899.    Patients of the UHG/PHS conglomerate were referred to Horizon Imaging and Clear Imaging without the choice of imaging center, thus dictating where patients received their health care.

900.    UHG referral forms for MRIs demonstrate the presence of a premeditated referral system to Horizon Imaging and Clear Imaging.  *See Exhibit 20 annexed hereto.*

901.   This referral form provides a preprinted option for the referring party to choose either "Clear" or "Horizon." Id.

902.   A third option merely states "Other." Id.

903.   Therefore, this form demonstrates that the defendant medical providers were predisposed to refer patients to Horizon Imaging or Clear Imaging, as these MRI facilities have ownership and/or management connections within the UHG/PHS network.

904.   Patient testimony demonstrates that the defendant medical providers habitually referred patients to the defendant MRI facilities without any patient input.

905.   Indeed, patient testimony reveals that patients were led to understand that they did not have a choice as to where to receive MR imaging and often had to travel great distances to undergo MRIs at Horizon Imaging and Clear Imaging.

906.   These self-referred MRIs were problematic for two reasons.

907.   First, the defendants used the misrepresentations in the reports from Desai, Paley, Horizon Imaging, and Clear Imaging to justify excessive treatment (including physical therapy, injections, and surgical procedures) for which Allstate was billed.

908.   Second, the MRIs themselves were incredibly profitable for the defendants due to the highly inflated prices charged by Horizon Imaging and Clear Imaging.

909.   Indeed, as discussed above, Chudler often cited MRI results in his reports and recommendations to commence and/or continue treatment, including chiropractic treatment and physical therapy.

910.   The MRIs were also used by Associated Surgical, American Surgical, Pierce, and other of the defendant medical providers to justify the performance of invasive procedures, such as injections.

911.    As these injections were justified on a false premise (the bogus MRI findings), the injections were likewise not supported as medically necessary, as discussed in further detail *infra*.

912.    Beyond being used to justify other treatment for which the defendants could bill Allstate, the bills for the MRIs themselves were highly lucrative for the defendants.

913.    Indeed, Horizon Imaging and Clear Imaging billed Allstate between $4,100 and $7,000 per MRI at all times relevant to this Complaint.

914.    These charges bear little relation to the actual cost of the MRI, which certain evidence suggests approximates $500 per MRI for mobile MRI centers like Horizon Imaging and Clear Imaging that use the same MRI technology.

915.    Thus, reimbursement from Allstate at the charged rate of $4,100 for each MRI represents a profit to the defendants of about $3,600 and reimbursement from Allstate at the charged rate of $7,000 for each MRI represents a profit to the defendants of about $6,500.

916.    In other words, the defendants charged Allstate at least eight (8) times and as much as fourteen (14) times their cost for MRIs.

917.    Another significant Michigan payor reimburses Horizon Imaging and Clear Imaging at the average of approximately $667 per MRI.

918.    The outrageous amounts charged by Horizon Imaging and Clear Imaging are exacerbated by the fact that several patients received multiple MRIs.

919.    Indeed, at least 230 of the patients at issue in this Complaint received at least two MRIs at Horizon Imaging and/or Clear Imaging.  *See chart annexed hereto at Exhibit 21.*

920.    Of these 230 patients, more than half had at least three MRIs at Horizon Imaging and/or Clear Imaging and several had in excess of four.  Id.

921.    The MRIs ordered and read by the defendant medical providers were often for areas of the body for which the patient did not make a subjective complaint or exhibit symptoms, further supporting a lack of medical necessity for the MRIs.

922.    Thus, it is clear that the MRIs performed by Horizon Imaging and Clear Imaging, and read by Desai and Paley, were not done because of medical need, but rather solely for pecuniary interests.

923.    It is beyond dispute that a referral by UHG, including any of its assumed name facilities, the various UWC entities, American Surgical, Associated Surgical, or any of the individual medical providers to Horizon Imaging or Clear Imaging benefitted the defendant medical providers financially in a way that a referral to an independent imaging center did not.

924.    As such, the defendant medical providers overwhelmingly referred their patients to Horizon Imaging and/or Clear Imaging.  *See* Exhibit 17.

925.    The legal and medical literature strongly supports the conclusion that such self-referral results in increases in excessive and unnecessary imaging.

926.    The self-referral incentive also transcends the defendant medical facilities to encompass the defendant radiologists as well, who as independent contractors of the defendant MRI facilities were influenced to exaggerate and misrepresent MRI findings to ensure future business for themselves.

927.    In sum, the premature and repeated referral of patients for MRIs early and often, as well as misrepresented MRI findings, was an important part of the defendants' scheme to defraud both because the MRIs themselves were lucrative for the defendants and because the MRIs facilitated the ability of the defendant medical providers to submit claims for payment to

Allstate for other types of treatment and procedures that were premised on the misrepresented MRI findings.

### 4. **Exemplar Claims**

928.    The following Allstate insureds exemplify the misrepresented findings reported by Desai, Paley, Horizon Imaging, and Clear Imaging; the use of MRIs to justify continued unnecessary treatment; and the general overuse of MR imaging by the defendants.

### a.    **J.C. (Claim No. 0203091483)**

929.    Patient J.C. treated at Associated Chiropractic following a January 6, 2011 motor vehicle accident.

930.    Prior to his evaluation by Chudler, J.C. underwent MR imaging on July 5, 2012 at Clear Imaging of his cervical and lumbar spine at the referral of his chiropractor at Associated Chiropractic (a UHG entity).

931.    On July 5, 2012, J.C. received MRIs of his cervical and lumbar spine for which Clear Imaging billed Allstate $5,300 each ($10,600 total).

932.    The following day, on July 6, 2011, Chudler found "[n]o focal neuro deficits" when he examined J.C.

933.    At that time, Chudler noted that the MRI results were pending and recommended that J.C. receive MR imaging of his right knee, which went forward on July 12, 2011 and for which Clear Imaging billed Allstate $4,100.

934.    Despite a normal image of J.C.'s cervical spine without evidence of neural compromise, Desai found several disc bulges with impingement of the thecal sac.

935.    These findings were thus misrepresentations and use of the term "impingement" was misleading because there was no negative clinical implication to this normal examination.

936.   Ultimately, Desai misrepresented these normal findings as disc degeneration in the cervical spine.

937.   J.C.'s lumbar spine imaging was also normal.

938.   Again, however, Desai overstated disease in his accompanying report.

939.   Where there were normal discs, Desai identified disc bulges.

940.   Again, Desai reported impingement of the thecal sac, which was absent from the imaging and implied significance where there was none.

941.   Therefore, Desai misrepresented J.C.'s disease and suggested that otherwise inconsequential findings had clinical significance.

942.   The practical consequence is that Desai's findings, particularly his trademark finding of impingement of the thecal sac, indicate an intent to mislead.

943.   Clear Imaging submitted claims for payment and accompanying MRI reports to Allstate through the U.S. Mail.

944.   Desai knew that his MRI reports would be sent to Allstate via the U.S. Mail.

945.   Allstate relied upon these submissions in adjusting the claims.

### b.      M.L.J. (Claim No. 0174974618)

946.   Patient M.L.J. underwent cervical and lumbar spine MRIs at Clear Imaging on September 22, 2010 following involvement in a motor vehicle accident on August 11, 2010.

947.   Clear Imaging billed Allstate for each MRI at a rate of $5,300 or a total of $10,600.

948.   On December 23, 2010, M.L.J. also received MRIs of both shoulders and her right knee at Clear Imaging.

949. For her age of forty-three, the MRI of M.L.J.'s cervical spine was normal, as mild degenerative changes are present in asymptomatic individuals of that age and there was no sign of neural compromise or neural root impingement.

950. Desai, however, found disc herniation impinging upon the ventral thecal sac, which was misleading because, at most, the imaging revealed mild impression on the thecal sac.

951. Desai also stated that there was a disc bulge at C6-7, which was in fact a normal level and not significant.

952. These findings in actuality represented insignificant amounts of degenerative change and did not constitute a herniation or significant disc bulge, despite Desai's characterization of them as such.

953. The MRI of M.L.J.'s lumbar spine also was normal.

954. Desai, however, found a disc bulge indenting upon the thecal sac, which was not present on the image.

955. Desai also found moderate bilateral narrowing of the neural foramina, which are the openings in the spinal cord through which the spinal nerves pass, while the image actually showed, at most, mild narrowing without any signs of neural compromise or herniation.

956. Therefore, Desai misrepresented M.L.J.'s disease with fabrication of the indent on the thecal sac, the use of the insignificant term "impingement," and overstatement of foraminal stenosis.

957. Clear Imaging submitted claims for payment and MRI reports to Allstate by way of the U.S. Mail.

958. Desai knew that his MRI reports would be sent to Allstate via the U.S. Mail.

959.    Allstate relied upon these submissions when tendering payment for the MR imaging for M.L.J. rendered at Clear Imaging in a total amount of $22,445.

### c.    G.K. (Claim No. 0197858632)

960.    Patient G.K. was solicited to treat at the defendant medical providers, as discussed above.

961.    G.K. initially was evaluated at UHG on April 12, 2011 following his involvement in a motor vehicle accident on March 4, 2011.

962.    G.K. received MRIs of his cervical spine at Horizon Imaging on May 27, 2011 at the referral of his UHG chiropractor.

963.    The image of G.K.'s cervical spine showed normal cervical alignment and curvature with minor disc bulges indicative of chronic degeneration to be expected for a patient of 48 years of age such as G.K.

964.    Desai, however, reported an abnormal curvature and disc bulges impinging upon G.K.'s ventral thecal sac.

965.    Rather, there was minimal ventral impression on the thecal sac that was without significance resulting in a misleading finding on the part of Desai.

966.    Desai also stated that there was a posterior disc herniation with impingement of the ventral thecal sac, which also was a misleading finding because there was no impingement on any structure.

967.    Consequently, Desai misrepresented disease for G.K.'s cervical spine MRI and inappropriately found an "impingement."

968.    On June 27, 2011, Chudler used this overstated MRI report to justify G.K. beginning a course of physical therapy and continuing chiropractic treatment and specifically cited the cervical disc herniation "impinging on the ventral thecal sac."

969.    Horizon Imaging billed Allstate in the amount of $5,300 for the MRI of G.K.'s cervical spine.

970.    Desai also overstated disease in his report of G.K.'s thoracic spine MRI dated December 28, 2011, which also was essentially normal with only a very minor disc bulge and no neural compromise or impingement of any structure.

971.    Desai nonetheless grossly overstated disease in his report of G.K.'s thoracic spine MRI.

972.    Desai noted, among other things, that the MRI showed disc bulges and a disc herniation where none were present.

973.    Desai also noted that there was impingement of the thecal sac at several levels, which is not accurate.

974.    Horizon Imaging billed Allstate in the amount of $5,300 for the MRI of G.K.'s thoracic spine.

975.    G.K. also underwent imaging of his lumbar spine on December 28, 2011, the results of which showed normal alignment and curvature.

976.    While a disc bulge and desiccation were present, there was no compromise of neural structures or impingement of any structures.

977.    However, like his previous reports, Desai's report for G.K.'s lumbar spine MRI also misrepresented disease in that he again found a disc bulge impinging the thecal sac, which

was not present, as well as mild bilateral foraminal narrowing, representing a gross

misinterpretation, if not an outright fabrication.

978.    Horizon Imaging billed Allstate in the amount of $5,300 for the MRI of G.K.'s

lumbar spine.

979.    Therefore, Desai reported gross overstatements of disease for all three of G.K.'s

spinal regions suggesting that he has no concept of normal anatomy and normal aging.

980.    G.K. also underwent a MRI of his brain on July 27, 2011 at Clear Imaging for

which Clear Imaging billed Allstate in the amount of $7,000.

981.    In total, Allstate paid Clear Imaging approximately $9,000 for the MR imaging of

G.K.

982.    Clear Imaging and Horizon Imaging submitted claims for payment and MRI

reports to Allstate through the U.S. Mail relating to G.K.

983.    Desai knew that his MRI reports would be sent to Allstate via the U.S. Mail.

984.    Allstate relied upon these submissions in adjusting the claims and tendering

payment.

### d.    D.M. (Claim No. 0178022547)

985.    Patient D.M. was evaluated by Chudler approximately one month following an

accident that occurred on August 30, 2010.

986.    In his examination, Chudler found "[n]o focal neuro deficits."

987.    D.M. underwent MR imaging of his cervical spine on December 3, 2010 at

Horizon Imaging at Chudler's referral.

988.    Horizon Imaging billed Allstate in the amount of $5,300 for the MRI of D.M.'s

cervical spine on December 3, 2010.

989.    The MRI of his cervical spine was normal with mild diffuse degenerative disc disease and mild foraminal narrowing without significant compromise of the spinal cord.

990.    Paley, however, reported that D.M. had a broad-based herniated disc impinging on the ventral margin of the cord, which was both incorrect and misleading as no neural compromise was present.

991.    Whereas Paley reported a disc herniation, there was merely a small bulge.

992.    Paley also noted moderate to severe right foraminal stenosis while, at most, there was mild narrowing.

993.    Therefore, Paley's findings represent gross overstatements of disease.

994.    D.M. also underwent a MR imaging of his right hand and shoulder on December 3, 2010, for which Horizon Imaging billed Allstate in the amount of $4,100.

995.    On December 15, 2010, following the MRIs of D.M.'s cervical spine, right shoulder, and right hand, Chudler recommended that D.M. continue with physical therapy related to his cervical spine.

996.    Horizon Imaging submitted claims for payment and MRI reports to Allstate by way of the U.S. Mail.

997.    Paley knew that his MRI reports would be sent to Allstate via the U.S. Mail.

998.    Allstate relied upon these submissions in adjusting the claims.

### e.    S.Y. (Claim No. 0227670577)

999.    Patient S.Y. underwent MR imaging at Clear Imaging of his cervical and lumbar spine on May 21, 2012 following a motor vehicle accident on November 29, 2011.

1000.   Clear Imaging billed Allstate in the amount of $5,300 for each MRI, or $10,600 total.

1001.   The examination of S.Y.'s cervical spine was completely normal.

1002.   Despite the normal imaging study of Y.S.'s cervical spine, Desai found disc bulges at levels C4-5, C5-6, and C6-7 impinging upon the thecal sac, which were grossly incorrect findings.

1003.   The examination of S.Y.'s lumbar spine also was completely normal.

1004.   However, despite the normal imaging study of Y.S.'s lumbar spine, Desai reported abnormalities, including a disc bulge at level L4-5 impinging upon the thecal sac and causing mild bilateral foraminal narrowing as well as a disc bulge at L5-S1 impinging upon the thecal sac.

1005.   Therefore, Desai misrepresented abnormalities in the MR images of Y.S.'s cervical and lumbar spine where none were present in disregard of normal anatomy.

1006.   Clear Imaging submitted claims for payment and MRI reports to Allstate through the U.S. Mail.

1007.   Desai knew that his MRI reports would be sent to Allstate via the U.S. Mail.

1008.   Allstate relied upon these submissions in adjusting the claims.

**f.      M.C. (Claim No. 0216858992)**

1009.   M.C. testified that he treated at UWC-Lansing following his involvement in a motor vehicle accident.

1010.   According to M.C., UWC-Lansing referred him to Clear Imaging for a total of three (3) MRIs.

1011.   Although M.C. lived in Lansing, Michigan and treated at the UWC facility in Lansing, he testified that UWC-Lansing insisted that he go to Clear Imaging located in the

Detroit area (Royal Oak) for diagnostic imaging, which is approximately 80 miles and an hour and fifteen minutes away from M.C.'s home.

1012.   M.C. testified that he understood from a UWC-Lansing representative that it was "mandatory" that he have the MRI at Clear Imaging.

1013.   Clear Imaging submitted claims for payment and the MRI report to Allstate through the U.S. Mail.

1014.   Allstate relied upon these submissions in adjusting the claims.

**g.      S.L. (Claim No. 0232258590)**

1015.   S.L. treated at UHG following her involvement in a motor vehicle accident on December 17, 2011.

1016.   S.L. testified that upon her examination at UHG, a UHG chiropractor referred for a MRI at Clear Imaging.

1017.   According to S.L., she was specifically sent to Clear Imaging and was provided with transportation to and from the imaging center.

1018.   S.L. underwent MR imaging studies at Clear Imaging, which resultant images were read by Desai, who also authored the reports.

1019.   Clear Imaging submitted claims for payment and the MRI report to Allstate through the U.S. Mail.

1020.   Desai knew that his MRI reports would be sent to Allstate via the U.S. Mail.

1021.   Allstate relied upon these submissions in adjusting the claims.

**h.      K.B. (Claim No. 100212501)**

1022.   K.B. testified that he treated at UWC following his motor vehicle accident.

116

1023.   K.B. testified that the UWC chiropractor referred him to have a MRI at Clear Imaging.

1024.   According to K.B., the chiropractor arranged the appointment for him and he did not have a choice of MRI provider.

1025.   Clear Imaging submitted claims for payment and MRI reports relative to K.B. to Allstate through the U.S. Mail.

1026.   Allstate relied upon these submissions in adjusting the claim.

### i.   T.M. (Claim No. 0236952404)

1027.   T.M. testified that she was solicited for treatment at Associated Chiropractic & Medical Centers, a UHG entity, and was referred to Clear Imaging for a MRI.

1028.   Clear Imaging submitted claims for payment and MRI reports relative to T.M. to Allstate through the U.S. Mail.

### D.   FRAUDULENT ELECTRODIAGNOSTIC TESTING

1029.   The defendant medical providers, especially UHG and Pierce, performed a significant number of electrodiagnostic tests.

1030.   Electrodiagnostic testing includes electromyography (EMG) and nerve conduction studies (NCS).

1031.   EMG testing involves the use of an electromyography machine to record the electrical activity of a skeletal muscle to evaluate the existence of muscle and/or nerve abnormalities.

1032.   An EMG is an invasive procedure that involves the insertion of a small needle electrode directly into an individual muscle.

1033.   There are at least two components to a properly administered EMG test.

117

1034.   First, after the needle is inserted below the skin, the muscle is examined at rest.

1035.   In a normal muscle at rest, there is some reaction to the muscle when the needle is first pushed through the surface of the muscle and then the muscle becomes "silent."

1036.   A damaged muscle – or a muscle that has experienced disruption of its normal nerve stimulation, as occurs in neuropathy or radiculopathy – continues to produce electric charges even at rest.

1037.   The second component of the EMG test measures the electrical activity that occurs when the muscle is activated by a motor nerve.

1038.   In a healthy muscle, a voluntary muscle movement produces a measurable electrical charge.

1039.   If the nerve or root has been damaged, then some part of the muscle signal may be missing or abnormal.

1040.   NCS testing is often performed in conjunction with EMG to assist in the diagnosis of neurological diseases.

1041.   To perform a NCS, the clinician must measure nerve impulses following nerve stimulation and obtain information regarding the speed (i.e., velocity), timing, and strength (i.e., amplitude) of nerve impulses.

1042.   NCS involve non-invasive tests in which peripheral nerves in the upper and lower limbs (i.e., arms and legs) are stimulated through the skin by the application of an electrical current.

1043.   A brief shock is then delivered at a measured distance from the recording electrodes to stimulate the nerve, causing it to conduct an electrical wave of depolarization down each respective nerve.

118

1044.   The velocity, amplitude, and shape of the response are then recorded by the recording electrodes attached to the surface of the skin.

1045.   The electrical characteristics of the nerve responses are compared with well-defined normal responses to identify the existence, nature, extent, and specific location of any abnormalities in the sensory and motor nerve fibers of peripheral nerves in the arms and legs.

1046.   The results of the defendant medical providers' EMG and NCS testing and their underlying medical records reflect predominantly unjustified testing resulting in a pattern of excess testing and unwarranted, indeed sometimes impossible, findings.

1047.   The electrodiagnostic testing performed by the defendant medical providers was unnecessary and problematic in several respects.

1048.   First, such testing was unnecessary and not justified based on the providers' own findings, especially Chudler's, but rather was ordered to justify additional treatment by the defendant medical providers and to generate higher claims for payment against auto insurers like Allstate.

1049.   Second, motor vehicle accidents rarely cause radiculopathy.

1050.   Third, the defendant medical providers generated unsupported and incredible electrodiagnostic testing reports and results.

1051.   Finally, the defendant medical providers performed electrodiagnostic testing pursuant to a predetermined protocol, thereby undermining the necessity and justification for such testing.

### 1.      Unnecessary and Unjustified EMG and NCS Testing

1052.   For EMG and NCS testing to be medically justified, the clinical examination must indicate symptoms or signs of radiculopathy.

1053.   The electrodiagnostic examination is a dynamic examination wherein the nerves and muscles studied will change from case-to-case.

1054.   Radiculopathy is a pathological condition of the nerve roots where one or more root nerves along the spine become damaged causing radiating pain to the part of the body served by the particular nerve.

1055.   Essentially, a radiculopathy is what is known as a "pinched nerve."

1056.   The patient's subjective symptoms alone cannot support an electrodiagnostic study absent objective findings by the practitioner because such studies are an extension of the clinical exam.

1057.   EMG and NCS studies are reserved for cases of actual neurologic abnormalities.

1058.   EMG and NCS are not indicated where, as is the case with nearly all patients of the defendant medical providers, neurologic deficits are not detected in the patients.

1059.   The defendant medical providers displayed a troubling pattern of ordering EMG and NCS testing without first making objective findings of abnormal neurology.

1060.   Chudler's examinations, for example, were extremely limited and the accompanying documentation merely reflects that he palpated the patients' back and generically described the patients' pain and lack of range of motion.

1061.   Chudler routinely found, in approximately three-quarters of his exams of the patients at issue in this Complaint, that patients have "no focal neurological deficits." *See chart of representative examples annexed hereto at Exhibit 17.*

1062.   No reason exists to resort to EMG and NCS when a patient does not present with a neurological deficit.

1063.   Therefore, even if Chudler did perform an adequate exam, his own findings do not support the course of treatment that he ordered for his patients, including electrodiagnostic testing.

1064.   Patients of the defendant medical providers underwent EMG and NCS testing even when objective symptoms or signs of radiculopathy were absent from the clinical examination.

1065.   Consequently, the defendant medical providers subjected their patients to unnecessary pain and risk of infection and billed Allstate for unnecessary and unjustified EMG and NCS testing.

### 2.   Motor Vehicle Accidents Rarely Cause Radiculopathy

1066.   The absence of objective symptoms and signs of radiculopathy in the patients of the defendant medical providers is not surprising because the entirety of the patients purported to be injured in motor vehicle accidents, the majority of which were minor "fender benders" in which the occupants of the vehicles did not immediately seek care at a hospital.

1067.   Motor vehicle accidents only rarely cause neuropathy.

1068.   A recently published study examined the frequency of radiculopathy in motor vehicle accident patients.  Randall L. Braddom, et al., Frequency of Radiculopathies in Motor Vehicle Accidents, 39 Muscle & Nerve 545-547 (2009).

1069.   The study found that motor vehicle trauma causes a slight increase over the baseline rate of cervical radiculopathy (8%) compared to non-motor vehicle accident patients (6%), and that the frequency of lumbar radiculopathy in the two populations was the same (12%). Id.

1070.   Therefore, cervical radiculopathy is only rarely caused by a motor vehicle accident and motor vehicle accidents do not cause a significant increase in the frequency of lumbar radiculopathy.

1071.   Consequently, the lack of objective symptoms and signs of radiculopathy in the defendant medical providers' patients is consistent with the documented reality that motor vehicle accidents rarely cause radiculopathies.

1072.   Any diagnosis of radiculopathy made by the defendant medical providers is thus further called into question given that the patients at issue in this Complaint universally treated at the defendant medical facilities following a motor vehicle accident.

3.   **Unlikely and Incredible Electrodiagnostic Testing Reports and Results**

1073.   The defendant medical providers' EMG studies were purportedly done on 30-60 muscles per patient, which is incredible and unlikely as this would involve the insertion of 30-60 needles into a patient's muscles during a single visit.

1074.   The results of electrodiagnostic tests conducted by the defendant medical providers, including UHG and Pierce, are likewise unlikely and include impossible data, thus rendering such results and findings meaningless.

1075.   The results of the testing inordinately contain findings of bilateral radiculopathy despite the lack of evidence in MRIs of root nerve compression, which while possible is highly unlikely to occur across a spectrum of patients as occurred with respect to the Allstate insureds at issue herein.

1076.   The EMG analyses from the defendant medical providers reported radiculopathy where none was present.

122

1077.   The EMG results also set forth impossible data, such as data indicating eight radiculopathies, which is medically impossible.

1078.   The results of the EMG studies demonstrate their lack of medical necessity given that the results were either normal or cite an abnormality of "1+ positive waves," which is considered a normal finding as well.

1079.   A finding of 1+ positive waves does not carry any clinical significance and merely indicates that the electromyographer should investigate further for more significant changes.

1080.   Moreover, it is impossible to detect "1+ positive waves" in the paraspinal muscles as the defendant medical providers consistently reported.

1081.   Therefore, the EMGs for the patients of the defendant medical providers followed a predictable pattern, including the conduction of testing despite the lack of patient neurological deficits, findings of clinically inconsequential "1+ positive waves," unsupported diagnoses of radiculopathies, and excessive numbers of muscles tested.

### 4.      Use of  a "Protocol Approach" to Electrodiagnostic Testing

1082.   As illustrated above, based upon the initial examinations of each patient, Chudler uniformly ordered a pre-determined protocol of medical services and diagnostic tests, including EMG and/or NCS tests.

1083.   Electrodiagnostic testing is an extension of the clinical exam and should be used, if at all, in accordance with a patient's individualized objective symptoms.

1084.   Accordingly, the nature and number of the peripheral nerves and the types of nerve fibers tested in a NCS should be dynamic (i.e., varied from patient to patient), and should never be based on a predetermined protocol.

1085.   Likewise, the provision of EMG tests should not be conducted pursuant to a predetermined protocol of muscles to be tested.

1086.   Such a protocol-based approach to electrodiagnostic testing can lead to overutilization of such testing, as described above.

1087.   Overutilization of invasive electrodiagnostic studies subjects patients to unnecessary pain and exposes them to unnecessary risk for infection.

1088.   The defendant medical providers, especially UHG and Pierce, displayed the use of a protocol approach when submitting their patients to electrodiagnostic testing.

1089.   Specifically, Chudler referred patients for electrodiagnostic testing even if they did not present with any neurological deficits or any other objective symptoms indicating a suspected radiculopathy, supporting that such referrals were made on the basis of a predetermined protocol.

1090.   Moreover, similar to the MRIs discussed in the preceding section, the defendants used the bogus results from the EMG and NCS testing to justify continued and increased treatment for patients.

1091.   As for the electrodiagnostic studies themselves, the defendant medical providers routinely subjected patients to excessive numbers of nerves tested during NCS and excessive numbers of muscles tested during EMG.

1092.   The results of these excessive studies also followed a predictable pattern.

1093.   As explained above, the patients were routinely found to have "1+ changes," which are the equivalent of normal.

1094.   Such a finding does not support a diagnosis of radiculopathy, despite the defendant medical providers' findings to the contrary.

124

1095.   The defendant medical providers, at the direction of Chudler, inappropriately performed electrodiagnostic testing pursuant to a predetermined protocol as evidenced by the pattern of EMG and NCS in disregard for their patients' best interests in an effort to maximize the amounts billed to insurers such as Allstate.

### 5.   **Exemplar Claims**

1096.   The following patients exemplify the protocol of electrodiagnostic testing carried out by the defendant medical providers discussed above, especially UHG and Pierce.

### a.   **A.S. (Claim No. 0158510008)**

1097.   Patient A.S. was in a motor vehicle accident on January 16, 2010.

1098.   On or about December 8, 2011, she began treating at UHG.

1099.   Chudler performed a superficial physical exam and found "no focal neurological deficits."

1100.   Despite the lack of objective neurologic findings, Chudler nonetheless referred A.S. for electrodiagnostic testing at Michigan Spine and Rehab on January 9, 2012.

1101.   The EMG testing purportedly studied approximately forty (40) muscles, which, as explained above, is excessive and would have involved the insertion of forty (40) needles into A.S.'s muscles during this single visit.

1102.   The results of A.S.'s EMG purportedly were 1+ changes in the left deltoid and biceps, which are the equivalent of normal.

1103.   The electrodiagnosticians, one of whom was Pierce, also found 1+ paraspinal changes on the left, which is an impossible finding.

1104.   As an initial matter, without an objective finding of a neurologic deficit in the first place, the EMG studies were irrelevant and thus medically unnecessary as not indicated by A.S.'s clinical exam, or lack thereof.

1105.   Second, the actual conduction of the EMG study was improper and excessively tested approximately forty (40) muscles.

1106.   Finally, the findings of the unwarranted EMG studies were impossible in some instances and normal in others, despite the defendants' attempt to characterize them otherwise.

1107.   Therefore, A.S.'s diagnosis of radiculopathy was wholly unsupported by the EMG findings and the EMG testing was not medically necessary.

1108.   Michigan Spine and Rehab submitted claims for payment and medical records relative to the EMG studies provided to A.S. to Allstate through the U.S. Mail.

1109.   Allstate relied upon these submissions in adjusting the claims for payment.

**b.       A.L. (Claim No. 0236132312)**

1110.   Patient A.L. was involved in a motor vehicle accident on February 20, 2012, and began treatment with Michigan Spine and Rehab on March 14, 2012 with an intact neurological exam.

1111.   Still, EMG studies were performed that same day on March 14, 2012.

1112.   The EMG studies reported seventy (70) muscles tested, which, if performed, would have involved insertion of seventy (70) needles during A.L.'s single March 14 visit.

1113.   The only changes detected were 1+, which are the equivalent of normal.

1114.   The resulting diagnoses of radiculopathies for A.L. were, thus, incredible and unsupported.

1115.   Indeed, in an examination of A.L. at Associated Chiropractic on June 14, 2012, Chudler assessed her as possessing "[n]o focal neuro deficits."

1116.   Thus, there was no basis to refer A.L. for EMG testing in the first instance, the testing that was done was excessive, and the "findings" of the test were misrepresented and worthless.

1117.   Michigan Spine and Rehab submitted claims for payment and medical records relative to the EMG studies provided to A.L. to Allstate through the U.S. Mail.

1118.   Allstate relied on these submissions when adjusting the claims and tendering payment.

### c.   E.R. (Claim No. 0225920123)

1119.   Patient E.R. was in a motor vehicle accident on November 14, 2011.

1120.   She began treating with Chudler on March 8, 2012 after several months of chiropractic treatment.

1121.   Chudler's exam found "no focal neurological deficits," consistent with his finding for the majority of his patients.

1122.   Nonetheless, E.R. underwent EMG and NCS testing, conducted by Pierce, on January 23, 2012 and January 27, 2012.

1123.   Michigan Spine and Rehab billed Allstate in the amount of $5,660 for the electrodiagnostic studies performed on January 23, 2012 and in the amount of $2,295 for the electrodiagnostic studies performed on January 27, 2012.

1124.   Significantly more than the standard number of muscles were tested.

1125.   Indeed, approximately forty (40) muscles were tested, which if actually performed would have involved insertion of forty (40) needles during a single visit.

1126. The only abnormality reported in E.R.'s EMG report was 1+ changes in the left biceps brachii and triceps, which is essentially a normal finding.

1127. As such, the ultimate conclusion of radiculopathy was not borne out by this testing, which was not medically necessary.

1128. Michigan Spine and Rehab submitted claims for payment and medical records relative to the EMG studies provided to E.R. to Allstate through the U.S. Mail.

1129. Allstate relied upon these submissions in adjusting the claims.

### d.     L.F. (Claim No. 0194061453)

1130. Patient L.F. began treating at Michigan Spine and Rehab on May 25, 2011, following her involvement in a motor vehicle accident that occurred on February 22, 2011.

1131. On or about June 24, 2011, at the referral of her Associated Chiropractic chiropractor, in contravention of L.F.'s presentation as neurologically normal, an EMG study was performed by Pierce of approximately sixty (60) muscles studied, which if performed would have required the insertion of sixty (60) needles into L.F.'s muscles during a single visit.

1132. The sole abnormality noted was 1+ changes in the biceps and triceps as well as in the gastrocnemius muscle, which findings are the equivalent of normal.

1133. Consequently, the finding of lumbar and cervical radiculopathies was wholly inappropriate.

1134. Chudler examined L.F. at Associated Chiropractic on September 2, 2011 and found that she possessed "[n]o focal neuro deficits."

1135. Michigan Spine and Rehab submitted claims for payment and medical records relative to the treatment provided to L.F. to Allstate through the U.S. Mail.

1136. Allstate relied upon these submissions in adjusting the claims.

**e.**     **M.S. (Claim No. 0167978997)**

1137.   Patient M.S. first treated at UHG on May 18, 2010, following her involvement in a motor vehicle accident on May 6, 2010.

1138.   Chudler evaluated M.S. on July 29, 2010, finding "[n]o focal neuro deficits."

1139.   On January 7, 2011, M.S. underwent an EMG and NCS at Katz's referral.

1140.   Michigan Spine and Rehab billed Allstate for the January 7, 2011 electrodiagnostic testing in the amount of $1,445.

1141.   The electrodiagnostic studies performed by Pierce included excessive nerve conductions and muscles studied.

1142.   The findings of 1+ changes in M.S.'s paraspinals and peronus longus are normal yet the conclusion of the EMG was "abnormal."

1143.   Given that M.S. did not present with objective or subjective indications for electrodiagnostic studies, the studies were unnecessary and not performed for the benefit of M.S.

1144.   M.S. continued to treat at UHG for the next eleven months until November 22, 2011.

1145.   Her continued treatment was justified in part on the bogus EMG testing done by Michigan Spine and Pain and Pierce.

1146.   Michigan Spine and Rehab submitted a claim for payment and medical records relative to the EMG study provided to M.S. to Allstate through the U.S. Mail.

1147.   Allstate relied upon these submissions in adjusting the claim.

**f.**     **A.W. (Claim No. 0209078013)**

1148.   Patient A.W. treated at UHG beginning on January 24, 2012, following his involvement in a motor vehicle accident on June 30, 2011.

129

1149.   On February 23, 2012, A.W. underwent EMG and NCS testing at Michigan Spine and Rehab.

1150.   Michigan Spine and Rehab charged Allstate in the amount of $5,460 for the February 23, 2012 EMG/NCS studies.

1151.   The electromyographer indicated increased insertional activity in the paraspinals upon which she based a diagnosis of cervical radiculopathy.

1152.   Such a finding of radiculopathy was not indicated by the results of the EMG for A.W.

1153.   Indeed, just two weeks later, on March 8, 2012, Chudler conducted an initial evaluation of A.W. and concluded that the exam revealed "[n]o focal neuro deficits."

1154.   The finding of radiculopathy by Michigan Spine and Rehab and Chudler's examination at UHG finding no neurological deficiencies for A.W. are inherently incompatible.

1155.   Moreover, the resort to EMG testing before a full clinical examination rendered such testing premature and, therefore, unnecessary.

1156.   Following this unnecessary EMG, A.W. received treatment with the defendant medical providers up until August of 2012.

1157.   Michigan Spine and Rehab submitted a claim for payment and medical records relative to the EMG studies provided to A.W. to Allstate through the U.S. Mail.

1158.   Allstate relied upon the submissions in adjusting the claim.

### g.      O.C. (Claim No. 0125938225)

1159.   Patient O.C. was involved in a motor vehicle accident on December 16, 2008 and purported to receive treatment for injuries stemming from this accident with Michigan Spine and Rehab at the end of January 2012, more than three years later.

1160.   Following the motor vehicle accident on December 16, 2008, O.C. did not immediately treat at the hospital and did not follow up with any complaints until weeks later.

1161.   An examination of O.C. performed at Michigan Spine and Rehab (i.e., UHG) on January 31, 2012 revealed "no focal neuro deficits."

1162.   Nonetheless, approximately two weeks later, on February 15, 2012, O.C. underwent an EMG that purportedly tested approximately fifty (50) muscles, which would have required the insertion of approximately fifty (50) needles during the single visit.

1163.   In keeping with the pattern of findings present in the EMGs of other patients, the electromyographer found 1+ changes, which lack clinical significance.

1164.   The ultimate finding of an abnormal EMG study for O.C. was thus unjustified.

1165.   O.C. continued to treat with Michigan Spine and Rehab for nearly a year subsequent to his EMG (until January 15, 2013).

1166.   Michigan Spine and Rehab submitted claims for payment and medical records relative to the treatment provided to O.C. to Allstate through the U.S. Mail.

1167.   Allstate relied on these submissions in adjusting the claims related to O.C.

**h.    S.L. (Claim No. 0236132312)**

1168.   Patient S.L. sought treatment at UHG following his involvement in a motor vehicle accident on February 20, 2012.

1169.   S.L. was initially evaluated at Associated Chiropractic on June 14, 2012 by Chudler.

1170.   In his report memorializing this exam, Chudler reported that S.L. presented with "[n]o focal neuro deficits."

131

1171.   However, on March 14, 2012, S.L. underwent electrodiagnostic testing performed by Pierce and another physician that was assessed as "abnormal" and suggestive of a radiculopathy.

1172.   These findings of a suggested radiculopathy are irreconcilable with Chudler's assessment that S.L. presented with no neurological deficit.

1173.   The electromyographers purported to study twelve (12) nerves and approximately sixty (60) muscles, both of which are excessive and highly unlikely.

1174.   Moreover, like other patients, 1+ changes were found, which are of no clinical significance and do not support a diagnosis of radiculopathy.

1175.   Michigan Spine and Rehab billed Allstate in the amount of $9,405 for the electrodiagnostic studies performed on March 14, 2012.

1176.   Michigan Spine and Rehab submitted a claim for payment and medical records relative to the EMG study provided to S.L. to Allstate through the U.S. Mail.

1177.   Allstate relied upon these submissions in adjusting the claim.

E.   FRAUDULENT INJECTIONS

1178.   The medical facility defendants also billed Allstate for medically unnecessary injections, including epidural steroid injections (ESI), medial branch blocks, facet injections, sacroiliac joint injections, as well as facet neurolysis.

1179.   The interventional procedures done on the defendants' patients were predominantly performed at one of two, or both, defendant surgical centers: Associated Surgical and American Surgical.

1180.   The performance of invasive procedures (such as injections) for the relief of pain must be based upon adequate diagnosis and legitimate medical necessity.

132

1181.   The defendant medical providers performed these invasive procedures, ostensibly, to relieve and manage patient pain.

1182.   However, in actuality, these procedures were performed pursuant to insufficient physical examinations, incorrect and unsubstantiated diagnoses, inadequate follow-up examinations, and without appropriate documentation.

1183.   Consequently, the defendant medical providers' patients received unjustified invasive procedures that offered little therapeutic efficacy while subjecting the patients to unnecessary risks of infection and the risks associated with anesthesia.

1184.   The invasive procedures performed by Associated Surgical, American Surgical, and Pierce were not necessary or justified for several reasons, including: (1) inadequate physical examinations, (2) incorrect and unsubstantiated diagnoses, (3) failure to conduct follow-up evaluations, and (4) repetitive use of procedures that are largely diagnostic rather than therapeutic.

1185.   The defendants also overused anesthesia when performing injections, thereby endangering the lives of their patients for the sole purpose of seeking higher payment from Allstate.

### 1.       **Inadequate Physical Examinations**

1186.   Use of invasive procedures, such as injections, must be based on a thorough and accurate physical examination.

1187.   Findings arising from physical examinations must be carefully recorded so that other physicians may reliably use such data in the future.

1188.   The physical examinations performed by the defendant medical providers, however, contain undeniable indicia of inadequate physical examinations, such as boilerplate

verbiage repeated in the records of physical examinations performed on a number of different office visits.

1189.   Therefore, the patient evaluations performed by the defendant medical providers, especially Chudler, were perfunctory and essentially identical.

1190.   Such simplistic and repetitive findings arising out of patient evaluations suggest that physical examinations were not actually performed.

1191.   Thus, from the outset, the defendant medical providers performed invasive procedures on patients without proper justification established by a thorough and well-documented physical examination, which renders the procedures performed without adequate basis and, thus, medically unnecessary.

## 2.        Incorrect and Unsubstantiated Diagnoses

1192.   The defendant medical providers displayed a troubling pattern of relying upon incorrect or unverified diagnoses to justify the performance of invasive procedures.

1193.   For example, in some instances, the defendant medical providers justified a certain procedure on the mere presence of pain in a particular location when such pain could have had many etiologies unrelated to the location.

1194.   In other instances, patients received interventional procedures based on a diagnosis of "traumatic-induced disc displacement syndrome," which is insufficient to justify invasive procedures, irrespective of the presence or absence of trauma, without an adequate physical examination to support the diagnosis (which did not occur, as discussed above).

1195.   Consequently, the physicians treating patients of the defendant medical providers, including Pierce, failed to perform sufficient evaluations to assess the accuracy of the patient's

diagnosis and to ensure the necessity of the injections, thus failing to fulfill their duties as physicians and rendering the injections noncompensable under Michigan's No-Fault Act.

1196. Moreover, to the extent the defendant medical providers relied on the MRI readings done by Desai and Paley through Horizon Imaging and Clear Imaging, such interpretations were misrepresented, overread, exaggerated, and, in some instances, utterly fabricated as part of the defendants' scheme to use the MRIs to generate bogus justifications to perform additional treatment and procedures.

1197. Thus, any reliance by the defendant medical providers on the MRIs (which were done by members of the same UHG/PHS network) was inappropriate and the MRIs cannot be used to justify the performance of injections.

### 3. Failure to Conduct Follow-Up Evaluations

1198. Patients of the defendant medical providers received a prescheduled number of injections without evaluation in between to determine the advisability of further injections.

1199. Indeed, patients received a series of injections without a determination of whether any individual injection relieved the patient's pain and the series could be terminated.

1200. There was a paucity of evaluation by the defendant medical providers, including Pierce, to confirm the efficacy of an injection between injections or between series of injections.

1201. As a consequence, Pierce and the other providers who failed to perform a follow-up examination had no way of knowing whether a single injection gave the patient sufficient relief to avoid further injections.

1202.   Such information was not sought by the defendants, including Pierce, because their patients were already set on a track for a predetermined number of injections regardless of whether the procedure was warranted or effective.

### 4.   Repetitive Use of Primarily Diagnostic Procedures

1203.   The defendant medical providers also repeated the performance of injections despite the fact that certain injections are largely used more as diagnostic tools rather than therapeutic ones.

1204.   For example, a facet joint injection in the cervical spine (which was frequently performed and billed for by Associated Surgical, American Surgical, and Pierce) is generally used to diagnose a patient by confirming whether pain is originating from the facet joint.

1205.   If such a facet joint injection relieves a patient's pain, the injection need not be performed again except to confirm diagnosis, because such an injection is almost always diagnostic, not therapeutic.

1206.   Likewise, medial branch blocks in the cervical spine (which were also frequently performed and billed for by Associated Surgical, American Surgical, and Pierce) are largely diagnostic and do not need to be repeated unless employing local anesthetics of a different duration to confirm diagnosis.

1207.   The defendant medical providers, however, routinely ordered and performed such diagnostic procedures in a series.

### 5.   Overuse of Anesthesia

1208.   As noted above, the performance of unnecessary injections subjected patients to unreasonable risks, including the risks associated with anesthesia.

1209.   Serious complications can arise from the use of excessive anesthesia.

136

1210.   The provision of moderate intravenous sedation for fluoroscopic procedures may be warranted by the clinical situation.

1211.   For example, in certain clinical situations wherein the patient has significant cardiopulmonary or renal disease or where a more invasive procedure than fluoroscopically-guided injections is performed, the assistance of formal anesthesia may be necessary.

1212.   However, for clinical situations that do not warrant the use of anesthesia services, including almost every patient involved in this Complaint, the provision of general anesthesia or monitored anesthesia care with propofol can subject the patient to physiologic trespass (i.e., loss of the airway).

1213.   Outside of the specific clinical situations described above, it is intrinsically safer for the patient to undergo intravenous conscious sedation, also known as "twilight" anesthesia, in comparison to general anesthesia or monitored anesthesia care with deep sedation.

1214.   The American Society of Anesthesiologists' Statement on Anesthetic Care during Interventional Pain Procedures for Adults, as formulated by the Pain Medicine Committee, instructs that "the majority of major pain procedures, under most routine circumstances, do not require anesthesia care other than local anesthesia.  Such procedures include epidural steroid injections, epidural blood patch, trigger point injections, sacroiliac joint injections, bursal injections, occipital nerve block, and facet injections."

1215.   In other words, almost every single procedure performed by Associated Surgical, American Surgical, Pierce, and the other defendant medical providers did not require anesthesia other than local anesthesia.

1216.   Yet, Allstate was routinely billed for full anesthesia by the defendant medical providers.

1217.   This level of anesthesia was not only unnecessary, but also significantly increased the risk of harm to patients, especially by increasing the threat of loss of the airway.

### 6.   **Exemplar Claims**

1218.   The problems discussed above relative to the defendant medical providers' use of injections and excessive anesthesia are pervasive and apply with respect to nearly every patient at issue in this Complaint who underwent an injection, including the following specific patient examples.

### a.   **A.S. (Claim No. 0158510008)**

1219.   Patient A.S. was purportedly injured in an automobile accident on January 16, 2010.

1220.   A.S. was not transported to a hospital from the scene of the accident.

1221.   On December 8, 2011, A.S. presented at UHG for an initial evaluation, which was performed by Chudler.

1222.   Chudler found that she possessed "[n]o focal neurologic deficits" yet referred A.S. to Michigan Spine and Rehab for a neurologic consultation.

1223.   On January 26, 2012, Chudler reexamined A.S. and made verbatim findings as his first examination, which evidences the perfunctory and repetitive nature of his physical examinations and his use of boilerplate language to document office visits.

1224.   A.S. was referred to Hussein Huraibi, M.D. ("Huraibi") at Associated Surgical for a pain management consultation, at which time it was determined that she was a candidate for epidural steroid injections (ESI).

138

1225.   Huraibi performed two cervical ESIs on A.S., one on February 29, 2012 and one on April 5, 2012, and two lumbar ESIs on A.S., one on March 14, 2012 and one on May 3, 2012.

1226.   The pre-operative diagnosis for these injections was cervical and lumbar traumatic-induced disc displacement syndrome.

1227.   However, trauma alone is an insufficient justification to perform ESIs.

1228.   The physical examinations of A.S. prior to the performance of the injections were insufficient to formulate the requisite indication for such injections.

1229.   Without a documented basis to administer ESI, the injections performed by Huraibi were not medically justified.

1230.   Following the ESIs, a physician assistant with Michigan Spine and Rehab referred A.S. to Huraibi for bilateral sacroiliac injections after failure of the ESIs to fully assuage her pain.

1231.   However, the referral was made merely on the basis of pain over A.S.'s sacroiliac joints.

1232.   There was a lack of proper indication for these sacroiliac joint injections because pain in this area can be attributed to many etiologies, including degenerative disc disease, facet arthropathy, and myofascial pain, and positive sacroiliac joint provocation tests were needed to confirm the diagnosis.

1233.   Sacroiliac joint provocation tests were not documented relative to A.S.

1234.   As a result, the sacroiliac joint injections performed by Huraibi on A.S. on July 19, 2012 and September 6, 2012 were without proper indication.

1235.   Huraibi failed to perform an independent evaluation of A.S. to assess the correctness of her diagnosis and to ensure the necessity of the injection.

1236.   A.S. underwent some degree of sedation for each of the injections she received.

1237.   For the injections performed on September 6, April 5, March 14, and February 29, A.S. received monitored anesthesia care with both propofol and fentanyl.

1238.   A.S. presented with no significant disease or indication to warrant the use of such excessive anesthesia.

1239.   The appropriate level of sedation for A.S. was intervenous conscious sedation.

1240.   Associated Surgical submitted claims for payment and medical records relative to A.S. to Allstate through the U.S. Mail.

1241.   Allstate relied on these submissions when adjusting the claims.

### b.      O.C. (Claim No. 0125938225)

1242.   Patient O.C. was purportedly injured in an automobile accident in December 2008.

1243.   Huraibi examined O.C. on January 24, 2012.

1244.   The exam was simplistic and perfunctory and Huraibi spent only twenty (20) minutes with O.C.

1245.   Huraibi assessed O.C. to have persistent sacral and left lower back pain of an unknown etiology.

1246.   Huraibi performed ESIs on O.C. for trauma-induced lumbar disc displacement syndrome on February 9, 2012 and March 1, 2012 at Associated Surgical.

1247.   Based upon a reevaluation performed by a Michigan Spine and Rehab physician assistant, O.C. was scheduled for additional ESIs.

1248.   Huraibi performed additional ESIs for trauma-inducted cervical disc displacement on April 12, 2012, June 7, 2012, and August 2, 2012 at Associated Surgical.

1249.   The ESIs performed on O.C. by Huraibi were not indicated because the evaluations were too simplistic to justify the necessity of the injections.

1250.   As there was no documented basis to administer the ESI, the same were medically unnecessary.

1251.   Huraibi also performed bilateral medial branch blocks on O.C. on May 3, 2012.

1252.   However, there was no previous evaluation by Huraibi to determine decreased lateral cervical range of motion, pain on palpation of all the facets injected, nor radiographic evidence suggesting facet disease.

1253.   Additionally, an evaluation by a Michigan Spine and Rehab physician assistant on March 27, 2012 revealed lateral rotation to be decreased to 45 degrees laterally, but failed to use inclinometry to make such a measurement.

1254.   The difference between 45 degrees of rotation, which is abnormal, and 50 degrees, which is normal, cannot be discerned from physical observation alone.

1255.   Thus, the evidence available to Huraibi was insufficient to provide him with an indication that the cervical medial branch block performed on May 3, 2012 was justified.

1256.   Moreover, according to the anesthesia records of Associated Surgical, O.C. received monitored anesthesia care with both propofol and fentanyl for the ESI procedures.

1257.   O.C. presented with no significant disease or indication to warrant the use of such excessive anesthesia.

1258.   The appropriate level of sedation for O.C. was intervenous conscious sedation.

1259.   Associated Surgical submitted claims for payment and medical records with respect to the injections administered to O.C.

1260.   Allstate relied upon such submissions in adjusting the claims and tendering payment.

c.   **L.B. (Claim No. 0171772171)**

1261.   Patient L.B. was purportedly injured in an automobile accident on July 2, 2010.

1262.   On December 2, 2011, Huraibi examined L.B. and found the sacroiliac joint provocation test to be negative bilaterally.

1263.   However, on March 9, 2012, Huraibi administered bilateral sacroiliac joint injections to L.B. at Associated Surgical.

1264.   There was no reevaluation and no change in the physical examination recorded to substantiate the indication for the sacroiliac joint injections.

1265.   Thus, the sacroiliac joint injections performed on March 9, 2012 were not necessary.

1266.   Associated Surgical billed Allstate in the amount of $2,300 for each injection, or $4,600 in total.

1267.   Associated Surgical submitted these claims for payment and accompanying medical records relative to the injections performed on L.B. to Allstate through the U.S. Mail.

1268.   Allstate relied upon these submissions in adjusting the claim and tendering payment.

### d.   M.K. (Claim No. 0170301741)

1269.   Patient M.K. was initially evaluated by Chudler on July 28, 2010 following her involvement in a motor vehicle accident on June 15, 2010.

1270.   Over the course of her treatment at UHG, from June 23, 2010 until January 12, 2012, M.K. received the gamut of services including physical therapy, chiropractic treatment, EMGs, multiple MRIs, and finally, pain management.

1271.   Pierce evaluated M.K. on November 23, 2010 and recommended that she receive injections to her cervical spine.

1272.   M.K. received a series of three cervical medial branch blocks at the right C4-5, C5-6, and C6-7 on December 2, 2010, December 23, 2010, and January 6, 2011, all performed by Pierce.

1273.   The final session of the cervical medial branch blocks, on January 6, 2011, took place at American Surgical.

1274.   Such a series of medial branch blocks is highly unusual because medial branch block injections in the cervical spine are almost always diagnostic and the repetition of such injections does not provide therapeutic value.

1275.   Indeed, M.K. reported to Chudler on February 28, 2011, that she continued to have pain in her cervical spine and that the injections had not provided relief.

1276.   Moreover, Pierce billed for an inappropriate number of facet levels on each date of the series of medial branch blocks on December 2, 2010, December 23, 2010, and January 6, 2011.

1277.   Two needle insertions are required to block a single facet joint.

1278.   The number of legitimate blocks to be billed is measured by the number of actual blocked facets rather than the number of needle insertions.

1279.   Billing for the number of needle insertions billed thus results in the provider billing for services not rendered.

1280.   American Surgical billed Allstate in the amount of $7,600 for the injections administered on January 6, 2011.

1281.   Allstate tendered payment to American Surgical in excess of $7,300.

1282.   American Surgical submitted claims for payment and medical records relative to the injections performed on M.K. to Allstate through the U.S. Mail.

1283.   Pierce knew that his medical reports would be sent to Allstate through the U.S. Mail.

1284.   Allstate relied upon these submissions when adjusting the claims and tendering payment.

## X.    SPECIFIC ALLEGATIONS OF MISREPRESENTATIONS MADE TO AND RELIED ON BY ALLSTATE

### A.    MISREPRESENTATIONS BY THE DEFENDANTS

1285.   To induce Allstate to pay promptly their charges for unnecessary and excessive medical services, the medical facility defendants, at the direction of their owners/managers (Zack, Katz, Mann, Sigler, Shaw, Waltz, Celentano, DeSanto, Yaldo, Cozzetto, Pierce, PHS, UHG Management, and UWC Management), submitted to Allstate documentation that materially misrepresented that the medical services they provided were necessary within the meaning of the Michigan No-Fault Act, that the charges for the same were reasonable, and that

all treatment was lawfully rendered (including rendered to patients who were not obtained in violation of Michigan's prohibition on solicitation).

1286.   Claims for PIP medical benefits under Michigan's No-Fault Act can only be made for "reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery, or rehabilitation."  Mich. Comp. Laws § 500.3107(1)(a).

1287.   Thus, every time the medical facility defendants (by and through their owners, managers, and individual healthcare providers), submitted bills and medical records to Allstate supporting their claims for No-Fault benefits, the defendants necessarily warranted that such bills and records related to necessary treatment for their patients' care, recovery, or rehabilitation.

1288.   In fact, however, the treatment rendered by the defendant medical providers was rarely necessary.

1289.   First, as detailed in the preceding section, the defendants frequently violated established standards of care, reported false findings/results, treated excessively, and rendered treatment without adequate substantiation and justification.

1290.   All of these factors negate the necessity of the treatment provided by the defendants.

1291.   Second, treatment was not rendered by independent medical providers, but rather by facilities and individuals with financial interests in prolonging and expanding treatment.

1292.   Indeed, the defendants (mis)used one spoke of the UHG/PHS hub to justify treatment at a different spoke, which vitiates any claim of treatment necessity by the defendants, who have an obvious financial incentive to refer for as much treatment as possible within their network.

1293.   Third, several patients did not present at the medical facility defendants of their own accord, but rather as a result of solicitation by participants in the UHG/PHS conglomerate.

1294.   If treatment is not required for a patient's care, recovery, or rehabilitation – and the solicitation tactics used by the defendants support that many patients were not requesting treatment at the time they were nonetheless directed to the medical facility defendants – such treatment is not medically necessary.

1295.   Finally, much of the treatment and the documentation supporting additional treatment emanated not from licensed healthcare professionals, but rather from attorneys and other laypersons.

1296.   Attorneys, including Shaw, drafted medical chart narratives, asked that post-dated forms be signed, demanded prescriptions for attendant care, and encouraged excessive treatment to bolster the value of their claims and lawsuits against Allstate.

1297.   The layperson managers of UHG/PHS likewise directed medical care, including implementing predetermined treatment protocols.

1298.   The foregoing facts – joint control of seemingly independent medical facilities, patient solicitation, and the provision of medical care and the drafting of medical records at the direction of laypersons – were not, and could not have been, known to Allstate until it commenced its investigation of the defendants shortly before filing this action.

1299.   Taken as a whole, the prevalence of such facts and the defendants' failure to abide by accepted standards of care render the treatment provided by the defendant medical providers unnecessary.

1300.   The failure to reveal the true interrelated nature of the defendant medical providers is present with respect to every patient at issue in this Complaint.

1301.   The fact of violations of medical standards is present with respect to almost every patient at issue in this Complaint, including those specific patient examples set out above and in the charts attached at Exhibits 1 to 10, 17 to 19, and 21.

1302.   Thus, each claim for payment (and accompanying medical records) under Michigan's No-Fault Act sent to Allstate by, on behalf of, or with the knowledge of the defendants constitutes a misrepresentation because the treatment underlying the claim was not medically necessary, as it must be in order to be compensable under Michigan law.

1303.   Similarly, the Michigan No-Fault Act states that only a provider "lawfully rendering treatment" may submit a claim for payment.  Mich. Comp. Laws § 500.3157.

1304.   The defendants rendered unnecessary treatment and solicited patients in derogation of Michigan law.

1305.   Thus, the treatment rendered by the defendant medical providers was not lawful and every claim for payment submitted to Allstate through the U.S. Mail misrepresented this fact.

1306.   Moreover, each Health Insurance Claim Form ("HCFA"), or bill, submitted to Allstate by the medical facility defendants, at the direction of their owners/managers, contained the following notation: "NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties."

1307.   Each HCFA also included the (electronic) signature of the treating provider, including Chudler and Pierce.

1308.   Through the submission of medical records, invoices, HCFAs, and other medical documentation to Allstate via the U.S. Mail, the medical facility defendants, including their

owners/managers, Chudler, Pierce, Desai, and Paley attested to the fact and medical necessity of the visits, examinations, interviews, screenings, testing, procedures, and ancillary services for which they billed Allstate.

1309.   As the medical facility defendants, Chudler, Pierce, Desai, and Paley did not render reasonably necessary medical treatment, each bill and accompanying documentation submitted by them to Allstate constitutes a material misrepresentation.

1310.   The medical facility defendants are owned by Zack, Katz, Cozzetto, Yaldo, and Pierce.

1311.   As the owners of the medical facility defendants, Zack, Katz, Cozzetto, Yaldo, and Pierce are directly responsible for the misrepresentations made to Allstate by the medical facility defendants.

1312.   Zack, Katz, Mann, Sigler, Shaw, Waltz, Celentano, DeSanto, Chudler, PHS, UHG Management, and UWC Management managed and operated every aspect of the medical facility defendants, from soliciting patients to establishing predetermined treatment protocols to dictating the content of medical records and what prescriptions were to be written to billing Allstate for the treatment purportedly rendered.

1313.   As the managers and operators of the medical facility defendants, Zack, Katz, Mann, Sigler, Shaw, Waltz, Celentano, DeSanto, Chudler, PHS, UHG Management, and UWC Management are directly responsible for the misrepresentations made to Allstate by the medical facility defendants and, in fact, ordered the misrepresentations that were made.

1314.   Chudler, Pierce, Desai, and Paley are licensed healthcare professionals who provided much of the unnecessary treatment at issue in this Complaint and authored many of the medical records at issue.

1315.   As the treatment was unnecessary and excessive, especially due to its predetermined nature, and as the medical reports and records contained exaggerated or fabricated findings, some of which were included at the behest of attorneys and the managers of UHG/PHS, Chudler, Pierce, Desai, and Paley directly were involved in making misrepresentations to Allstate, including authoring and signing the misrepresentations in the medical documentation that was sent to Allstate and on which Allstate relied.

1316.   As licensed medical professionals, Chudler, Pierce, Desai, and Paley were obligated, legally and ethically, to act honestly, with integrity, and in accordance with their professional oaths and pledges.

1317.   Each misrepresentation made by Chudler, Pierce, Desai, and Paley was in violation of their legal and ethical obligations as healthcare professionals.

1318.   The facially valid documents submitted to Allstate by the medical facility defendants, by and through their owners/managers, and by Chudler, Pierce, Desai, and Paley were designed to, and did in fact, induce Allstate to rely on the accuracy of such documents.

**B.**   **ALLSTATE'S JUSTIFIABLE RELIANCE**

1319.   At all relevant times, the medical facility defendants, their owners/managers (Zack, Katz, Mann, Sigler, Shaw, Waltz, Celentano, DeSanto, Yaldo, Cozzetto, Pierce, Chudler, PHS, UHG Management, and UWC Management), and the individual medical providers (Chudler, Pierce, Desai, and Paley) concealed from Allstate facts regarding the fact and medical necessity of medical procedures performed for patients of the medical facility defendants to prevent Allstate from discovering that the claims submitted by the medical facility defendants were not compensable under the No-Fault Act.

1320.   These misrepresentations include submitting false documentation, including HCFAs, documenting the fact and necessity of medical treatment in order to seek reimbursement under Michigan's No-Fault Act.

1321.   Evidence of the fraudulent scheme detailed herein was not discovered until after patterns had emerged and Allstate began to investigate the medical facility defendants and their owners/managers and individual treating providers, revealing the true nature and full scope of the defendants' fraudulent scheme.

1322.   Due to these defendants' material misrepresentations and other affirmative acts designed to conceal their fraudulent scheme from Allstate, Allstate did not and could not have discovered that its damages were attributable to fraud until shortly before the filing of this Complaint.

1323.   In reliance on these defendants' misrepresentations, Allstate paid money to the medical facility defendants to its detriment.

1324.   Allstate would not have paid these monies had the defendants provided true and accurate information about the necessity of the medical services provided.

1325.   Allstate would not have paid these monies had the medical facility defendants not misrepresented the facts surrounding how patients were referred to the medical facility defendants (i.e., pursuant to a referral system employing the use of runners, tow truck drivers, WCIS, MI Pro Consultants, police reports, and complicit personal injury attorneys).

1326.   As a result, Allstate has paid in excess of $3,697,049 in reasonable reliance on the false medical documentation and false representations regarding the medical facility defendants' eligibility for reimbursement under the Michigan No-Fault Act.

## XI.    SPECIFIC ALLEGATIONS OF MAIL FRAUD RACKETEERING ACTIVITY

1327.   As discussed above, the defendant medical providers (UHG, its various assumed entities, Health Systems, UWC, UWC-Detroit, UWC-Flint, UWC-Lansing, Clear Imaging, Horizon Imaging, Associated Surgical, American Surgical, Chudler, Pierce, Desai, and Paley), the UHG/PHS management/ownership team (UHG, PHS, UWC Management, UHG Management, Zack, Katz, Mann, Sigler, Shaw, Waltz, Yaldo, Pierce, Cozzetto, Celentano, DeSanto, and Chudler), and the associates of the same (WCIS, MI Pro Consultants, Martinez, and Sereno) devised and agreed to enact a scheme to defraud Allstate by soliciting legal clients/medical patients to refer to the medical facility defendants for treatment and, of course, generating claims for payment against Allstate.

1328.   This solicitation was accomplished by the use of WCIS (including its call center and the website whocanIsue.com), the use of runners, the use of police reports, symbiotic relationships with several local attorneys, MI Pro Consultants and other "marketing" and "case management" services provided by Sereno and Martinez, and agreements with tow truck drivers.

1329.   The treatment and services purportedly provided by the defendant medical providers was not necessary because (1) it was done pursuant to a predetermined protocol and not based on the patient's clinical needs, (2) it was not supported by proper medical assessment/diagnosis, (3) it did not adhere to established medical guidelines and standards, and (4) it was done at the direction of laypersons, including the managers of UHG/PHS and personal injury attorneys.

1330.   The objective of the scheme to defraud Allstate, which occurred throughout the period noted in Exhibit 22, was to collect No-Fault benefits to which the defendants were not entitled because the medical services rendered were not necessary and were unlawful.

1331.   This objective necessarily required the submission of claims to Allstate.

1332.   The medical facility defendants created, prepared, and submitted false medical documentation and placed the same in a post office and/or authorized depository for mail to be sent and delivered by the United States Postal Service.

1333.   All documents, medical records, notes, reports, bills, HCFAs, medical diagnoses, letters, correspondence, and requests for payment in connection with the insurance claims referenced throughout this pleading traveled through the U.S. Mail.

1334.   Every automobile insurance claim detailed herein involved at least one use of the U.S. Mail, including the mailing of, among other things, the notice of claim, initial policies, insurance payments, medical records, bills, claims settlement checks, and return of the cancelled settlement drafts to the financial institution(s) from which the draft(s) were drawn, as well as the return of settlement draft duplicates to the insurance carrier's home office for filing.

1335.   The fraudulent medical billing scheme detailed herein generated thousands of mailings.

1336.   A chart highlighting representative examples of mail fraud arising from the medical facility defendants' patient/business files is annexed hereto at Exhibit 22.

1337.   As detailed herein, the defendants also submitted, caused to be submitted, or knew medical documentation and claims for payment would be submitted to Allstate related to each exemplar patient discussed in this Complaint.

1338.   Katz, Zack, Mann, Sigler, Shaw, Waltz, Cozzetto, Yaldo, Pierce, Celentano, DeSanto, and Chudler are the owners/managers of UHG/PHS and have an interest in every medical facility named herein.

1339.   These owners/managers established predetermined protocols that were forced onto the individual medical providers in the UHG/PHS network.

1340.   Katz, Zack, and Shaw also pressured individual medical providers to enter certain diagnoses, to write prescriptions for attendant care, to postdate medical reports, and to include narratives and reports written by non-healthcare professionals (usually personal injury attorneys) in their medical charts.

1341.   Celentano and DeSanto were also heavily involved in managing and operating the UHG/PHS conglomerate and used WCIS to obtain a significant number of patients, without which UHG/PHS would not have been able to operate.

1342.   Similarly, Celentano, DeSanto, Sereno, and Martinez contributed patients to be run through the UHG/PHS mill that were obtained from WCIS and MI Pro Consultants, other "case management" and "marketing" services, the development of co-dependent relationships with Michigan attorneys, and the use of police reports, runners, and tow truck drivers.

1343.   Cozzetto, Yaldo, and Pierce retained ownership interests in the UWC facilities (Cozzetto), Associated Surgical (Yaldo), and American Surgical (Pierce) that were important pieces of the UHG/PHS puzzle and encouraged, facilitated, and benefited from the excessive treatment (and bills) that resulted from the predetermined protocols and self-referrals that were rampant throughout the UHG/PHS network.

1344.   Chudler, Pierce, Desai, and Paley were the most active individual treating participants in the scheme to conduct and bill for medically unnecessary treatment.

1345.   Indeed, each of these individuals played his part very well.

1346.   Chudler, UHG's medical director, was the gatekeeper who started most patients on the path to excessive and unnecessary treatment.

1347.   Pierce actively referred patients for other treatment and also conducted surgical procedures and electrodiagnostic testing that was wholly unwarranted, improperly performed, and unnecessary.

1348.   Desai and Paley consistently overread and misrepresented MRIs, including at times outright fabricating results, thus facilitating and providing justification for the other defendant medical providers' continued treatment.

1349.   Thus, Katz, Zack, Mann, Sigler, Shaw, Waltz, Celentano, DeSanto, Cozzetto, Yaldo, Chudler, Pierce, Desai, and Paley, by and through the medical facility defendant in which each has an interest, managed, and/or provided healthcare treatment through, mailed, caused to be mailed, and/or knew that documents would be mailed to Allstate, including medical reports, records, and bills that materially misrepresented that the medical facility defendants were (1) providing reasonably necessary medical treatment, (2) were lawfully rendering treatment, and (3) that the charges for said treatment were reasonable.

1350.   UHG Management, UWC Management, WCIS, MI Pro Consultants, Martinez, and Sereno knew, and it was reasonably foreseeable, that the medical facility defendants would submit false medical documentation for No-Fault reimbursement through the U.S. Mail related to the clients/patients that they caused to be referred to the medical facility defendants.

1351.   Indeed, it was within the ordinary course of business for each medical facility defendant to submit claims for No-Fault reimbursement to insurance carriers like Allstate through the U.S. Mail.

1352.   Moreover, UHG Management, WCIS, MI Pro Consultants, Celentano, DeSanto, Martinez, and Sereno facilitated the use of the mails by the medical facility defendants by

wrongfully soliciting clients/patients and referring them to the medical facility defendants in the first place.

1353.   As all of the defendants named herein agreed that the medical facility defendants would use (and, in fact, did use) the mails in furtherance of their scheme to defraud Allstate by seeking payment for services that are not compensable under the Michigan No-Fault Act, the defendants committed mail fraud, as defined in 18 U.S.C. § 1341.

1354.   Allstate reasonably relied on the submissions it received from the medical facility defendants (with many records authored by Chudler, Pierce, Desai, and Paley) through the U.S. Mail in tendering payment to the medical facility defendants, including the representative submissions set out in Exhibit 22 annexed hereto.

1355.   These payments were then shared, directly and indirectly, by all the defendants named in this Complaint.

1356.   As the defendants agreed to pursue the same criminal objective (namely, mail fraud), they committed a conspiracy within the meaning of the RICO Act, 18 U.S.C. § 1962(d), and are therefore jointly and severally liable for Allstate's damages.

## XII.   **DAMAGES**

1357.   The pattern of fraudulent conduct by the defendants injured Allstate in its business and property by reason of the aforesaid violations of law.

1358.   Although it is not necessary for Allstate to calculate damages with specificity at this stage in the litigation, and Allstate's damages continue to accrue, Allstate's injury includes, but is not limited to, compensatory damages in excess of $3,697,049.

1359.   Exhibits 23 (UHG), 24 (Health Systems), 25 (UWC), 26 (UWC-Detroit), 27 (UWC-Flint), 28 (UWC-Lansing), 29 (Clear Imaging), 30 (Horizon Imaging), and 31 (American

Surgical), annexed hereto and incorporated herein as if fully set forth in their entirety, identify monies paid by Allstate to the medical facility defendants by date, payor, payee, patient claim number, check number, and amount.

1360.   Allstate's claim for compensatory damages, as set out in Exhibits 23 to 31, does not include payment made with respect to any assigned claim facility claimant.

1361.   Allstate also seeks damages, in an amount to be determined at trial, related to the cost of investigation to uncover the fraudulent activities of the defendants and the cost of claims handling/adjustment for claims submitted by the defendants pursuant to Mich. Comp. Law § 500.3148(2).

1362.   Allstate investigated each of the medical facility defendants both individually and in connection with the comprehensive scheme detailed herein and incurred investigative and claims handling expenses with respect to each medical facility defendant.

## XIII.   CAUSES OF ACTION

### COUNT I
### VIOLATION OF 18 U.S.C. § 1962(c)
### (UHG Enterprise)
**Against Professional Health Systems, LLC; Health Systems, Inc.; United Wellness Centers, Inc.; United Wellness Center of Detroit, PLLC; United Wellness Center of Flint, PLLC; United Wellness Center of Lansing, PLLC; Clear Imaging LLC; Horizon Imaging LLC; Associated Surgical Center, P.C.; American Surgical Centers I, Inc.; American Surgical Centers II, LLC; WCIS Media LLC.; UHG Management LLC; United Wellness Centers Management, LLC; Greater Michigan Professional Services LLC d/b/a MI Pro Consultants; Scott P. Zack, D.C.; David M. Katz, D.C.; Cory J. Mann; Yisroel Sigler; Evan P. Shaw; Ron Waltz; Mazin K. Yaldo, M.D.; Silvio J. Cozzetto, D.C.; Vincent L. Celentano; Joseph F. DeSanto; Loren C. Chudler, D.O.; and Jeff S. Pierce, D.O.**

1363.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1362 set forth above as if fully set forth herein.

1364.   In connection with each of the claims identified in the within Complaint, Professional Health Systems, LLC; Health Systems, Inc.; United Wellness Centers, Inc.; United

Wellness Center of Detroit, PLLC; United Wellness Center of Flint, PLLC; United Wellness Center of Lansing, PLLC; Clear Imaging LLC; Horizon Imaging LLC; Associated Surgical Center, P.C.; American Surgical Centers I, Inc.; American Surgical Centers II, LLC; WCIS Media LLC.; UHG Management LLC; United Wellness Centers Management, LLC; Greater Michigan Professional Services LLC d/b/a MI Pro Consultants; Scott P. Zack, D.C.; David M. Katz, D.C.; Cory J. Mann; Yisroel Sigler; Evan P. Shaw; Ron Waltz; Mazin K. Yaldo, M.D.; Silvio J. Cozzetto, D.C.; Vincent L. Celentano; Joseph F. DeSanto; Loren C. Chudler, D.O.; and Jeff S. Pierce, D.O. ("Count I defendants") intentionally caused to be prepared and mailed false medical documentation by UHG, or knew that such false medical documentation would be mailed in the ordinary course of UHG's business, or should have reasonably foreseen that the mailing of such false medical documentation by UHG would occur, in furtherance of the Count I defendants' scheme to defraud.

1365.   The Count I defendants employed, knew, or should have foreseen that two or more mailings to demand and/or receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 22.

1366.   Among other things, medical records, bills, and invoices were delivered to Allstate through the U.S. Mail.

1367.   Policies of insurance were delivered to insureds through the U.S. Mail.

1368.   Payments to UHG from Allstate were transmitted through the U.S. Mail.

1369.   As documented above, the Count I defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical expenses and/or services that were purportedly performed at and/or by UHG to

collect payment from Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the Michigan No-Fault Act.

1370. As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts to UHG for the benefit of the Count I defendants that would not otherwise have been paid.

1371. The Count I defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count I defendants to continue their fraudulent scheme without detection.

1372. The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

1373. By mailing, or agreeing that the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count I defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1374. The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to UHG for the benefit of the Count I defendants.

1375. UHG constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1376. The Count I defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

1377. Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count I defendants' fraudulent acts.

1378.   The Count I defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1379.   Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

1380.   Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1381.   By virtue of the Count I defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted, by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

### COUNT II
### VIOLATION OF 18 U.S.C. § 1962(d)
### (UHG Enterprise)
**Against Professional Health Systems, LLC; Health Systems, Inc.; United Wellness Centers, Inc.; United Wellness Center of Detroit, PLLC; United Wellness Center of Flint, PLLC; United Wellness Center of Lansing, PLLC; Clear Imaging LLC; Horizon Imaging LLC; Associated Surgical Center, P.C.; American Surgical Centers I, Inc.; American Surgical Centers II, LLC; WCIS Media LLC.; UHG Management LLC; United Wellness Centers Management, LLC; Greater Michigan Professional Services LLC d/b/a MI Pro Consultants; Scott P. Zack, D.C.; David M. Katz, D.C.; Cory J. Mann; Yisroel Sigler; Evan P. Shaw; Ron Waltz; Mazin K. Yaldo, M.D.; Silvio J. Cozzetto, D.C.; Vincent L. Celentano; Joseph F. DeSanto; Nicole F. Martinez; Anthony F. Sereno; Loren C. Chudler, D.O.; Jeff S. Pierce, D.O.; Chintan Desai, M.D.; and Michael Paley, M.D.**

1382.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1362 set forth above as if fully set forth herein.

1383.   Defendants Professional Health Systems, LLC; Health Systems, Inc.; United Wellness Centers, Inc.; United Wellness Center of Detroit, PLLC; United Wellness Center of Flint, PLLC; United Wellness Center of Lansing, PLLC; Clear Imaging LLC; Horizon Imaging LLC; Associated Surgical Center, P.C.; American Surgical Centers I, Inc.; American Surgical

Centers II, LLC; WCIS Media LLC.; UHG Management LLC; United Wellness Centers

Management, LLC; Greater Michigan Professional Services LLC d/b/a MI Pro Consultants;

Scott P. Zack, D.C.; David M. Katz, D.C.; Cory J. Mann; Yisroel Sigler; Evan P. Shaw; Ron

Waltz; Mazin K. Yaldo, M.D.; Silvio J. Cozzetto, D.C.; Vincent L. Celentano; Joseph F.

DeSanto; Nicole F. Martinez; Anthony F. Sereno; Loren C. Chudler, D.O.; Jeff S. Pierce, D.O.;

Chintan Desai, M.D.; and Michael Paley, M.D.  ("Count II defendants") conspired with each

other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of UHG.

        1384.   The Count II defendants each agreed to further, facilitate, support, and/or operate

the UHG enterprise.

        1385.   As such, the Count II defendants conspired to violate 18 U.S.C. § 1962(c).

        1386.   The purpose of the conspiracy was to obtain No-Fault payments from Allstate on

behalf of UHG even though UHG was not eligible to collect No-Fault payments by virtue of its

unlawful conduct.

        1387.   The Count II defendants were aware of this purpose and agreed to take steps to

meet the conspiracy's objectives, including soliciting patients, rendering unnecessary treatment

to patients, and the creation and submission to Allstate of insurance claim and legal documents

containing material misrepresentations and/or material omissions.

        1388.   Allstate has been injured in its business and property by reason of this

conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a

result of the Count II defendants' unlawful conduct described herein.

        1389.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count II defendants are

jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the

damages sustained by reason of the claims submitted by or on behalf of the Count II defendants,

2:13-cv-15108-VAR-MKM   Doc # 1   Filed 12/17/13   Pg 161 of 230   Pg ID 161

and others acting in concert with them, together with the costs of suit, including reasonable

attorney's fees.

**COUNT III**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Health Systems Enterprise)**
**Against Universal Health Group, Inc. d/b/a Saginaw Spine and Pain, Michigan Spine and
Rehab, Associated Medical, Inc., Associated Chiropractic & Medical Center, and Rehab,
Inc.; Professional Health Systems, LLC; UHG Management LLC; Scott P. Zack, D.C.;
David M. Katz, D.C.; Cory J. Mann; Yisroel Sigler; Evan P. Shaw; Ron Waltz; Vincent L.
Celentano; and Joseph F. DeSanto**

1390.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1362

set forth above as if fully set forth herein.

1391.   In connection with each of the claims identified in the within Complaint,

Universal Health Group, Inc. d/b/a Saginaw Spine and Pain, Michigan Spine and Rehab,

Associated Medical, Inc., Associated Chiropractic & Medical Center, and Rehab, Inc.;

Professional Health Systems, LLC; UHG Management LLC; Scott P. Zack, D.C.; David M.

Katz, D.C.; Cory J. Mann; Yisroel Sigler; Evan P. Shaw; Ron Waltz; Vincent L. Celentano; and

Joseph F. DeSanto ("Count III defendants") intentionally caused to be prepared and mailed false

medical documentation by Health Systems, or knew that such false medical documentation

would be mailed in the ordinary course of Health Systems's business, or should have reasonably

foreseen that the mailing of such false medical documentation by Health Systems would occur,

in furtherance of the Count III defendants' scheme to defraud.

1392.   The Count III defendants employed, knew, or should have foreseen that two or

more mailings to demand and/or receive payment from Allstate on certain dates, including, but

not limited to, those dates identified in the chart annexed hereto at Exhibit 22.

1393.   Among other things, medical records, bills, invoices, applications for insurance,

applications for benefits, and premium checks were delivered to Allstate through the U.S. Mail.

161

1394.   Policies of insurance were delivered to insureds through the U.S. Mail.

1395.   Payments to Health Systems from Allstate were transmitted through the U.S. Mail.

1396.   As documented above, the Count III defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical expenses and/or services that were purportedly performed at and/or by Health Systems to collect payment from Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the Michigan No-Fault Act.

1397.   As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts to Health Systems for the benefit of the Count III defendants that would not otherwise have been paid.

1398.   The Count III defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count III defendants to continue their fraudulent scheme without detection.

1399.   The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

1400.   By mailing, or agreeing that the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count III defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1401.   The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Health Systems for the benefit of the Count III defendants.

1402.   Health Systems constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1403.   The Count III defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

1404.   Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count III defendants' fraudulent acts.

1405.   The Count III defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1406.   Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

1407.   Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1408.   By virtue of the Count III defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted, by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT IV
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Health Systems Enterprise)
**Against Universal Health Group, Inc. d/b/a Saginaw Spine and Pain, Michigan Spine and Rehab, Associated Medical, Inc., Associated Chiropractic & Medical Center, and Rehab, Inc.; Professional Health Systems, LLC; United Wellness Centers, Inc.; United Wellness Center of Detroit, PLLC; United Wellness Center of Flint, PLLC; United Wellness Center of Lansing, PLLC; Clear Imaging LLC; Horizon Imaging LLC; Associated Surgical Center, P.C.; American Surgical Centers I, Inc.; American Surgical Centers II, LLC; WCIS Media LLC.; UHG Management LLC; Greater Michigan Professional Services LLC d/b/a MI Pro Consultants; Scott P. Zack, D.C.; David M. Katz, D.C.; Cory J. Mann; Yisroel Sigler; Evan P. Shaw; Ron Waltz; Mazin K. Yaldo, M.D.; Silvio J. Cozzetto, D.C.; Vincent L. Celentano; Joseph F. DeSanto; Nicole F. Martinez; Anthony F. Sereno; Loren C. Chudler, D.O.; Jeff S. Pierce, D.O.; Chintan Desai, M.D.; and Michael Paley, M.D.**

1409.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1362 set forth above as if fully set forth herein.

1410.   Defendants Universal Health Group, Inc. d/b/a Saginaw Spine and Pain, Michigan Spine and Rehab, Associated Medical, Inc., Associated Chiropractic & Medical Center, and Rehab, Inc.; Professional Health Systems, LLC; United Wellness Centers, Inc.; United Wellness Center of Detroit, PLLC; United Wellness Center of Flint, PLLC; United Wellness Center of Lansing, PLLC; Clear Imaging LLC; Horizon Imaging LLC; Associated Surgical Center, P.C.; American Surgical Centers I, Inc.; American Surgical Centers II, LLC; WCIS Media LLC.; UHG Management LLC; Greater Michigan Professional Services LLC d/b/a MI Pro Consultants; Scott P. Zack, D.C.; David M. Katz, D.C.; Cory J. Mann; Yisroel Sigler; Evan P. Shaw; Ron Waltz; Mazin K. Yaldo, M.D.; Silvio J. Cozzetto, D.C.; Vincent L. Celentano; Joseph F. DeSanto; Nicole F. Martinez; Anthony F. Sereno; Loren C. Chudler, D.O.; Jeff S. Pierce, D.O.; Chintan Desai, M.D.; and Michael Paley, M.D.  ("Count IV defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Health Systems.

1411.   The Count IV defendants each agreed to further, facilitate, support, and/or operate the Health Systems enterprise.

1412.   As such, the Count IV defendants conspired to violate 18 U.S.C. § 1962(c).

1413.   The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Health Systems even though Health Systems was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

1414.   The Count IV defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including soliciting patients, rendering unnecessary treatment to patients, and the creation and submission to Allstate of insurance claim and legal documents containing material misrepresentations and/or material omissions.

1415.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count IV defendants' unlawful conduct described herein.

1416.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count IV defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count IV defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

### COUNT V
### VIOLATION OF 18 U.S.C. § 1962(c)
**(UWC Enterprise)**
**Against Universal Health Group, Inc. d/b/a Saginaw Spine and Pain, Michigan Spine and Rehab, Associated Medical, Inc., Associated Chiropractic & Medical Center, and Rehab, Inc.; Professional Health Systems, LLC; UHG Management LLC; United Wellness Centers Management, LLC; Scott P. Zack, D.C.; David M. Katz, D.C.; Cory J. Mann; Yisroel Sigler; Evan P. Shaw; Ron Waltz; Silvio J. Cozzetto, D.C.; Vincent L. Celentano; and Joseph F. DeSanto**

1417.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1362 set forth above as if fully set forth herein.

1418.   In connection with each of the claims identified in the within Complaint, Universal Health Group, Inc. d/b/a Saginaw Spine and Pain, Michigan Spine and Rehab, Associated Medical, Inc., Associated Chiropractic & Medical Center, and Rehab, Inc.; Professional Health Systems, LLC; UHG Management LLC; United Wellness Centers Management, LLC; Scott P. Zack, D.C.; David M. Katz, D.C.; Cory J. Mann; Yisroel Sigler; Evan P. Shaw; Ron Waltz; Silvio J. Cozzetto, D.C.; Vincent L. Celentano; and Joseph F. DeSanto ("Count V defendants") intentionally caused to be prepared and mailed false medical documentation by UWC, or knew that such false medical documentation would be mailed in the ordinary course of UWC's business, or should have reasonably foreseen that the mailing of such false medical documentation by UWC would occur, in furtherance of the Count V defendants' scheme to defraud.

1419.   The Count V defendants employed, knew, or should have foreseen that two or more mailings to demand and/or receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 22.

1420.   Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through the U.S. Mail.

1421.   Policies of insurance were delivered to insureds through the U.S. Mail.

1422.   Payments to UWC from Allstate were transmitted through the U.S. Mail.

1423.   As documented above, the Count V defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical expenses and/or services that were purportedly performed at and/or by UWC to collect payment from Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the Michigan No-Fault Act.

1424.   As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts to UWC for the benefit of the Count V defendants that would not otherwise have been paid.

1425.   The Count V defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count V defendants to continue their fraudulent scheme without detection.

1426.   The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

1427.   By mailing, or agreeing that the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count V defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1428.   The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to UWC for the benefit of the Count V defendants.

1429.   UWC constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1430.   The Count V defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

1431.   Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count V defendants' fraudulent acts.

1432.   The Count V defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1433.   Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

1434.   Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1435.   By virtue of the Count V defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted, by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT VI**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(UWC Enterprise)**
**Against Universal Health Group, Inc. d/b/a Saginaw Spine and Pain, Michigan Spine and Rehab, Associated Medical, Inc., Associated Chiropractic & Medical Center, and Rehab, Inc.; Professional Health Systems, LLC; Health Systems, Inc.; United Wellness Center of Detroit, PLLC; United Wellness Center of Flint, PLLC; United Wellness Center of Lansing, PLLC; Clear Imaging LLC; Horizon Imaging LLC; Associated Surgical Center, P.C.; American Surgical Centers I, Inc.; American Surgical Centers II, LLC; WCIS Media LLC.; UHG Management LLC; United Wellness Centers Management, LLC; Greater Michigan Professional Services LLC d/b/a MI Pro Consultants; Scott P. Zack, D.C.; David M. Katz, D.C.; Cory J. Mann; Yisroel Sigler; Evan P. Shaw; Ron Waltz; Mazin K. Yaldo, M.D.; Silvio J. Cozzetto, D.C.; Vincent L. Celentano; Joseph F. DeSanto; Nicole F. Martinez; Anthony F. Sereno; Loren C. Chudler, D.O.; Jeff S. Pierce, D.O.; Chintan Desai, M.D.; and Michael Paley, M.D.**

1436.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1362 set forth above as if fully set forth herein.

1437.   Defendants Universal Health Group, Inc. d/b/a Saginaw Spine and Pain, Michigan Spine and Rehab, Associated Medical, Inc., Associated Chiropractic & Medical Center, and Rehab, Inc.; Professional Health Systems, LLC; Health Systems, Inc.; United Wellness Center of Detroit, PLLC; United Wellness Center of Flint, PLLC; United Wellness Center of Lansing, PLLC; Clear Imaging LLC; Horizon Imaging LLC; Associated Surgical Center, P.C.; American

168

Surgical Centers I, Inc.; American Surgical Centers II, LLC; WCIS Media LLC.; UHG Management LLC; United Wellness Centers Management, LLC; Greater Michigan Professional Services LLC d/b/a MI Pro Consultants; Scott P. Zack, D.C.; David M. Katz, D.C.; Cory J. Mann; Yisroel Sigler; Evan P. Shaw; Ron Waltz; Mazin K. Yaldo, M.D.; Silvio J. Cozzetto, D.C.; Vincent L. Celentano; Joseph F. DeSanto; Nicole F. Martinez; Anthony F. Sereno; Loren C. Chudler, D.O.; Jeff S. Pierce, D.O.; Chintan Desai, M.D.; and Michael Paley, M.D. ("Count VI defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of UWC.

1438. The Count VI defendants each agreed to further, facilitate, support, and/or operate the UWC enterprise.

1439. As such, the Count VI defendants conspired to violate 18 U.S.C. § 1962(c).

1440. The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of UWC even though UWC was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

1441. The Count VI defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including soliciting patients, rendering unnecessary treatment to patients, and the creation and submission to Allstate of insurance claim and legal documents containing material misrepresentations and/or material omissions.

1442. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count VI defendants' unlawful conduct described herein.

1443. By virtue of this violation of 18 U.S.C. § 1962(d), the Count VI defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the

damages sustained by reason of the claims submitted by or on behalf of the Count VI defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT VII**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(UWC-Detroit Enterprise)**
**Against Universal Health Group, Inc. d/b/a Saginaw Spine and Pain, Michigan Spine and Rehab, Associated Medical, Inc., Associated Chiropractic & Medical Center, and Rehab, Inc.; Professional Health Systems, LLC; UHG Management LLC; United Wellness Centers Management, LLC; Scott P. Zack, D.C.; David M. Katz, D.C.; Cory J. Mann; Yisroel Sigler; Evan P. Shaw; Ron Waltz; Silvio J. Cozzetto, D.C.; Vincent L. Celentano; and Joseph F. DeSanto**

1444.    Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1362 set forth above as if fully set forth herein.

1445.    In connection with each of the claims identified in the within Complaint, Universal Health Group, Inc. d/b/a Saginaw Spine and Pain, Michigan Spine and Rehab, Associated Medical, Inc., Associated Chiropractic & Medical Center, and Rehab, Inc.; Professional Health Systems, LLC; UHG Management LLC; United Wellness Centers Management, LLC; Scott P. Zack, D.C.; David M. Katz, D.C.; Cory J. Mann; Yisroel Sigler; Evan P. Shaw; Ron Waltz; Silvio J. Cozzetto, D.C.; Vincent L. Celentano; and Joseph F. DeSanto ("Count VII defendants") intentionally caused to be prepared and mailed false medical documentation by UWC-Detroit, or knew that such false medical documentation would be mailed in the ordinary course of UWC-Detroit's business, or should have reasonably foreseen that the mailing of such false medical documentation by UWC-Detroit would occur, in furtherance of the Count VII defendants' scheme to defraud.

170

1446.   The Count VII defendants employed, knew, or should have foreseen that two or more mailings to demand and/or receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 22.

1447.   Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through the U.S. Mail.

1448.   Policies of insurance were delivered to insureds through the U.S. Mail.

1449.   Payments to UWC-Detroit from Allstate were transmitted through the U.S. Mail.

1450.   As documented above, the Count VII defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical expenses and/or services that were purportedly performed at and/or by UWC-Detroit to collect payment from Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the Michigan No-Fault Act.

1451.   As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts to UWC-Detroit for the benefit of the Count VII defendants that would not otherwise have been paid.

1452.   The Count VII defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count VII defendants to continue their fraudulent scheme without detection.

1453.   The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

1454.   By mailing, or agreeing that the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count VII defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1455.   The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to UWC-Detroit for the benefit of the Count VII defendants.

1456.   UWC-Detroit constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1457.   The Count VII defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

1458.   Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count VII defendants' fraudulent acts.

1459.   The Count VII defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1460.   Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

1461.   Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1462.   By virtue of the Count VII defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted, by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT VIII
### VIOLATION OF 18 U.S.C. § 1962(d)
#### (UWC-Detroit Enterprise)
**Against Universal Health Group, Inc. d/b/a Saginaw Spine and Pain, Michigan Spine and Rehab, Associated Medical, Inc., Associated Chiropractic & Medical Center, and Rehab, Inc.; Professional Health Systems, LLC; Health Systems, Inc.; United Wellness Centers, Inc.; United Wellness Center of Flint, PLLC; United Wellness Center of Lansing, PLLC; Clear Imaging LLC; Horizon Imaging LLC; Associated Surgical Center, P.C.; American Surgical Centers I, Inc.; American Surgical Centers II, LLC; WCIS Media LLC.; UHG Management LLC; United Wellness Centers Management, LLC; Greater Michigan Professional Services LLC d/b/a MI Pro Consultants; Scott P. Zack, D.C.; David M. Katz, D.C.; Cory J. Mann; Yisroel Sigler; Evan P. Shaw; Ron Waltz; Mazin K. Yaldo, M.D.; Silvio J. Cozzetto, D.C.; Vincent L. Celentano; Joseph F. DeSanto; Nicole F. Martinez; Anthony F. Sereno; Loren C. Chudler, D.O.; Jeff S. Pierce, D.O.; Chintan Desai, M.D.; and Michael Paley, M.D.**

1463.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1362 set forth above as if fully set forth herein.

1464.   Defendants Universal Health Group, Inc. d/b/a Saginaw Spine and Pain, Michigan Spine and Rehab, Associated Medical, Inc., Associated Chiropractic & Medical Center, and Rehab, Inc.; Professional Health Systems, LLC; Health Systems, Inc.; United Wellness Centers, Inc.; United Wellness Center of Flint, PLLC; United Wellness Center of Lansing, PLLC; Clear Imaging LLC; Horizon Imaging LLC; Associated Surgical Center, P.C.; American Surgical Centers I, Inc.; American Surgical Centers II, LLC; WCIS Media LLC.; UHG Management LLC; United Wellness Centers Management, LLC; Greater Michigan Professional Services LLC d/b/a MI Pro Consultants; Scott P. Zack, D.C.; David M. Katz, D.C.; Cory J. Mann; Yisroel Sigler; Evan P. Shaw; Ron Waltz; Mazin K. Yaldo, M.D.; Silvio J. Cozzetto, D.C.; Vincent L. Celentano; Joseph F. DeSanto; Nicole F. Martinez; Anthony F. Sereno; Loren C. Chudler, D.O.; Jeff S. Pierce, D.O.; Chintan Desai, M.D.; and Michael Paley, M.D.  ("Count VIII defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of UWC-Detroit.

1465.   The Count VIII defendants each agreed to further, facilitate, support, and/or operate the UWC-Detroit enterprise.

1466.   As such, the Count VIII defendants conspired to violate 18 U.S.C. § 1962(c).

1467.   The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of UWC-Detroit even though UWC-Detroit was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

1468.   The Count VIII defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including soliciting patients, rendering unnecessary treatment to patients, and the creation and submission to Allstate of insurance claim and legal documents containing material misrepresentations and/or material omissions.

1469.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count VIII defendants' unlawful conduct described herein.

1470.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count VIII defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count VIII defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT IX
### VIOLATION OF 18 U.S.C. § 1962(c)
### (UWC-Flint Enterprise)
**Against Universal Health Group, Inc. d/b/a Saginaw Spine and Pain, Michigan Spine and Rehab, Associated Medical, Inc., Associated Chiropractic & Medical Center, and Rehab, Inc.; Professional Health Systems, LLC; UHG Management LLC; United Wellness Centers Management, LLC; Scott P. Zack, D.C.; David M. Katz, D.C.; Cory J. Mann; Yisroel Sigler; Evan P. Shaw; Ron Waltz; Silvio J. Cozzetto, D.C.; Vincent L. Celentano; and Joseph F. DeSanto**

1471.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1362 set forth above as if fully set forth herein.

1472.   In connection with each of the claims identified in the within Complaint, Universal Health Group, Inc. d/b/a Saginaw Spine and Pain, Michigan Spine and Rehab, Associated Medical, Inc., Associated Chiropractic & Medical Center, and Rehab, Inc.; Professional Health Systems, LLC; UHG Management LLC; United Wellness Centers Management, LLC; Scott P. Zack, D.C.; David M. Katz, D.C.; Cory J. Mann; Yisroel Sigler; Evan P. Shaw; Ron Waltz; Silvio J. Cozzetto, D.C.; Vincent L. Celentano; and Joseph F. DeSanto ("Count IX defendants") intentionally caused to be prepared and mailed false medical documentation by UWC-Flint, or knew that such false medical documentation would be mailed in the ordinary course of UWC-Flint's business, or should have reasonably foreseen that the mailing of such false medical documentation by UWC-Flint would occur, in furtherance of the Count IX defendants' scheme to defraud.

1473.   The Count IX defendants employed, knew, or should have foreseen that two or more mailings to demand and/or receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 22.

1474.   Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through the U.S. Mail.

1475.   Policies of insurance were delivered to insureds through the U.S. Mail.

1476.   Payments to UWC-Flint from Allstate were transmitted through the U.S. Mail.

1477.   As documented above, the Count IX defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical expenses and/or services that were purportedly performed at and/or by UWC-Flint to collect payment from Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the Michigan No-Fault Act.

1478.   As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts to UWC-Flint for the benefit of the Count IX defendants that would not otherwise have been paid.

1479.   The Count IX defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count IX defendants to continue their fraudulent scheme without detection.

1480.   The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

1481.   By mailing, or agreeing that the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count IX defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1482.   The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to UWC-Flint for the benefit of the Count IX defendants.

1483.   UWC-Flint constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1484.   The Count IX defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

1485.   Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count IX defendants' fraudulent acts.

1486.   The Count IX defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1487.   Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

1488.   Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1489.   By virtue of the Count IX defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted, by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT X**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(UWC-Flint Enterprise)**
**Against Universal Health Group, Inc. d/b/a Saginaw Spine and Pain, Michigan Spine and Rehab, Associated Medical, Inc., Associated Chiropractic & Medical Center, and Rehab, Inc.; Professional Health Systems, LLC; Health Systems, Inc.; United Wellness Centers, Inc.; United Wellness Center of Detroit, PLLC; United Wellness Center of Lansing, PLLC; Clear Imaging LLC; Horizon Imaging LLC; Associated Surgical Center, P.C.; American Surgical Centers I, Inc.; American Surgical Centers II, LLC; WCIS Media LLC.; UHG Management LLC; United Wellness Centers Management, LLC; Greater Michigan Professional Services LLC d/b/a MI Pro Consultants; Scott P. Zack, D.C.; David M. Katz, D.C.; Cory J. Mann; Yisroel Sigler; Evan P. Shaw; Ron Waltz; Mazin K. Yaldo, M.D.; Silvio J. Cozzetto, D.C.; Vincent L. Celentano; Joseph F. DeSanto; Nicole F. Martinez; Anthony F. Sereno; Loren C. Chudler, D.O.; Jeff S. Pierce, D.O.; Chintan Desai, M.D.; and Michael Paley, M.D.**

1490.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1362 set forth above as if fully set forth herein.

1491.   Defendants Universal Health Group, Inc. d/b/a Saginaw Spine and Pain, Michigan Spine and Rehab, Associated Medical, Inc., Associated Chiropractic & Medical Center, and Rehab, Inc.; Professional Health Systems, LLC; Health Systems, Inc.; United Wellness Centers, Inc.; United Wellness Center of Detroit, PLLC; United Wellness Center of Lansing, PLLC; Clear Imaging LLC; Horizon Imaging LLC; Associated Surgical Center, P.C.; American Surgical Centers I, Inc.; American Surgical Centers II, LLC; WCIS Media LLC.; UHG Management LLC; United Wellness Centers Management, LLC; Greater Michigan Professional Services LLC d/b/a MI Pro Consultants; Scott P. Zack, D.C.; David M. Katz, D.C.; Cory J. Mann; Yisroel Sigler; Evan P. Shaw; Ron Waltz; Mazin K. Yaldo, M.D.; Silvio J. Cozzetto, D.C.; Vincent L. Celentano; Joseph F. DeSanto; Nicole F. Martinez; Anthony F. Sereno; Loren C. Chudler, D.O.; Jeff S. Pierce, D.O.; Chintan Desai, M.D.; and Michael Paley, M.D.("Count X defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of UWC-Flint.

178

1492.   The Count X defendants each agreed to further, facilitate, support, and/or operate the UWC-Flint enterprise.

1493.   As such, the Count X defendants conspired to violate 18 U.S.C. § 1962(c).

1494.   The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of UWC-Flint even though UWC-Flint was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

1495.   The Count X defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including soliciting patients, rendering unnecessary treatment to patients, and the creation and submission to Allstate of insurance claim and legal documents containing material misrepresentations and/or material omissions.

1496.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count X defendants' unlawful conduct described herein.

1497.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count X defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count X defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XI**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(UWC-Lansing Enterprise)**
**Against Universal Health Group, Inc. d/b/a Saginaw Spine and Pain, Michigan Spine and Rehab, Associated Medical, Inc., Associated Chiropractic & Medical Center, and Rehab, Inc.; Professional Health Systems, LLC; UHG Management LLC; United Wellness Centers Management, LLC; Scott P. Zack, D.C.; David M. Katz, D.C.; Cory J. Mann; Yisroel Sigler; Evan P. Shaw; Ron Waltz; Silvio J. Cozzetto, D.C.; Vincent L. Celentano; and Joseph F. DeSanto**

1498.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1362 set forth above as if fully set forth herein.

1499.   In connection with each of the claims identified in the within Complaint, Universal Health Group, Inc. d/b/a Saginaw Spine and Pain, Michigan Spine and Rehab, Associated Medical, Inc., Associated Chiropractic & Medical Center, and Rehab, Inc.; Professional Health Systems, LLC; UHG Management LLC; United Wellness Centers Management, LLC; Scott P. Zack, D.C.; David M. Katz, D.C.; Cory J. Mann; Yisroel Sigler; Evan P. Shaw; Ron Waltz; Silvio J. Cozzetto, D.C.; Vincent L. Celentano; and Joseph F. DeSanto ("Count XI defendants") intentionally caused to be prepared and mailed false medical documentation by UWC-Lansing, or knew that such false medical documentation would be mailed in the ordinary course of UWC-Lansing's business, or should have reasonably foreseen that the mailing of such false medical documentation by UWC-Lansing would occur, in furtherance of the Count XI defendants' scheme to defraud.

1500.   The Count XI defendants employed, knew, or should have foreseen that two or more mailings to demand and/or receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 22.

1501.   Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through the U.S. Mail.

1502.   Policies of insurance were delivered to insureds through the U.S. Mail.

1503.   Payments to UWC-Lansing from Allstate were transmitted through the U.S. Mail.

1504.   As documented above, the Count XI defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical expenses and/or services that were purportedly performed at and/or by UWC-Lansing to collect payment from Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the Michigan No-Fault Act.

1505.   As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts to UWC-Lansing for the benefit of the Count XI defendants that would not otherwise have been paid.

1506.   The Count XI defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count XI defendants to continue their fraudulent scheme without detection.

1507.   The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

1508.   By mailing, or agreeing that the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count XI defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1509.   The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to UWC-Lansing for the benefit of the Count XI defendants.

1510.   UWC-Lansing constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1511.   The Count XI defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

1512.   Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count XI defendants' fraudulent acts.

1513.   The Count XI defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1514.   Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

1515.   Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1516.   By virtue of the Count XI defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted, by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XII
### VIOLATION OF 18 U.S.C. § 1962(d)
### (UWC-Lansing Enterprise)
**Against Universal Health Group, Inc. d/b/a Saginaw Spine and Pain, Michigan Spine and Rehab, Associated Medical, Inc., Associated Chiropractic & Medical Center, and Rehab, Inc.; Professional Health Systems, LLC; Health Systems, Inc.; United Wellness Centers, Inc.; United Wellness Center of Detroit, PLLC; United Wellness Center of Flint, PLLC; Clear Imaging LLC; Horizon Imaging LLC; Associated Surgical Center, P.C.; American Surgical Centers I, Inc.; American Surgical Centers II, LLC; WCIS Media LLC.; UHG Management LLC; United Wellness Centers Management, LLC; Greater Michigan Professional Services LLC d/b/a MI Pro Consultants; Scott P. Zack, D.C.; David M. Katz, D.C.; Cory J. Mann; Yisroel Sigler; Evan P. Shaw; Ron Waltz; Mazin K. Yaldo, M.D.; Silvio J. Cozzetto, D.C.; Vincent L. Celentano; Joseph F. DeSanto; Nicole F. Martinez; Anthony F. Sereno; Loren C. Chudler, D.O.; Jeff S. Pierce, D.O.; Chintan Desai, M.D.; and Michael Paley, M.D.**

1517.    Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1362 set forth above as if fully set forth herein.

1518.    Defendants Universal Health Group, Inc. d/b/a Saginaw Spine and Pain, Michigan Spine and Rehab, Associated Medical, Inc., Associated Chiropractic & Medical Center, and Rehab, Inc.; Professional Health Systems, LLC; Health Systems, Inc.; United Wellness Centers, Inc.; United Wellness Center of Detroit, PLLC; United Wellness Center of Flint, PLLC; Clear Imaging LLC; Horizon Imaging LLC; Associated Surgical Center, P.C.; American Surgical Centers I, Inc.; American Surgical Centers II, LLC; WCIS Media LLC.; UHG Management LLC; United Wellness Centers Management, LLC; Greater Michigan Professional Services LLC d/b/a MI Pro Consultants; Scott P. Zack, D.C.; David M. Katz, D.C.; Cory J. Mann; Yisroel Sigler; Evan P. Shaw; Ron Waltz; Mazin K. Yaldo, M.D.; Silvio J. Cozzetto, D.C.; Vincent L. Celentano; Joseph F. DeSanto; Nicole F. Martinez; Anthony F. Sereno; Loren C. Chudler, D.O.; Jeff S. Pierce, D.O.; Chintan Desai, M.D.; and Michael Paley, M.D. ("Count XII defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of UWC-Lansing.

1519.   The Count XII defendants each agreed to further, facilitate, support, and/or operate the UWC-Lansing enterprise.

1520.   As such, the Count XII defendants conspired to violate 18 U.S.C. § 1962(c).

1521.   The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of UWC-Lansing even though UWC-Lansing was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

1522.   The Count XII defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including soliciting patients, rendering unnecessary treatment to patients, and the creation and submission to Allstate of insurance claim and legal documents containing material misrepresentations and/or material omissions.

1523.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count XII defendants' unlawful conduct described herein.

1524.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count XII defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count XII defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XIII
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Clear Imaging Enterprise)
### Against Universal Health Group, Inc. d/b/a Saginaw Spine and Pain, Michigan Spine and Rehab, Associated Medical, Inc., Associated Chiropractic & Medical Center, and Rehab, Inc.; Professional Health Systems, LLC; UHG Management LLC; Scott P. Zack, D.C.; David M. Katz, D.C.; Cory J. Mann; Yisroel Sigler; Evan P. Shaw; Ron Waltz; Vincent L. Celentano; Joseph F. DeSanto; Loren C. Chudler, D.O.; and Chintan Desai, M.D.

1525.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1362 set forth above as if fully set forth herein.

1526.   In connection with each of the claims identified in the within Complaint, Universal Health Group, Inc. d/b/a Saginaw Spine and Pain, Michigan Spine and Rehab, Associated Medical, Inc., Associated Chiropractic & Medical Center, and Rehab, Inc.; Professional Health Systems, LLC; UHG Management LLC; Scott P. Zack, D.C.; David M. Katz, D.C.; Cory J. Mann; Yisroel Sigler; Evan P. Shaw; Ron Waltz; Vincent L. Celentano; Joseph F. DeSanto; Loren C. Chudler, D.O.; and Chintan Desai, M.D. ("Count XIII defendants") intentionally caused to be prepared and mailed false medical documentation by Clear Imaging, or knew that such false medical documentation would be mailed in the ordinary course of Clear Imaging's business, or should have reasonably foreseen that the mailing of such false medical documentation by Clear Imaging would occur, in furtherance of the Count XIII defendants' scheme to defraud.

1527.   The Count XIII defendants employed, knew, or should have foreseen that two or more mailings to demand and/or receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 22.

1528.   Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through the U.S. Mail.

1529.   Policies of insurance were delivered to insureds through the U.S. Mail.

185

1530.   Payments to Clear Imaging from Allstate were transmitted through the U.S. Mail.

1531.   As documented above, the Count XIII defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical expenses and/or services that were purportedly performed at and/or by Clear Imaging to collect payment from Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the Michigan No-Fault Act.

1532.   As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts to Clear Imaging for the benefit of the Count XIII defendants that would not otherwise have been paid.

1533.   The Count XIII defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count XIII defendants to continue their fraudulent scheme without detection.

1534.   The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

1535.   By mailing, or agreeing that the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count XIII defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1536.   The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Clear Imaging for the benefit of the Count XIII defendants.

1537.   Clear Imaging constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1538.   The Count XIII defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

1539.   Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count XIII defendants' fraudulent acts.

1540.   The Count XIII defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1541.   Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

1542.   Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1543.   By virtue of the Count XIII defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted, by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XIV
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Clear Imaging Enterprise)
**Against Universal Health Group, Inc. d/b/a Saginaw Spine and Pain, Michigan Spine and Rehab, Associated Medical, Inc., Associated Chiropractic & Medical Center, and Rehab, Inc.; Professional Health Systems, LLC; Health Systems, Inc.; United Wellness Centers, Inc.; United Wellness Center of Detroit, PLLC; United Wellness Center of Flint, PLLC; United Wellness Center of Lansing, PLLC; Horizon Imaging LLC; Associated Surgical Center, P.C.; American Surgical Centers I, Inc.; American Surgical Centers II, LLC; WCIS Media LLC.; UHG Management LLC; United Wellness Centers Management, LLC; Greater Michigan Professional Services LLC d/b/a MI Pro Consultants; Scott P. Zack, D.C.; David M. Katz, D.C.; Cory J. Mann; Yisroel Sigler; Evan P. Shaw; Ron Waltz; Mazin K. Yaldo, M.D.; Silvio J. Cozzetto, D.C.; Vincent L. Celentano; Joseph F. DeSanto; Nicole F. Martinez; Anthony F. Sereno; Loren C. Chudler, D.O.; Jeff S. Pierce, D.O.; Chintan Desai, M.D.; and Michael Paley, M.D.**

1544.    Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1362 set forth above as if fully set forth herein.

1545.    Defendants Universal Health Group, Inc. d/b/a Saginaw Spine and Pain, Michigan Spine and Rehab, Associated Medical, Inc., Associated Chiropractic & Medical Center, and Rehab, Inc.; Professional Health Systems, LLC; Health Systems, Inc.; United Wellness Centers, Inc.; United Wellness Center of Detroit, PLLC; United Wellness Center of Flint, PLLC; United Wellness Center of Lansing, PLLC; Horizon Imaging LLC; Associated Surgical Center, P.C.; American Surgical Centers I, Inc.; American Surgical Centers II, LLC; WCIS Media LLC.; UHG Management LLC; United Wellness Centers Management, LLC; Greater Michigan Professional Services LLC d/b/a MI Pro Consultants; Scott P. Zack, D.C.; David M. Katz, D.C.; Cory J. Mann; Yisroel Sigler; Evan P. Shaw; Ron Waltz; Mazin K. Yaldo, M.D.; Silvio J. Cozzetto, D.C.; Vincent L. Celentano; Joseph F. DeSanto; Nicole F. Martinez; Anthony F. Sereno; Loren C. Chudler, D.O.; Jeff S. Pierce, D.O.; Chintan Desai, M.D.; and Michael Paley, M.D.  ("Count XIV defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Clear Imaging.

1546.   The Count XIV defendants each agreed to further, facilitate, support, and/or operate the Clear Imaging enterprise.

1547.   As such, the Count XIV defendants conspired to violate 18 U.S.C. § 1962(c).

1548.   The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Clear Imaging even though Clear Imaging was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

1549.   The Count XIV defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including soliciting patients, rendering unnecessary treatment to patients, and the creation and submission to Allstate of insurance claim and legal documents containing material misrepresentations and/or material omissions.

1550.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count XIV defendants' unlawful conduct described herein.

1551.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count XIV defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count XIV defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XV**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Horizon Imaging Enterprise)**
**Against Universal Health Group, Inc. d/b/a Saginaw Spine and Pain, Michigan Spine and Rehab, Associated Medical, Inc., Associated Chiropractic & Medical Center, and Rehab, Inc.; Professional Health Systems, LLC; UHG Management LLC; Scott P. Zack, D.C.; David M. Katz, D.C.; Cory J. Mann; Yisroel Sigler; Evan P. Shaw; Ron Waltz; Vincent L. Celentano; Joseph F. DeSanto; Loren C. Chudler, D.O.; Chintan Desai, M.D.; and Michael Paley, M.D.**

1552.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1362 set forth above as if fully set forth herein.

1553.   In connection with each of the claims identified in the within Complaint, Universal Health Group, Inc. d/b/a Saginaw Spine and Pain, Michigan Spine and Rehab, Associated Medical, Inc., Associated Chiropractic & Medical Center, and Rehab, Inc.; Professional Health Systems, LLC; UHG Management LLC; Scott P. Zack, D.C.; David M. Katz, D.C.; Cory J. Mann; Yisroel Sigler; Evan P. Shaw; Ron Waltz; Vincent L. Celentano; Joseph F. DeSanto; Loren C. Chudler, D.O.; Chintan Desai, M.D.; and Michael Paley, M.D. ("Count XV defendants") intentionally caused to be prepared and mailed false medical documentation by Horizon Imaging, or knew that such false medical documentation would be mailed in the ordinary course of Horizon Imaging's business, or should have reasonably foreseen that the mailing of such false medical documentation by Horizon Imaging would occur, in furtherance of the Count XV defendants' scheme to defraud.

1554.   The Count XV defendants employed, knew, or should have foreseen that two or more mailings to demand and/or receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 22.

1555.   Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through the U.S. Mail.

190

1556.   Policies of insurance were delivered to insureds through the U.S. Mail.

1557.   Payments to Horizon Imaging from Allstate were transmitted through the U.S. Mail.

1558.   As documented above, the Count XV defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical expenses and/or services that were purportedly performed at and/or by Horizon Imaging to collect payment from Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the Michigan No-Fault Act.

1559.   As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts to Horizon Imaging for the benefit of the Count XV defendants that would not otherwise have been paid.

1560.   The Count XV defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count XV defendants to continue their fraudulent scheme without detection.

1561.   The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

1562.   By mailing, or agreeing that the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count XV defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1563.   The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Horizon Imaging for the benefit of the Count XV defendants.

1564.   Horizon Imaging constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1565.   The Count XV defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

1566.   Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count XV defendants' fraudulent acts.

1567.   The Count XV defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1568.   Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

1569.   Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1570.   By virtue of the Count XV defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted, by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XVI**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(Horizon Imaging Enterprise)**
**Against Universal Health Group, Inc. d/b/a Saginaw Spine and Pain, Michigan Spine and Rehab, Associated Medical, Inc., Associated Chiropractic & Medical Center, and Rehab, Inc.; Professional Health Systems, LLC; Health Systems, Inc.; United Wellness Centers, Inc.; United Wellness Center of Detroit, PLLC; United Wellness Center of Flint, PLLC; United Wellness Center of Lansing, PLLC; Clear Imaging LLC; Associated Surgical Center, P.C.; American Surgical Centers I, Inc.; American Surgical Centers II, LLC; WCIS Media LLC.; UHG Management LLC; United Wellness Centers Management, LLC; Greater Michigan Professional Services LLC d/b/a MI Pro Consultants; Scott P. Zack, D.C.; David M. Katz, D.C.; Cory J. Mann; Yisroel Sigler; Evan P. Shaw; Ron Waltz; Mazin K. Yaldo, M.D.; Silvio J. Cozzetto, D.C.; Vincent L. Celentano; Joseph F. DeSanto; Nicole F. Martinez; Anthony F. Sereno; Loren C. Chudler, D.O.; Jeff S. Pierce, D.O.; Chintan Desai, M.D.; and Michael Paley, M.D.**

1571.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1362 set forth above as if fully set forth herein.

1572.   Defendants Universal Health Group, Inc. d/b/a Saginaw Spine and Pain, Michigan Spine and Rehab, Associated Medical, Inc., Associated Chiropractic & Medical Center, and Rehab, Inc.; Professional Health Systems, LLC; Health Systems, Inc.; United Wellness Centers, Inc.; United Wellness Center of Detroit, PLLC; United Wellness Center of Flint, PLLC; United Wellness Center of Lansing, PLLC; Clear Imaging LLC; Associated Surgical Center, P.C.; American Surgical Centers I, Inc.; American Surgical Centers II, LLC; WCIS Media LLC.; UHG Management LLC; United Wellness Centers Management, LLC; Greater Michigan Professional Services LLC d/b/a MI Pro Consultants; Scott P. Zack, D.C.; David M. Katz, D.C.; Cory J. Mann; Yisroel Sigler; Evan P. Shaw; Ron Waltz; Mazin K. Yaldo, M.D.; Silvio J. Cozzetto, D.C.; Vincent L. Celentano; Joseph F. DeSanto; Nicole F. Martinez; Anthony F. Sereno; Loren C. Chudler, D.O.; Jeff S. Pierce, D.O.; Chintan Desai, M.D.; and Michael Paley, M.D. ("Count XVI defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Horizon Imaging.

193

1573.   The Count XVI defendants each agreed to further, facilitate, support, and/or operate the Horizon Imaging enterprise.

1574.   As such, the Count XVI defendants conspired to violate 18 U.S.C. § 1962(c).

1575.   The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Horizon Imaging even though Horizon Imaging was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

1576.   The Count XVI defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including soliciting patients, rendering unnecessary treatment to patients, and the creation and submission to Allstate of insurance claim and legal documents containing material misrepresentations and/or material omissions.

1577.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count XVI defendants' unlawful conduct described herein.

1578.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count XVI defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count XVI defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XVII**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Associated Surgical Enterprise)**
**Against Universal Health Group, Inc. d/b/a Saginaw Spine and Pain, Michigan Spine and Rehab, Associated Medical, Inc., Associated Chiropractic & Medical Center, and Rehab, Inc.; Professional Health Systems, LLC; UHG Management LLC; Scott P. Zack, D.C.; David M. Katz, D.C.; Cory J. Mann; Yisroel Sigler; Evan P. Shaw; Ron Waltz; Mazin K. Yaldo, M.D.; Vincent L. Celentano; and Joseph F. DeSanto**

1579.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1362 set forth above as if fully set forth herein.

1580.   In connection with each of the claims identified in the within Complaint, Universal Health Group, Inc. d/b/a Saginaw Spine and Pain, Michigan Spine and Rehab, Associated Medical, Inc., Associated Chiropractic & Medical Center, and Rehab, Inc.; Professional Health Systems, LLC; UHG Management LLC; Scott P. Zack, D.C.; David M. Katz, D.C.; Cory J. Mann; Yisroel Sigler; Evan P. Shaw; Ron Waltz; Mazin K. Yaldo, M.D.; Vincent L. Celentano; and Joseph F. DeSanto ("Count XVII defendants") intentionally caused to be prepared and mailed false medical documentation by Associated Surgical, or knew that such false medical documentation would be mailed in the ordinary course of Associated Surgical's business, or should have reasonably foreseen that the mailing of such false medical documentation by Associated Surgical would occur, in furtherance of the Count XVII defendants' scheme to defraud.

1581.   The Count XVII defendants employed, knew, or should have foreseen that two or more mailings to demand payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 22.

1582.   Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through the U.S. Mail.

1583.   Policies of insurance were delivered to insureds through the U.S. Mail.

1584.   As documented above, the Count XVII defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical expenses and/or services that were purportedly performed at and/or by Associated Surgical to collect payment from Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the Michigan No-Fault Act.

1585.   As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, incurred expenses for adjusting and processing the claims submitted by Associated Surgical by and through the Count XVII defendants.

1586.   The Count XVII defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count XVII defendants to continue their fraudulent scheme without detection.

1587.   The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

1588.   By mailing, or agreeing that the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count XVII defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1589.   The activities alleged in this Complaint had the direct effect of causing Allstate to expend costs related to the claims submitted by, and on behalf of, Associated Surgical, including costs for claims adjustment and handling.

1590.   Associated Surgical constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

196

1591.   The Count XVII defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

1592.   Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count XVII defendants' fraudulent acts.

1593.   The Count XVII defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1594.   Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

1595.   Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1596.   By virtue of the Count XVII defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the claims adjustment/processing damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted, by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XVIII**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(Associated Surgical Enterprise)**
**Against Universal Health Group, Inc. d/b/a Saginaw Spine and Pain, Michigan Spine and Rehab, Associated Medical, Inc., Associated Chiropractic & Medical Center, and Rehab, Inc.; Professional Health Systems, LLC; Health Systems, Inc.; United Wellness Centers, Inc.; United Wellness Center of Detroit, PLLC; United Wellness Center of Flint, PLLC; United Wellness Center of Lansing, PLLC; Clear Imaging LLC; Horizon Imaging LLC; American Surgical Centers I, Inc.; American Surgical Centers II, LLC; WCIS Media LLC.; UHG Management LLC; United Wellness Centers Management, LLC; Greater Michigan Professional Services LLC d/b/a MI Pro Consultants; Scott P. Zack, D.C.; David M. Katz, D.C.; Cory J. Mann; Yisroel Sigler; Evan P. Shaw; Ron Waltz; Mazin K. Yaldo, M.D.; Silvio J. Cozzetto, D.C.; Vincent L. Celentano; Joseph F. DeSanto; Nicole F. Martinez; Anthony F. Sereno; Loren C. Chudler, D.O.; Jeff S. Pierce, D.O.; Chintan Desai, M.D.; and Michael Paley, M.D.**

1597.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1362 set forth above as if fully set forth herein.

1598.   Defendants Universal Health Group, Inc. d/b/a Saginaw Spine and Pain, Michigan Spine and Rehab, Associated Medical, Inc., Associated Chiropractic & Medical Center, and Rehab, Inc.; Professional Health Systems, LLC; Health Systems, Inc.; United Wellness Centers, Inc.; United Wellness Center of Detroit, PLLC; United Wellness Center of Flint, PLLC; United Wellness Center of Lansing, PLLC; Clear Imaging LLC; Horizon Imaging LLC; American Surgical Centers I, Inc.; American Surgical Centers II, LLC; WCIS Media LLC.; UHG Management LLC; United Wellness Centers Management, LLC; Greater Michigan Professional Services LLC d/b/a MI Pro Consultants; Scott P. Zack, D.C.; David M. Katz, D.C.; Cory J. Mann; Yisroel Sigler; Evan P. Shaw; Ron Waltz; Mazin K. Yaldo, M.D.; Silvio J. Cozzetto, D.C.; Vincent L. Celentano; Joseph F. DeSanto; Nicole F. Martinez; Anthony F. Sereno; Loren C. Chudler, D.O.; Jeff S. Pierce, D.O.; Chintan Desai, M.D.; and Michael Paley, M.D. ("Count XVIII defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Associated Surgical.

198

1599.   The Count XVIII defendants each agreed to further, facilitate, support, and/or operate the Associated Surgical enterprise.

1600.   As such, the Count XVIII defendants conspired to violate 18 U.S.C. § 1962(c).

1601.   The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Associated Surgical even though Associated Surgical was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

1602.   The Count XVIII defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including soliciting patients, rendering unnecessary treatment to patients, and the creation and submission to Allstate of insurance claim and legal documents containing material misrepresentations and/or material omissions.

1603.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been forced to expend costs adjusting and processing claims from Associated Surgical as a result of the Count XVIII defendants' unlawful conduct described herein.

1604.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count XVIII defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count XVIII defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XIX
### VIOLATION OF 18 U.S.C. § 1962(c)
### (American Surgical Enterprise)
### Against Universal Health Group, Inc. d/b/a Saginaw Spine and Pain, Michigan Spine and Rehab, Associated Medical, Inc., Associated Chiropractic & Medical Center, and Rehab, Inc.; Professional Health Systems, LLC; UHG Management LLC; Scott P. Zack, D.C.; David M. Katz, D.C.; Cory J. Mann; Yisroel Sigler; Evan P. Shaw; Ron Waltz; Vincent L. Celentano; Joseph F. DeSanto; and Jeff S. Pierce, D.O.

1605.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1362 set forth above as if fully set forth herein.

1606.   In connection with each of the claims identified in the within Complaint, Universal Health Group, Inc. d/b/a Saginaw Spine and Pain, Michigan Spine and Rehab, Associated Medical, Inc., Associated Chiropractic & Medical Center, and Rehab, Inc.; Professional Health Systems, LLC; UHG Management LLC; Scott P. Zack, D.C.; David M. Katz, D.C.; Cory J. Mann; Yisroel Sigler; Evan P. Shaw; Ron Waltz; Vincent L. Celentano; Joseph F. DeSanto; and Jeff S. Pierce, D.O. ("Count XIX defendants") intentionally caused to be prepared and mailed false medical documentation by American Surgical, or knew that such false medical documentation would be mailed in the ordinary course of American Surgical's business, or should have reasonably foreseen that the mailing of such false medical documentation by American Surgical would occur, in furtherance of the Count XIX defendants' scheme to defraud.

1607.   The Count XIX defendants employed, knew, or should have foreseen that two or more mailings to demand and/or receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 22.

1608.   Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through the U.S. Mail.

1609.   Policies of insurance were delivered to insureds through the U.S. Mail.

1610.   Payments to American Surgical from Allstate were transmitted through the U.S. Mail.

1611.   As documented above, the Count XIX defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical expenses and/or services that were purportedly performed at and/or by American Surgical to collect payment from Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the Michigan No-Fault Act.

1612.   As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts to American Surgical for the benefit of the Count XIX defendants that would not otherwise have been paid.

1613.   The Count XIX defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count XIX defendants to continue their fraudulent scheme without detection.

1614.   The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

1615.   By mailing, or agreeing that the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count XIX defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1616.   The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to American Surgical for the benefit of the Count XIX defendants.

1617.   American Surgical constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1618.   The Count XIX defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

1619.   Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count XIX defendants' fraudulent acts.

1620.   The Count XIX defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1621.   Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

1622.   Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1623.   By virtue of the Count XIX defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted, by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XX
### VIOLATION OF 18 U.S.C. § 1962(d)
### (American Surgical Enterprise)
**Against Universal Health Group, Inc. d/b/a Saginaw Spine and Pain, Michigan Spine and Rehab, Associated Medical, Inc., Associated Chiropractic & Medical Center, and Rehab, Inc.; Professional Health Systems, LLC; Health Systems, Inc.; United Wellness Centers, Inc.; United Wellness Center of Detroit, PLLC; United Wellness Center of Flint, PLLC; United Wellness Center of Lansing, PLLC; Clear Imaging LLC; Horizon Imaging LLC; Associated Surgical Center, P.C.; WCIS Media LLC.; UHG Management LLC; United Wellness Centers Management, LLC; Greater Michigan Professional Services LLC d/b/a MI Pro Consultants; Scott P. Zack, D.C.; David M. Katz, D.C.; Cory J. Mann; Yisroel Sigler; Evan P. Shaw; Ron Waltz; Mazin K. Yaldo, M.D.; Silvio J. Cozzetto, D.C.; Vincent L. Celentano; Joseph F. DeSanto; Nicole F. Martinez; Anthony F. Sereno; Loren C. Chudler, D.O.; Jeff S. Pierce, D.O.; Chintan Desai, M.D.; and Michael Paley, M.D.**

1624.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1362 set forth above as if fully set forth herein.

202

1625.   Defendants Universal Health Group, Inc. d/b/a Saginaw Spine and Pain, Michigan Spine and Rehab, Associated Medical, Inc., Associated Chiropractic & Medical Center, and Rehab, Inc.; Professional Health Systems, LLC; Health Systems, Inc.; United Wellness Centers, Inc.; United Wellness Center of Detroit, PLLC; United Wellness Center of Flint, PLLC; United Wellness Center of Lansing, PLLC; Clear Imaging LLC; Horizon Imaging LLC; Associated Surgical Center, P.C.; WCIS Media LLC.; UHG Management LLC; United Wellness Centers Management, LLC; Greater Michigan Professional Services LLC d/b/a MI Pro Consultants; Scott P. Zack, D.C.; David M. Katz, D.C.; Cory J. Mann; Yisroel Sigler; Evan P. Shaw; Ron Waltz; Mazin K. Yaldo, M.D.; Silvio J. Cozzetto, D.C.; Vincent L. Celentano; Joseph F. DeSanto; Nicole F. Martinez; Anthony F. Sereno; Loren C. Chudler, D.O.; Jeff S. Pierce, D.O.; Chintan Desai, M.D.; and Michael Paley, M.D. ("Count XX defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of American Surgical.

1626.   The Count XX defendants each agreed to further, facilitate, support, and/or operate the American Surgical enterprise.

1627.   As such, the Count XX defendants conspired to violate 18 U.S.C. § 1962(c).

1628.   The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of American Surgical even though American Surgical was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

1629.   The Count XX defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including soliciting patients, rendering unnecessary treatment to patients, and the creation and submission to Allstate of insurance claim and legal documents containing material misrepresentations and/or material omissions.

1630.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count XX defendants' unlawful conduct described herein.

1631.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count XX defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count XX defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XXI
### COMMON LAW FRAUD
**Against Universal Health Group, Inc. d/b/a Saginaw Spine and Pain, Michigan Spine and Rehab, Associated Medical, Inc., Associated Chiropractic & Medical Center, and Rehab, Inc.; Professional Health Systems, LLC; Health Systems, Inc.; United Wellness Centers, Inc.; United Wellness Center of Detroit, PLLC; United Wellness Center of Flint, PLLC; United Wellness Center of Lansing, PLLC; Clear Imaging LLC; Horizon Imaging LLC; Associated Surgical Center, P.C.; American Surgical Centers I, Inc.; American Surgical Centers II, LLC; UHG Management LLC; United Wellness Centers Management, LLC; Scott P. Zack, D.C.; David M. Katz, D.C.; Cory J. Mann; Yisroel Sigler; Evan P. Shaw; Ron Waltz; Mazin K. Yaldo, M.D.; Silvio J. Cozzetto, D.C.; Vincent L. Celentano; Joseph F. DeSanto; Loren C. Chudler, D.O.; Jeff S. Pierce, D.O.; Chintan Desai, M.D.; and Michael Paley, M.D.**

1632.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1362 set forth above as if fully set forth herein.

1633.   The scheme to defraud Allstate perpetrated by Universal Health Group, Inc. d/b/a Saginaw Spine and Pain, Michigan Spine and Rehab, Associated Medical, Inc., Associated Chiropractic & Medical Center, and Rehab, Inc.; Professional Health Systems, LLC; Health Systems, Inc.; United Wellness Centers, Inc.; United Wellness Center of Detroit, PLLC; United Wellness Center of Flint, PLLC; United Wellness Center of Lansing, PLLC; Clear Imaging LLC; Horizon Imaging LLC; Associated Surgical Center, P.C.; American Surgical Centers I,

Inc.; American Surgical Centers II, LLC; UHG Management LLC; United Wellness Centers Management, LLC; Scott P. Zack, D.C.; David M. Katz, D.C.; Cory J. Mann; Yisroel Sigler; Evan P. Shaw; Ron Waltz; Mazin K. Yaldo, M.D.; Silvio J. Cozzetto, D.C.; Vincent L. Celentano; Joseph F. DeSanto; Loren C. Chudler, D.O.; Jeff S. Pierce, D.O.; Chintan Desai, M.D.; and Michael Paley, M.D. ("Count XXI defendants") was dependent upon a succession of material misrepresentations of fact that the defendant medical providers were lawfully rendering medical treatment in compliance with the Michigan No-Fault Act and were entitled to collect benefits thereunder.

1634.   The misrepresentations of fact made by the Count XXI defendants include, but are not limited to, those material misrepresentations discussed in section X *supra*.

1635.   The Count XXI defendants' representations were false or required disclosure of additional facts to render the information furnished not misleading.

1636.   The misrepresentations were intentionally made by the Count XXI defendants in furtherance of their scheme to defraud Allstate by submitting, causing to be submitted, or knowing that non-compensable claims for payment under the Michigan No-Fault Act would be submitted to Allstate.

1637.   The Count XXI defendants' misrepresentations were known to be false and were made for the purpose of inducing Allstate to make payments for claims that are not compensable under Michigan law.

1638.   Allstate reasonably relied upon such material misrepresentations to its detriment in paying numerous non-meritorious bills for medical expenses pursuant to No-Fault insurance claims and in incurring expenses related to the adjustment and processing of claims submitted by the medical facility defendants.

1639.   As a direct and proximate result of the defendants' fraudulent representations and acts, Allstate has been damaged as previously described herein.

## COUNT XXII
## CIVIL CONSPIRACY

**Against Universal Health Group, Inc. d/b/a Saginaw Spine and Pain, Michigan Spine and Rehab, Associated Medical, Inc., Associated Chiropractic & Medical Center, and Rehab, Inc.; Professional Health Systems, LLC; Health Systems, Inc.; United Wellness Centers, Inc.; United Wellness Center of Detroit, PLLC; United Wellness Center of Flint, PLLC; United Wellness Center of Lansing, PLLC; Clear Imaging LLC; Horizon Imaging LLC; Associated Surgical Center, P.C.; American Surgical Centers I, Inc.; American Surgical Centers II, LLC; UHG Management LLC; United Wellness Centers Management, LLC; Scott P. Zack, D.C.; David M. Katz, D.C.; Cory J. Mann; Yisroel Sigler; Evan P. Shaw; Ron Waltz; Mazin K. Yaldo, M.D.; Silvio J. Cozzetto, D.C.; Vincent L. Celentano; Joseph F. DeSanto; Loren C. Chudler, D.O.; Jeff S. Pierce, D.O.; Chintan Desai, M.D.; and Michael Paley, M.D.**

1640.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1362 set forth above as if fully set forth herein.

1641.   Defendants Universal Health Group, Inc. d/b/a Saginaw Spine and Pain, Michigan Spine and Rehab, Associated Medical, Inc., Associated Chiropractic & Medical Center, and Rehab, Inc.; Professional Health Systems, LLC; Health Systems, Inc.; United Wellness Centers, Inc.; United Wellness Center of Detroit, PLLC; United Wellness Center of Flint, PLLC; United Wellness Center of Lansing, PLLC; Clear Imaging LLC; Horizon Imaging LLC; Associated Surgical Center, P.C.; American Surgical Centers I, Inc.; American Surgical Centers II, LLC; UHG Management LLC; United Wellness Centers Management, LLC; Scott P. Zack, D.C.; David M. Katz, D.C.; Cory J. Mann; Yisroel Sigler; Evan P. Shaw; Ron Waltz; Mazin K. Yaldo, M.D.; Silvio J. Cozzetto, D.C.; Vincent L. Celentano; Joseph F. DeSanto; Loren C. Chudler, D.O.; Jeff S. Pierce, D.O.; Chintan Desai, M.D.; and Michael Paley, M.D. ("Count XXII defendants") combined and concerted to accomplish the unlawful purpose of defrauding Allstate by submitting claims for reimbursement under the No-Fault Act to which they were not entitled

because (1) the defendant medical providers did not provide reasonably necessary medical treatment, (2) the defendants wrongly solicited patients to treat at the medical facility defendants, thus rendering the treatment unlawful, and (3) the defendants did not submit reasonable charges to Allstate.

1642.  The Count XXII defendants worked together to achieve an unlawful purpose (namely, defrauding Allstate for personal gain).

1643.  This purpose was known to all of the Count XXII defendants and intentionally pursued.

1644.  Despite knowing that the medical facility defendants were not entitled to reimbursement under the No-Fault Act because they billed for services that were not reasonably necessary, because treatment was not lawfully rendered, and because they charged outrageous and unreasonable prices, the Count XXII defendants nonetheless submitted, caused to be submitted, or knew that claims would be submitted (with accompanying false medical documentation) to Allstate seeking payment to the medical facility defendants.

1645.  In reasonable reliance on the false medical documentation submitted by the medical facility defendants and their owners/managers/healthcare provider operators, Allstate paid certain of the claims submitted.

1646.  All of the Count XXII defendants benefited from the payments wrongfully procured from Allstate.

1647.  The medical facility defendants and their owners/managers/healthcare provider affiliates directly benefited from the payments made to the medical facility defendants.

1648.  Therefore, the Count XXII defendants committed acts that caused damage to Allstate.

1649.   All of the Count XXII defendants actively and intentionally partook in a scheme to defraud Allstate and also encouraged and aided other Count XXII defendants in the commission of acts done for the benefit of all Count XXII defendants and to the unjustified detriment of Allstate.

1650.   Accordingly, all of the Count XXII defendants are equally liable for the fraud perpetrated on Allstate pursuant to their conspiracy.

## <u>COUNT XXIII</u>
## PAYMENT UNDER MISTAKE OF FACT
**Against Universal Health Group, Inc. d/b/a Saginaw Spine and Pain, Michigan Spine and Rehab, Associated Medical, Inc., Associated Chiropractic & Medical Center, and Rehab, Inc.; Health Systems, Inc.; United Wellness Centers, Inc.; United Wellness Center of Detroit, PLLC; United Wellness Center of Flint, PLLC; United Wellness Center of Lansing, PLLC; Clear Imaging LLC; Horizon Imaging LLC; American Surgical Centers I, Inc.; and American Surgical Centers II, LLC**

1651.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1362 set forth above as if fully set forth herein.

1652.   Allstate paid the amounts described herein and itemized in Exhibits 23 to 31 under a misunderstanding, misapprehension, error, fault, or ignorance of material facts, namely, the scheme to defraud Allstate by misrepresenting the necessity of medical services purportedly provided by the medical facility defendants.

1653.   Allstate sustained damages by paying under a mistake of fact the claims submitted by, or on behalf of, Universal Health Group, Inc. d/b/a Saginaw Spine and Pain, Michigan Spine and Rehab, Associated Medical, Inc., Associated Chiropractic & Medical Center, and Rehab, Inc.; Health Systems, Inc.; United Wellness Centers, Inc.; United Wellness Center of Detroit, PLLC; United Wellness Center of Flint, PLLC; United Wellness Center of Lansing, PLLC; Clear Imaging LLC; Horizon Imaging LLC; American Surgical Centers I, Inc.; and American Surgical Centers II, LLC ("Count XXIII defendants"), which misrepresented the reasonableness,

208

necessity, and lawfulness of the medical treatment allegedly rendered and/or whether the patient's injury arose out of a motor vehicle accident.

1654.   The Count XXIII defendants, individually and jointly and severally, would be unjustly enriched if permitted to retain the payments made to them by Allstate under a mistake of fact.

1655.   Allstate is entitled to restitution from each of the Count XXIII defendants, individually and jointly and severally, for all monies paid to and/or received by them from Allstate.

**COUNT XXIV**
**UNJUST ENRICHMENT**
**Against Universal Health Group, Inc. d/b/a Saginaw Spine and Pain, Michigan Spine and Rehab, Associated Medical, Inc., Associated Chiropractic & Medical Center, and Rehab, Inc.; Health Systems, Inc.; United Wellness Centers, Inc.; United Wellness Center of Detroit, PLLC; United Wellness Center of Flint, PLLC; United Wellness Center of Lansing, PLLC; Clear Imaging LLC; Horizon Imaging LLC; American Surgical Centers I, Inc.; and American Surgical Centers II, LLC**

1656.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1362 set forth above as if fully set forth herein.

1657.   Allstate paid monies, including those amounts set out in Exhibits 23 to 31, in response to the claims submitted, or caused to be submitted, by defendants Universal Health Group, Inc. d/b/a Saginaw Spine and Pain, Michigan Spine and Rehab, Associated Medical, Inc., Associated Chiropractic & Medical Center, and Rehab, Inc.; Health Systems, Inc.; United Wellness Centers, Inc.; United Wellness Center of Detroit, PLLC; United Wellness Center of Flint, PLLC; United Wellness Center of Lansing, PLLC; Clear Imaging LLC; Horizon Imaging LLC; American Surgical Centers I, Inc.; and American Surgical Centers II, LLC ("Count XXIV defendants") in reasonable belief that it was legally obligated to make such payments based upon the defendants' fraudulent misrepresentations.

209

1658.   Allstate's payments constitute a benefit which the Count XXIV defendants aggressively sought and voluntarily accepted.

1659.   The Count XXIV defendants wrongfully obtained payments from Allstate through the fraudulent scheme detailed herein.

1660.   The Count XXIV defendants have been unjustly enriched by receipt of these wrongfully obtained payments from Allstate

1661.   The Count XXIV defendants' retention of these payments would violate fundamental principles of justice, equity, and good conscience.

<u>**COUNT XXV**</u>
**DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201**
**Against Universal Health Group, Inc. d/b/a Saginaw Spine and Pain, Michigan Spine and Rehab, Associated Medical, Inc., Associated Chiropractic & Medical Center, and Rehab, Inc.; Health Systems, Inc.; United Wellness Centers, Inc.; United Wellness Center of Detroit, PLLC; United Wellness Center of Flint, PLLC; United Wellness Center of Lansing, PLLC; Clear Imaging LLC; Horizon Imaging LLC; Associated Surgical Center, P.C.; American Surgical Centers I, Inc.; American Surgical Centers II, LLC; Scott P. Zack, D.C.; David M. Katz, D.C.; Mazin K. Yaldo, M.D.; Silvio J. Cozzetto, D.C.; Loren C. Chudler, D.O.; Jeff S. Pierce, D.O.; Chintan Desai, M.D.; and Michael Paley, M.D.**

1662.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1362 set forth above as if fully set forth herein.

1663.   Defendants Universal Health Group, Inc. d/b/a Saginaw Spine and Pain, Michigan Spine and Rehab, Associated Medical, Inc., Associated Chiropractic & Medical Center, and Rehab, Inc.; Health Systems, Inc.; United Wellness Centers, Inc.; United Wellness Center of Detroit, PLLC; United Wellness Center of Flint, PLLC; United Wellness Center of Lansing, PLLC; Clear Imaging LLC; Horizon Imaging LLC; Associated Surgical Center, P.C.; American Surgical Centers I, Inc.; American Surgical Centers II, LLC; Scott P. Zack, D.C.; David M. Katz, D.C.; Mazin K. Yaldo, M.D.; Silvio J. Cozzetto, D.C.; Loren C. Chudler, D.O.; Jeff S. Pierce, D.O.; Chintan Desai, M.D.; and Michael Paley, M.D. ("Count XXV defendants") routinely

210

performed medically unnecessary treatment with respect to those patients at issue in this Complaint.

1664.   The Count XXV defendants also rendered medical treatment pursuant to a fraudulent scheme whereby patients were referred to them for the purpose of generating claims to Allstate, and not for the purpose of providing reasonably necessary medical treatment.

1665.   Horizon Imaging LLC and Clear Imaging LLC submitted and continue to submit unreasonable charges for MRIs to Allstate.

1666.   Pursuant to the Michigan No-Fault Act, Mich. Comp. Law § 500.3101, *et seq.*, an insurer is liable to pay benefits only for reasonable and necessary expenses arising out of a motor vehicle accident.  Mich. Comp. Laws §§ 500.3105 and 500.3107.

1667.   The lack of reasonableness and necessity are defenses to an insurer's obligation to pay No-Fault benefits arising out of a motor vehicle accident.  Mich. Comp. Law § 500.3107.

1668.   Where a claimant and/or assignee is unable to show that an expense has been incurred for a reasonably necessary product or service arising out of a motor vehicle accident, there can be no finding of a breach of the insurer's duty to pay, and thus no finding of liability with regard to that expense.

1669.   Further, providers may only charge a reasonable amount for the products, services, and accommodations rendered.  Mich. Comp. Laws § 500.3157.

1670.   The Count XXV defendants continue to submit claims under the No-Fault Act for unnecessary and/or unlawfully rendered medical services to Allstate, and other claims remain pending with Allstate.

211

1671.   Horizon Imaging LLC and Clear Imaging LLC continue to submit claims under the No-Fault Act containing unreasonable charges, and other claims remain pending with Allstate.

1672.   The Count XXV defendants will continue to bill Allstate for No- Fault benefit payments absent a declaration by this Court that their activities are unlawful and that Allstate has no obligation to pay pending, previously denied, and/or any future No-Fault claims submitted by any of the Count XXV defendants.

1673.   Horizon Imaging LLC and Clear Imaging LLC will continue to bill Allstate unreasonable amounts for MRIs absent a declaration by this Court that their charges are unreasonable and that Allstate has no obligation to pay pending, previously denied, and/or future No-Fault claims submitted by Horizon Imaging LLC and Clear Imaging LLC.

1674.   Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XXV defendants provided medically unnecessary treatment that is not compensable under Michigan's No-Fault Act.

1675.   Allstate also requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XXV defendants were engaged in a fraudulent scheme whereby they provided medically unnecessary treatment and submitted unreasonable charges for the same to Allstate at all relevant times.

1676.   Allstate further requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the charges for MRIs submitted by Horizon Imaging LLC and Clear Imaging LLC are and were unreasonable at all relevant times.

1677.   As such, the Count XXV defendants have no standing to submit, pursue, or receive assigned No-Fault benefits from Allstate.

212

## XIV.   DEMAND FOR RELIEF

WHEREFORE, plaintiffs Allstate Insurance Company, Allstate Indemnity Company, and

Allstate Property and Casualty Company respectfully pray that judgment enter in their favor, as

follows:

### COUNT I
### VIOLATION OF 18 U.S.C. § 1962(c)
### (UHG Enterprise)
**Against Professional Health Systems, LLC; Health Systems, Inc.; United Wellness Centers, Inc.; United Wellness Center of Detroit, PLLC; United Wellness Center of Flint, PLLC; United Wellness Center of Lansing, PLLC; Clear Imaging LLC; Horizon Imaging LLC; Associated Surgical Center, P.C.; American Surgical Centers I, Inc.; American Surgical Centers II, LLC; WCIS Media LLC.; UHG Management LLC; United Wellness Centers Management, LLC; Greater Michigan Professional Services LLC d/b/a MI Pro Consultants; Scott P. Zack, D.C.; David M. Katz, D.C.; Cory J. Mann; Yisroel Sigler; Evan P. Shaw; Ron Waltz; Mazin K. Yaldo, M.D.; Silvio J. Cozzetto, D.C.; Vincent L. Celentano; Joseph F. DeSanto; Loren C. Chudler, D.O.; and Jeff S. Pierce, D.O.**

(a)   AWARD Allstate its actual and consequential damages against the defendants

jointly and severally in an amount to be determined at trial;

(b)   AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with

interest, costs, and attorney's fees;

(c)   GRANT Allstate injunctive relief enjoining the defendants from engaging in the

wrongful conduct alleged in the within Complaint; and

(d)   GRANT all other relief this Court deems just.

## COUNT II
### VIOLATION OF 18 U.S.C. § 1962(d)
### (UHG Enterprise)
**Against Professional Health Systems, LLC; Health Systems, Inc.; United Wellness Centers, Inc.; United Wellness Center of Detroit, PLLC; United Wellness Center of Flint, PLLC; United Wellness Center of Lansing, PLLC; Clear Imaging LLC; Horizon Imaging LLC; Associated Surgical Center, P.C.; American Surgical Centers I, Inc.; American Surgical Centers II, LLC; WCIS Media LLC.; UHG Management LLC; United Wellness Centers Management, LLC; Greater Michigan Professional Services LLC d/b/a MI Pro Consultants; Scott P. Zack, D.C.; David M. Katz, D.C.; Cory J. Mann; Yisroel Sigler; Evan P. Shaw; Ron Waltz; Mazin K. Yaldo, M.D.; Silvio J. Cozzetto, D.C.; Vincent L. Celentano; Joseph F. DeSanto; Nicole F. Martinez; Anthony F. Sereno; Loren C. Chudler, D.O.; Jeff S. Pierce, D.O.; Chintan Desai, M.D.; and Michael Paley, M.D.**

(a)     AWARD Allstate its actual and consequential damages against the defendants jointly and severally in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT III
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Health Systems Enterprise)
**Against Universal Health Group, Inc. d/b/a Saginaw Spine and Pain, Michigan Spine and Rehab, Associated Medical, Inc., Associated Chiropractic & Medical Center, and Rehab, Inc.; Professional Health Systems, LLC; UHG Management LLC; Scott P. Zack, D.C.; David M. Katz, D.C.; Cory J. Mann; Yisroel Sigler; Evan P. Shaw; Ron Waltz; Vincent L. Celentano; and Joseph F. DeSanto**

(a)     AWARD Allstate its actual and consequential damages against the defendants jointly and severally in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

214

(c)      GRANT Allstate injunctive relief enjoining the defendants from engaging in the

wrongful conduct alleged in the within Complaint; and

(d)      GRANT all other relief this Court deems just.

**COUNT IV**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(Health Systems Enterprise)**
**Against Universal Health Group, Inc. d/b/a Saginaw Spine and Pain, Michigan Spine and Rehab, Associated Medical, Inc., Associated Chiropractic & Medical Center, and Rehab, Inc.; Professional Health Systems, LLC; United Wellness Centers, Inc.; United Wellness Center of Detroit, PLLC; United Wellness Center of Flint, PLLC; United Wellness Center of Lansing, PLLC; Clear Imaging LLC; Horizon Imaging LLC; Associated Surgical Center, P.C.; American Surgical Centers I, Inc.; American Surgical Centers II, LLC; WCIS Media LLC.; UHG Management LLC; Greater Michigan Professional Services LLC d/b/a MI Pro Consultants; Scott P. Zack, D.C.; David M. Katz, D.C.; Cory J. Mann; Yisroel Sigler; Evan P. Shaw; Ron Waltz; Mazin K. Yaldo, M.D.; Silvio J. Cozzetto, D.C.; Vincent L. Celentano; Joseph F. DeSanto; Nicole F. Martinez; Anthony F. Sereno; Loren C. Chudler, D.O.; Jeff S. Pierce, D.O.; Chintan Desai, M.D.; and Michael Paley, M.D.**

(a)      AWARD Allstate its actual and consequential damages against the defendants

jointly and severally in an amount to be determined at trial;

(b)      AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with

interest, costs, and attorney's fees;

(c)      GRANT Allstate injunctive relief enjoining the defendants from engaging in the

wrongful conduct alleged in the within Complaint; and

(d)      GRANT all other relief this Court deems just.

## COUNT V
### VIOLATION OF 18 U.S.C. § 1962(c)
### (UWC Enterprise)
### Against Universal Health Group, Inc. d/b/a Saginaw Spine and Pain, Michigan Spine and Rehab, Associated Medical, Inc., Associated Chiropractic & Medical Center, and Rehab, Inc.; Professional Health Systems, LLC; UHG Management LLC; United Wellness Centers Management, LLC; Scott P. Zack, D.C.; David M. Katz, D.C.; Cory J. Mann; Yisroel Sigler; Evan P. Shaw; Ron Waltz; Silvio J. Cozzetto, D.C.; Vincent L. Celentano; and Joseph F. DeSanto

(a)     AWARD Allstate its actual and consequential damages against the defendants jointly and severally in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT VI
### VIOLATION OF 18 U.S.C. § 1962(d)
### (UWC Enterprise)
### Against Universal Health Group, Inc. d/b/a Saginaw Spine and Pain, Michigan Spine and Rehab, Associated Medical, Inc., Associated Chiropractic & Medical Center, and Rehab, Inc.; Professional Health Systems, LLC; Health Systems, Inc.; United Wellness Center of Detroit, PLLC; United Wellness Center of Flint, PLLC; United Wellness Center of Lansing, PLLC; Clear Imaging LLC; Horizon Imaging LLC; Associated Surgical Center, P.C.; American Surgical Centers I, Inc.; American Surgical Centers II, LLC; WCIS Media LLC.; UHG Management LLC; United Wellness Centers Management, LLC; Greater Michigan Professional Services LLC d/b/a MI Pro Consultants; Scott P. Zack, D.C.; David M. Katz, D.C.; Cory J. Mann; Yisroel Sigler; Evan P. Shaw; Ron Waltz; Mazin K. Yaldo, M.D.; Silvio J. Cozzetto, D.C.; Vincent L. Celentano; Joseph F. DeSanto; Nicole F. Martinez; Anthony F. Sereno; Loren C. Chudler, D.O.; Jeff S. Pierce, D.O.; Chintan Desai, M.D.; and Michael Paley, M.D.

(a)     AWARD Allstate its actual and consequential damages against the defendants jointly and severally in an amount to be determined at trial;

(b)      AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with

interest, costs, and attorney's fees;

(c)      GRANT Allstate injunctive relief enjoining the defendants from engaging in the

wrongful conduct alleged in the within Complaint; and

(d)      GRANT all other relief this Court deems just.

<u>**COUNT VII**</u>
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(UWC-Detroit Enterprise)**
**Against Universal Health Group, Inc. d/b/a Saginaw Spine and Pain, Michigan Spine and
Rehab, Associated Medical, Inc., Associated Chiropractic & Medical Center, and Rehab,
Inc.; Professional Health Systems, LLC; UHG Management LLC; United Wellness Centers
Management, LLC; Scott P. Zack, D.C.; David M. Katz, D.C.; Cory J. Mann; Yisroel
Sigler; Evan P. Shaw; Ron Waltz; Silvio J. Cozzetto, D.C.; Vincent L. Celentano; and
Joseph F. DeSanto**

(a)      AWARD Allstate its actual and consequential damages against the defendants

jointly and severally in an amount to be determined at trial;

(b)      AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with

interest, costs, and attorney's fees;

(c)      GRANT Allstate injunctive relief enjoining the defendants from engaging in the

wrongful conduct alleged in the within Complaint; and

(d)      GRANT all other relief this Court deems just.

## COUNT VIII
### VIOLATION OF 18 U.S.C. § 1962(d)
### (UWC-Detroit Enterprise)
**Against Universal Health Group, Inc. d/b/a Saginaw Spine and Pain, Michigan Spine and Rehab, Associated Medical, Inc., Associated Chiropractic & Medical Center, and Rehab, Inc.; Professional Health Systems, LLC; Health Systems, Inc.; United Wellness Centers, Inc.; United Wellness Center of Flint, PLLC; United Wellness Center of Lansing, PLLC; Clear Imaging LLC; Horizon Imaging LLC; Associated Surgical Center, P.C.; American Surgical Centers I, Inc.; American Surgical Centers II, LLC; WCIS Media LLC.; UHG Management LLC; United Wellness Centers Management, LLC; Greater Michigan Professional Services LLC d/b/a MI Pro Consultants; Scott P. Zack, D.C.; David M. Katz, D.C.; Cory J. Mann; Yisroel Sigler; Evan P. Shaw; Ron Waltz; Mazin K. Yaldo, M.D.; Silvio J. Cozzetto, D.C.; Vincent L. Celentano; Joseph F. DeSanto; Nicole F. Martinez; Anthony F. Sereno; Loren C. Chudler, D.O.; Jeff S. Pierce, D.O.; Chintan Desai, M.D.; and Michael Paley, M.D.**

(a)     AWARD Allstate its actual and consequential damages against the defendants jointly and severally in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT IX
### VIOLATION OF 18 U.S.C. § 1962(c)
### (UWC-Flint Enterprise)
**Against Universal Health Group, Inc. d/b/a Saginaw Spine and Pain, Michigan Spine and Rehab, Associated Medical, Inc., Associated Chiropractic & Medical Center, and Rehab, Inc.; Professional Health Systems, LLC; UHG Management LLC; United Wellness Centers Management, LLC; Scott P. Zack, D.C.; David M. Katz, D.C.; Cory J. Mann; Yisroel Sigler; Evan P. Shaw; Ron Waltz; Silvio J. Cozzetto, D.C.; Vincent L. Celentano; and Joseph F. DeSanto**

(a)     AWARD Allstate its actual and consequential damages against the defendants jointly and severally in an amount to be determined at trial;

218

     (b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

     (c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

     (d)     GRANT all other relief this Court deems just.

## COUNT X
### VIOLATION OF 18 U.S.C. § 1962(d)
### (UWC-Flint Enterprise)
**Against Universal Health Group, Inc. d/b/a Saginaw Spine and Pain, Michigan Spine and Rehab, Associated Medical, Inc., Associated Chiropractic & Medical Center, and Rehab, Inc.; Professional Health Systems, LLC; Health Systems, Inc.; United Wellness Centers, Inc.; United Wellness Center of Detroit, PLLC; United Wellness Center of Lansing, PLLC; Clear Imaging LLC; Horizon Imaging LLC; Associated Surgical Center, P.C.; American Surgical Centers I, Inc.; American Surgical Centers II, LLC; WCIS Media LLC.; UHG Management LLC; United Wellness Centers Management, LLC; Greater Michigan Professional Services LLC d/b/a MI Pro Consultants; Scott P. Zack, D.C.; David M. Katz, D.C.; Cory J. Mann; Yisroel Sigler; Evan P. Shaw; Ron Waltz; Mazin K. Yaldo, M.D.; Silvio J. Cozzetto, D.C.; Vincent L. Celentano; Joseph F. DeSanto; Nicole F. Martinez; Anthony F. Sereno; Loren C. Chudler, D.O.; Jeff S. Pierce, D.O.; Chintan Desai, M.D.; and Michael Paley, M.D.**

     (a)     AWARD Allstate its actual and consequential damages against the defendants jointly and severally in an amount to be determined at trial;

     (b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

     (c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

     (d)     GRANT all other relief this Court deems just.

## COUNT XI
## VIOLATION OF 18 U.S.C. § 1962(c)
### (UWC-Lansing Enterprise)
**Against Universal Health Group, Inc. d/b/a Saginaw Spine and Pain, Michigan Spine and Rehab, Associated Medical, Inc., Associated Chiropractic & Medical Center, and Rehab, Inc.; Professional Health Systems, LLC; UHG Management LLC; United Wellness Centers Management, LLC; Scott P. Zack, D.C.; David M. Katz, D.C.; Cory J. Mann; Yisroel Sigler; Evan P. Shaw; Ron Waltz; Silvio J. Cozzetto, D.C.; Vincent L. Celentano; and Joseph F. DeSanto**

(a)     AWARD Allstate its actual and consequential damages against the defendants jointly and severally in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT XII
## VIOLATION OF 18 U.S.C. § 1962(d)
### (UWC-Lansing Enterprise)
**Against Universal Health Group, Inc. d/b/a Saginaw Spine and Pain, Michigan Spine and Rehab, Associated Medical, Inc., Associated Chiropractic & Medical Center, and Rehab, Inc.; Professional Health Systems, LLC; Health Systems, Inc.; United Wellness Centers, Inc.; United Wellness Center of Detroit, PLLC; United Wellness Center of Flint, PLLC; Clear Imaging LLC; Horizon Imaging LLC; Associated Surgical Center, P.C.; American Surgical Centers I, Inc.; American Surgical Centers II, LLC; WCIS Media LLC.; UHG Management LLC; United Wellness Centers Management, LLC; Greater Michigan Professional Services LLC d/b/a MI Pro Consultants; Scott P. Zack, D.C.; David M. Katz, D.C.; Cory J. Mann; Yisroel Sigler; Evan P. Shaw; Ron Waltz; Mazin K. Yaldo, M.D.; Silvio J. Cozzetto, D.C.; Vincent L. Celentano; Joseph F. DeSanto; Nicole F. Martinez; Anthony F. Sereno; Loren C. Chudler, D.O.; Jeff S. Pierce, D.O.; Chintan Desai, M.D.; and Michael Paley, M.D.**

(a)     AWARD Allstate its actual and consequential damages against the defendants jointly and severally in an amount to be determined at trial;

(b)      AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with

interest, costs, and attorney's fees;

(c)      GRANT Allstate injunctive relief enjoining the defendants from engaging in the

wrongful conduct alleged in the within Complaint; and

(d)      GRANT all other relief this Court deems just.

<u>**COUNT XIII**</u>
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Clear Imaging Enterprise)**
**Against Universal Health Group, Inc. d/b/a Saginaw Spine and Pain, Michigan Spine and Rehab, Associated Medical, Inc., Associated Chiropractic & Medical Center, and Rehab, Inc.; Professional Health Systems, LLC; UHG Management LLC; Scott P. Zack, D.C.; David M. Katz, D.C.; Cory J. Mann; Yisroel Sigler; Evan P. Shaw; Ron Waltz; Vincent L. Celentano; Joseph F. DeSanto; Loren C. Chudler, D.O.; and Chintan Desai, M.D.**

(a)      AWARD Allstate its actual and consequential damages against the defendants

jointly and severally in an amount to be determined at trial;

(b)      AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with

interest, costs, and attorney's fees;

(c)      GRANT Allstate injunctive relief enjoining the defendants from engaging in the

wrongful conduct alleged in the within Complaint; and

(d)      GRANT all other relief this Court deems just.

221

## COUNT XIV
### VIOLATION OF 18 U.S.C. § 1962(d)
#### (Clear Imaging Enterprise)

**Against Universal Health Group, Inc. d/b/a Saginaw Spine and Pain, Michigan Spine and Rehab, Associated Medical, Inc., Associated Chiropractic & Medical Center, and Rehab, Inc.; Professional Health Systems, LLC; Health Systems, Inc.; United Wellness Centers, Inc.; United Wellness Center of Detroit, PLLC; United Wellness Center of Flint, PLLC; United Wellness Center of Lansing, PLLC; Horizon Imaging LLC; Associated Surgical Center, P.C.; American Surgical Centers I, Inc.; American Surgical Centers II, LLC; WCIS Media LLC.; UHG Management LLC; United Wellness Centers Management, LLC; Greater Michigan Professional Services LLC d/b/a MI Pro Consultants; Scott P. Zack, D.C.; David M. Katz, D.C.; Cory J. Mann; Yisroel Sigler; Evan P. Shaw; Ron Waltz; Mazin K. Yaldo, M.D.; Silvio J. Cozzetto, D.C.; Vincent L. Celentano; Joseph F. DeSanto; Nicole F. Martinez; Anthony F. Sereno; Loren C. Chudler, D.O.; Jeff S. Pierce, D.O.; Chintan Desai, M.D.; and Michael Paley, M.D.**

(a)     AWARD Allstate its actual and consequential damages against the defendants jointly and severally in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT XV
### VIOLATION OF 18 U.S.C. § 1962(c)
#### (Horizon Imaging Enterprise)

**Against Universal Health Group, Inc. d/b/a Saginaw Spine and Pain, Michigan Spine and Rehab, Associated Medical, Inc., Associated Chiropractic & Medical Center, and Rehab, Inc.; Professional Health Systems, LLC; UHG Management LLC; Scott P. Zack, D.C.; David M. Katz, D.C.; Cory J. Mann; Yisroel Sigler; Evan P. Shaw; Ron Waltz; Vincent L. Celentano; Joseph F. DeSanto; Loren C. Chudler, D.O.; Chintan Desai, M.D.; and Michael Paley, M.D.**

(a)     AWARD Allstate its actual and consequential damages against the defendants jointly and severally in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with

interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the

wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT XVI
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Horizon Imaging Enterprise)
**Against Universal Health Group, Inc. d/b/a Saginaw Spine and Pain, Michigan Spine and Rehab, Associated Medical, Inc., Associated Chiropractic & Medical Center, and Rehab, Inc.; Professional Health Systems, LLC; Health Systems, Inc.; United Wellness Centers, Inc.; United Wellness Center of Detroit, PLLC; United Wellness Center of Flint, PLLC; United Wellness Center of Lansing, PLLC; Clear Imaging LLC; Associated Surgical Center, P.C.; American Surgical Centers I, Inc.; American Surgical Centers II, LLC; WCIS Media LLC.; UHG Management LLC; United Wellness Centers Management, LLC; Greater Michigan Professional Services LLC d/b/a MI Pro Consultants; Scott P. Zack, D.C.; David M. Katz, D.C.; Cory J. Mann; Yisroel Sigler; Evan P. Shaw; Ron Waltz; Mazin K. Yaldo, M.D.; Silvio J. Cozzetto, D.C.; Vincent L. Celentano; Joseph F. DeSanto; Nicole F. Martinez; Anthony F. Sereno; Loren C. Chudler, D.O.; Jeff S. Pierce, D.O.; Chintan Desai, M.D.; and Michael Paley, M.D.**

(a)     AWARD Allstate its actual and consequential damages against the defendants

jointly and severally in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with

interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the

wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT XVII
## VIOLATION OF 18 U.S.C. § 1962(c)
### (Associated Surgical Enterprise)
**Against Universal Health Group, Inc. d/b/a Saginaw Spine and Pain, Michigan Spine and Rehab, Associated Medical, Inc., Associated Chiropractic & Medical Center, and Rehab, Inc.; Professional Health Systems, LLC; UHG Management LLC; Scott P. Zack, D.C.; David M. Katz, D.C.; Cory J. Mann; Yisroel Sigler; Evan P. Shaw; Ron Waltz; Mazin K. Yaldo, M.D.; Vincent L. Celentano; and Joseph F. DeSanto**

(a)     AWARD Allstate its actual and consequential damages against the defendants jointly and severally in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT XVIII
## VIOLATION OF 18 U.S.C. § 1962(d)
### (Associated Surgical Enterprise)
**Against Universal Health Group, Inc. d/b/a Saginaw Spine and Pain, Michigan Spine and Rehab, Associated Medical, Inc., Associated Chiropractic & Medical Center, and Rehab, Inc.; Professional Health Systems, LLC; Health Systems, Inc.; United Wellness Centers, Inc.; United Wellness Center of Detroit, PLLC; United Wellness Center of Flint, PLLC; United Wellness Center of Lansing, PLLC; Clear Imaging LLC; Horizon Imaging LLC; American Surgical Centers I, Inc.; American Surgical Centers II, LLC; WCIS Media LLC.; UHG Management LLC; United Wellness Centers Management, LLC; Greater Michigan Professional Services LLC d/b/a MI Pro Consultants; Scott P. Zack, D.C.; David M. Katz, D.C.; Cory J. Mann; Yisroel Sigler; Evan P. Shaw; Ron Waltz; Mazin K. Yaldo, M.D.; Silvio J. Cozzetto, D.C.; Vincent L. Celentano; Joseph F. DeSanto; Nicole F. Martinez; Anthony F. Sereno; Loren C. Chudler, D.O.; Jeff S. Pierce, D.O.; Chintan Desai, M.D.; and Michael Paley, M.D.**

(a)     AWARD Allstate its actual and consequential damages against the defendants jointly and severally in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

224

(c)      GRANT Allstate injunctive relief enjoining the defendants from engaging in the

wrongful conduct alleged in the within Complaint; and

(d)      GRANT all other relief this Court deems just.

## COUNT XIX
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(American Surgical Enterprise)**
**Against Universal Health Group, Inc. d/b/a Saginaw Spine and Pain, Michigan Spine and
Rehab, Associated Medical, Inc., Associated Chiropractic & Medical Center, and Rehab,
Inc.; Professional Health Systems, LLC; UHG Management LLC; Scott P. Zack, D.C.;
David M. Katz, D.C.; Cory J. Mann; Yisroel Sigler; Evan P. Shaw; Ron Waltz; Vincent L.
Celentano; Joseph F. DeSanto; and Jeff S. Pierce, D.O.**

(a)      AWARD Allstate its actual and consequential damages against the defendants

jointly and severally in an amount to be determined at trial;

(b)      AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with

interest, costs, and attorney's fees;

(c)      GRANT Allstate injunctive relief enjoining the defendants from engaging in the

wrongful conduct alleged in the within Complaint; and

(d)      GRANT all other relief this Court deems just.

## COUNT XX
## VIOLATION OF 18 U.S.C. § 1962(d)
### (American Surgical Enterprise)
**Against Universal Health Group, Inc. d/b/a Saginaw Spine and Pain, Michigan Spine and Rehab, Associated Medical, Inc., Associated Chiropractic & Medical Center, and Rehab, Inc.; Professional Health Systems, LLC; Health Systems, Inc.; United Wellness Centers, Inc.; United Wellness Center of Detroit, PLLC; United Wellness Center of Flint, PLLC; United Wellness Center of Lansing, PLLC; Clear Imaging LLC; Horizon Imaging LLC; Associated Surgical Center, P.C.; WCIS Media LLC.; UHG Management LLC; United Wellness Centers Management, LLC; Greater Michigan Professional Services LLC d/b/a MI Pro Consultants; Scott P. Zack, D.C.; David M. Katz, D.C.; Cory J. Mann; Yisroel Sigler; Evan P. Shaw; Ron Waltz; Mazin K. Yaldo, M.D.; Silvio J. Cozzetto, D.C.; Vincent L. Celentano; Joseph F. DeSanto; Nicole F. Martinez; Anthony F. Sereno; Loren C. Chudler, D.O.; Jeff S. Pierce, D.O.; Chintan Desai, M.D.; and Michael Paley, M.D.**

(a)     AWARD Allstate its actual and consequential damages against the defendants jointly and severally in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT XXI
## COMMON LAW FRAUD
**Against Universal Health Group, Inc. d/b/a Saginaw Spine and Pain, Michigan Spine and Rehab, Associated Medical, Inc., Associated Chiropractic & Medical Center, and Rehab, Inc.; Professional Health Systems, LLC; Health Systems, Inc.; United Wellness Centers, Inc.; United Wellness Center of Detroit, PLLC; United Wellness Center of Flint, PLLC; United Wellness Center of Lansing, PLLC; Clear Imaging LLC; Horizon Imaging LLC; Associated Surgical Center, P.C.; American Surgical Centers I, Inc.; American Surgical Centers II, LLC; UHG Management LLC; United Wellness Centers Management, LLC; Scott P. Zack, D.C.; David M. Katz, D.C.; Cory J. Mann; Yisroel Sigler; Evan P. Shaw; Ron Waltz; Mazin K. Yaldo, M.D.; Silvio J. Cozzetto, D.C.; Vincent L. Celentano; Joseph F. DeSanto; Loren C. Chudler, D.O.; Jeff S. Pierce, D.O.; Chintan Desai, M.D.; and Michael Paley, M.D.**

(a)     AWARD Allstate its actual and consequential damages against the defendants jointly and severally in an amount to be determined at trial;

(b)      AWARD Allstate its costs, including, but not limited to, investigative costs

incurred in the detection of the defendants' illegal conduct; and

(c)      GRANT all other relief this Court deems just.

## COUNT XXII
### CIVIL CONSPIRACY

**Against Universal Health Group, Inc. d/b/a Saginaw Spine and Pain, Michigan Spine and Rehab, Associated Medical, Inc., Associated Chiropractic & Medical Center, and Rehab, Inc.; Professional Health Systems, LLC; Health Systems, Inc.; United Wellness Centers, Inc.; United Wellness Center of Detroit, PLLC; United Wellness Center of Flint, PLLC; United Wellness Center of Lansing, PLLC; Clear Imaging LLC; Horizon Imaging LLC; Associated Surgical Center, P.C.; American Surgical Centers I, Inc.; American Surgical Centers II, LLC; UHG Management LLC; United Wellness Centers Management, LLC; Scott P. Zack, D.C.; David M. Katz, D.C.; Cory J. Mann; Yisroel Sigler; Evan P. Shaw; Ron Waltz; Mazin K. Yaldo, M.D.; Silvio J. Cozzetto, D.C.; Vincent L. Celentano; Joseph F. DeSanto; Loren C. Chudler, D.O.; Jeff S. Pierce, D.O.; Chintan Desai, M.D.; and Michael Paley, M.D.**

(a)      AWARD Allstate its actual and consequential damages against the defendants

jointly and severally in an amount to be determined at trial;

(b)      AWARD Allstate its costs, including, but not limited to, investigative costs

incurred in the detection of the defendants' illegal conduct; and

(c)      GRANT all other relief this Court deems just.

## COUNT XXIII
### PAYMENT UNDER MISTAKE OF FACT

**Against Universal Health Group, Inc. d/b/a Saginaw Spine and Pain, Michigan Spine and Rehab, Associated Medical, Inc., Associated Chiropractic & Medical Center, and Rehab, Inc.; Professional Health Systems, LLC; Health Systems, Inc.; United Wellness Centers, Inc.; United Wellness Center of Detroit, PLLC; United Wellness Center of Flint, PLLC; United Wellness Center of Lansing, PLLC; Clear Imaging LLC; Horizon Imaging LLC; American Surgical Centers I, Inc.; and American Surgical Centers II, LLC**

(a)      AWARD Allstate its actual and consequential damages in an amount to be

determined at trial; and

(b)      GRANT all other relief this Court deems just.

**COUNT XXIV**
**UNJUST ENRICHMENT**
**Against Universal Health Group, Inc. d/b/a Saginaw Spine and Pain, Michigan Spine and Rehab, Associated Medical, Inc., Associated Chiropractic & Medical Center, and Rehab, Inc.; Professional Health Systems, LLC; Health Systems, Inc.; United Wellness Centers, Inc.; United Wellness Center of Detroit, PLLC; United Wellness Center of Flint, PLLC; United Wellness Center of Lansing, PLLC; Clear Imaging LLC; Horizon Imaging LLC; American Surgical Centers I, Inc.; and American Surgical Centers II, LLC**

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at trial; and

(b)    GRANT all other relief this Court deems just.

**COUNT XXV**
**DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201**
**Against Universal Health Group, Inc. d/b/a Saginaw Spine and Pain, Michigan Spine and Rehab, Associated Medical, Inc., Associated Chiropractic & Medical Center, and Rehab, Inc.; Health Systems, Inc.; United Wellness Centers, Inc.; United Wellness Center of Detroit, PLLC; United Wellness Center of Flint, PLLC; United Wellness Center of Lansing, PLLC; Clear Imaging LLC; Horizon Imaging LLC; Associated Surgical Center, P.C.; American Surgical Centers I, Inc.; American Surgical Centers II, LLC; Scott P. Zack, D.C.; David M. Katz, D.C.; Mazin K. Yaldo, M.D.; Silvio J. Cozzetto, D.C.; Loren C. Chudler, D.O.; Jeff S. Pierce, D.O.; Chintan Desai, M.D.; and Michael Paley, M.D.**

(a)    DECLARE that Universal Health Group, Inc. d/b/a Saginaw Spine and Pain, Michigan Spine and Rehab, Associated Medical, Inc., Associated Chiropractic & Medical Center, and Rehab, Inc.; Health Systems, Inc.; United Wellness Centers, Inc.; United Wellness Center of Detroit, PLLC; United Wellness Center of Flint, PLLC; United Wellness Center of Lansing, PLLC; Clear Imaging LLC; Horizon Imaging LLC; Associated Surgical Center, P.C.; American Surgical Centers I, Inc.; American Surgical Centers II, LLC; Scott P. Zack, D.C.; David M. Katz, D.C.; Mazin K. Yaldo, M.D.; Silvio J. Cozzetto, D.C.; Loren C. Chudler, D.O.; Jeff S. Pierce, D.O.; Chintan Desai, M.D.; and Michael Paley, M.D. wrongfully submitted bills for medical treatment that was not reasonably necessary and unlawful and, therefore, not compensable under the Michigan No-Fault Act;

228

(b)     DECLARE that the activities of Universal Health Group, Inc. d/b/a Saginaw Spine and Pain, Michigan Spine and Rehab, Associated Medical, Inc., Associated Chiropractic & Medical Center, and Rehab, Inc.; Health Systems, Inc.; United Wellness Centers, Inc.; United Wellness Center of Detroit, PLLC; United Wellness Center of Flint, PLLC; United Wellness Center of Lansing, PLLC; Clear Imaging LLC; Horizon Imaging LLC; Associated Surgical Center, P.C.; American Surgical Centers I, Inc.; American Surgical Centers II, LLC; Scott P. Zack, D.C.; David M. Katz, D.C.; Mazin K. Yaldo, M.D.; Silvio J. Cozzetto, D.C.; Loren C. Chudler, D.O.; Jeff S. Pierce, D.O.; Chintan Desai, M.D.; and Michael Paley, M.D. were fraudulent and, therefore, not compensable under the Michigan No-Fault Act;

(c)     DECLARE that Allstate has no obligation to pay pending, previously denied, and/or future No-Fault insurance claims submitted by Universal Health Group, Inc. d/b/a Saginaw Spine and Pain, Michigan Spine and Rehab, Associated Medical, Inc., Associated Chiropractic & Medical Center, and Rehab, Inc.; Health Systems, Inc.; United Wellness Centers, Inc.; United Wellness Center of Detroit, PLLC; United Wellness Center of Flint, PLLC; United Wellness Center of Lansing, PLLC; Clear Imaging LLC; Horizon Imaging LLC; Associated Surgical Center, P.C.; American Surgical Centers I, Inc.; American Surgical Centers II, LLC; Scott P. Zack, D.C.; David M. Katz, D.C.; Mazin K. Yaldo, M.D.; Silvio J. Cozzetto, D.C.; Loren C. Chudler, D.O.; Jeff S. Pierce, D.O.; Chintan Desai, M.D.; and Michael Paley, M.D.;

(d)     DECLARE that the charges for MRIs submitted by Horizon Imaging LLC and Clear Imaging LLC are not and were not reasonable and that Allstate has no obligation to pay any claim related to the same; and

(e)     GRANT all other relief this Court deems just and appropriate.

**XV.**    **<u>JURY TRIAL DEMAND</u>**

The plaintiffs hereby demand a trial by jury on all claims.

Respectfully submitted,

SMITH & BRINK, P.C.

*/s/ Richard D. King, Jr.*

_____
Richard D. King, Jr.
rking@smithbrink.com
Nathan A. Tilden (P76969)
ntilden@smithbrink.com
Jacquelyn A. McEttrick
jmcettrick@smithbrink.com
350 Granite St., Suite 2303
Braintree, MA 02184
(617) 770-2214

*Attorneys for Plaintiffs*
*Allstate Insurance Company,*
*Allstate Indemnity Company, and*
*Allstate Property & Casualty*
*Insurance Company*

Dated: December 17, 2013